**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| IN RE KRISPY KREME SECURITIES LITIGATION | No. 3:25-cv-00332-MOC-SCR<br><br><u>CLASS ACTION</u><br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |
|---|---|

# TABLE OF CONTENTS

**Page**


I. PRELIMINARY STATEMENT ..... 2

II. JURISDICTION AND VENUE ..... 8

III. PARTIES ..... 9

A. Lead Plaintiff ..... 9

B. Defendants ..... 9

IV. OVERVIEW OF THE FRAUD ..... 11

A. Prior To The Class Period, Krispy Kreme Shifted Its Business Strategy To A "Delivered Fresh Daily" Model To Address The "Lack of Access" That Prevented The Company's Growth ..... 11

B. The Key To Krispy Kreme's DFD Growth Strategy Was Its McDonald's Partnership, Which Would Enable The Company To Sell Fresh Daily Doughnuts At McDonald's Locations Nationwide ..... 13

C. Throughout The Class Period, Defendants Repeatedly Assured Investors That The Nationwide McDonald's Rollout Was Proceeding According To Plan, And That Krispy Kreme Had The Infrastructure And Logistics Capability To Deliver Fresh Doughnuts Daily At Scale ..... 15

D. Defendants Unequivocally Represented To Investors That The McDonald's Rollout Was A Complete "Success," Even Claiming That Due To The Successful Launch, They Were Accelerating the Pace of Expansion ..... 16

E. In Truth, The McDonald's Expansion Was Immediately Disastrous And Costly ..... 18

1. Desperate To Publicly Announce The "Next Great Venture" That Would Boost Krispy Kreme's Growth, Defendants Failed To Perform Adequate Due Diligence On The Viability Of The McDonald's Deal ..... 19

2. "*Get It Done, Get It Done, Get It Done*": Defendants Deliberately Ignored—And Publicly Concealed—The Massive Cost Increases Needed To Fund The McDonald's Expansion, Which Were Internally Quantified Through A Project Called "*Project Ray*" ..... 21

3. Numerous Former Employees Confirmed That Krispy Kreme's Infrastructure And Facilities Were Woefully Inadequate For The McDonald's Expansion, Which Also Led To Increased Costs ..... 24

4. Contrary To Defendants' Public Claims, The Limited Scope Of The Company's Kentucky Pilot Program Provided No Meaningful Data To Gauge Demand On A Nationwide Level ..... 30

5. Defendants Had Access To Real-Time Data, Which Showed Throughout The Class Period That Sales Figures Did Not Support Defendants' Wholly Positive Statements To Investors ..... 33

6. "*A Complete Sh*t Show*": The McDonald's Rollout Was A Disaster Due To Krispy Kreme's Poor Infrastructure And Logistics, Which Led To Missed Or Incorrect Deliveries And Further Increased Costs ..... 34

7. "*None Of The Doughnuts Were Going Out The Same Day*": Krispy Kreme's Deficient Operations Resulted In Deliveries Of Old And Stale Doughnuts To McDonald's Locations, Undercutting Demand ..... 38

F. The Truth Emerges, But Defendants Continue To Mislead Investors Regarding The True State Of The McDonald's Expansion, Concealing The Full Extent Of Krispy Kreme's Operational Deficiencies And Increased Costs ..... 41

G. The Full Truth Was Revealed Just Months Later: The McDonald's Partnership Was An Abject Failure Precisely Due To The Company's Abysmal Infrastructure Operations And "Unsustainable" Spiraling Costs ..... 43

H. Post Class Period Events Further Confirm the Fraud ..... 46

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..... 48

A. March 2024 Statements ..... 49

B. May 2024 Statements ..... 52

C. August 2024 Statements ..... 56

E. October 2024 Statements ..... 62

F. November 2024 Statements ..... 64

G. February 2025 Statements ..... 72

VI. ADDITIONAL ALLEGATIONS OF SCIENTER ..... 76

VII. LOSS CAUSATION ..... 85

A. February 25, 2025 Disclosure ..... 86

B. May 8, 2025 Disclosure ..... 86

VIII. PRESUMPTION OF RELIANCE ..... 87

IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE ..... 88

X. CLASS ACTION ALLEGATIONS ..... 89

XI. CLAIMS FOR RELIEF ..... 91

XII. PRAYER FOR RELIEF ........ 95
XIII. JURY DEMAND ........ 96

Lead Plaintiff West Palm Beach Police Pension Fund ("WPB Police," "Plaintiff," or "Lead Plaintiff"), by and through the undersigned counsel, brings this securities class action against Krispy Kreme, Inc. ("Krispy Kreme" or the "Company"), Krispy Kreme's Chief Executive Officer ("CEO") Joshua Charlesworth ("Charlesworth") and Krispy Kreme's Chief Financial Officer ("CFO") Jeremiah Ashukian ("Ashukian," and together with Charlesworth, the "Individual Defendants," and collectively with Krispy Kreme, "Defendants"). Lead Plaintiff brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, on behalf of itself and all other persons and entities who purchased or otherwise acquired Krispy Kreme securities between March 26, 2024 and May 7, 2025, inclusive (the "Class Period"), and were damaged thereby (collectively, the "Class").

Lead Plaintiff alleges the following upon personal knowledge as to itself and its acts, and upon information and belief as to all other matters, based upon the ongoing investigation of its counsel. Lead Counsel's investigation included, among other things: (a) interviews with numerous, high-level former employees of Krispy Kreme and McDonald's employees; (b) review and analysis of public filings made by Krispy Kreme with the Securities and Exchange Commission ("SEC"); (c) review and analysis of press releases and other publications disseminated by Defendants and other parties; (d) review of news articles, shareholder communications, conference calls, and postings on Krispy Kreme's website; and (e) review of other publicly available information concerning the Company and the Individual Defendants.

Lead Plaintiff believes that substantial additional evidentiary support for its allegations will be developed after a reasonable opportunity for discovery, as many of the facts are known only by Defendants, or are exclusively within Defendants' custody or control.

## I. PRELIMINARY STATEMENT

1. This is a securities fraud class action in which Defendants repeatedly misrepresented one of the most important transactions in Krispy Kreme's history: a deal to sell doughnuts in thousands of McDonald's locations nationwide. This deal was a game changer for the Company. In the years since Krispy Kreme's 2021 IPO, the Company faced mounting losses and a crippling debt load. To turn its business around, Krispy Kreme shifted its growth strategy away from a traditional dine-in model and adopted a "Delivered Fresh Daily" ("DFD") approach, where it would deliver fresh doughnuts each day to grocery stores, convenience stores and other partner retailers. To that end, the key to turning around the Company and seeing Krispy Kreme's DFD dream come to fruition, was its partnership with fast food giant McDonald's.

2. After announcing a pilot program in 2022 and then an expansion of the partnership in 2024, Krispy Kreme promised investors that the union of the Big Mac with the "Original Glazed Doughnut" would unlock massive growth for the Company by nearly ***tripling*** its domestic points of sale and adding more than ***$400 million*** in annual revenue. Defendants' representations had their intended effect, as the Company's stock price soared by 40%. The stock traded at over $17 per share after the announcement—a price the stock had not reached in years—on unusually high volumes of 43 million shares, vastly higher than the average trading volumes of around 2 million shares daily.

3. Significantly, the success of Krispy Kreme's partnership with McDonald's was entirely dependent on the Company's ability to deliver fresh doughnuts on a daily basis to thousands of McDonald's franchises across the country. Given that doughnuts go stale after a day—and that Krispy Kreme had built its brand on providing "***fresh doughnuts daily***"—it was essential that the Company had the infrastructure and logistics to do exactly this, and to do it profitably. Indeed, the Company's officers stressed this very point in stating that Krispy Kreme's

DFD strategy required the Company to become a "***doughnut logistics company***," and therefore Defendants were intently focused on ensuring that Krispy Kreme's "***doughnuts always arrive at the right time, right quality***."

4. Throughout the Class Period, Defendants repeatedly and emphatically assured investors that Krispy Kreme had the infrastructure and operational capabilities to satisfy the stringent requirements of its agreement with McDonald's. On March 26, 2024—the first day of the Class Period—Defendants boasted that the McDonald's pilot program had demonstrated that "consumer excitement and demand exceeded expectations," and thus Krispy Kreme would commence a nationwide rollout into roughly 12,000 McDonald's locations. Significantly, Defendants made clear to investors that the Company had the infrastructure and capabilities to accomplish this expansion. Defendants stated that Krispy Kreme could purportedly accomplish half of this rollout—the first 6,000 McDonald's locations—using its "***existing capacity***," and that the Company only needed to make modest investments in items like "***trucks and drivers***" because the rollout would "***leverag[e] an underutilized system***." When analysts expressed concern about the potential costs for the expansion, Defendants assured the market that Krispy Kreme was "***not ramping up CapEx over the next couple of years to fund some of the expansion in the U.S***."

5. As the Class Period progressed, Defendants repeatedly maintained to investors that the McDonald's expansion was a success. For example, on November 7, 2024, Defendants touted to the market that the "***successful start to [the] nationwide McDonald's rollout***" was precisely because of Krispy Kreme's "***[s]trong operational execution***." Because of this purportedly tremendous operational success, Defendants claimed that there was a "***really good [consumer] response in line with [the Company's] original assumptions***." Moreover, Defendants repeatedly praised Krispy Kreme for effectively meeting this elevated consumer demand at McDonald's

locations, stating that the Company was "***doing a great job and making sure [the doughnuts] get [there] at the right time, the right quantities***," with doughnuts that were "***well presented and always the freshest and highest quality***." In short, Defendants' Class Period messaging to investors was constant and unequivocal: demand was validated, Krispy Kreme's operations were performing well, costs were under control, and the McDonald's expansion remained "***on track***."

6. Defendants' statements were false. In reality, Krispy Kreme's infrastructure from the inception of the deal was wholly incapable of delivering its products on a daily basis to McDonald's, and the McDonald's partnership was an abject failure as a result. Indeed, as part of Lead Plaintiff's independent investigation, Lead Counsel interviewed numerous former senior Krispy Kreme employees—including high-level members of the Company's team that was specifically tasked with overseeing the McDonald's expansion at locations nationwide. These former employees uniformly corroborated that, contrary to Defendants' repeated representations, the McDonald's partnership was "***a complete sh*t show***," as it was apparent "from the beginning" of the rollout that Krispy Kreme's logistics and operations could not adequately sustain the production volumes needed for the expansion.

7. These former employees recounted that Krispy Kreme's deficient infrastructure led immediately to increased costs to hire additional drivers, purchase additional equipment that was mandated by the McDonald's contract, and remediate outdated baking facilities, which only increased dramatically and exponentially as the rollout continued. These problems were also well known to Defendants, who were directly confronted with rampant execution problems and cost concerns. Indeed, multiple former employees recalled an internal project in the summer of 2023 called "*Project Ray*," which detailed the magnitude of the required investments for the McDonald's expansion, with the executives in charge of the project repeatedly warning Defendants: "***Are you***

***sure you want to do this if it's going to cost this much money up front***?" Moreover, Defendants themselves regularly boasted that they accessed sales and operational data in real time, further underscoring their knowledge of these rampant issues.

8. The fundamental deficiencies in Krispy Kreme's infrastructure were so severe and pervasive that basic safety and quality-control protocols were lacking; deliveries were routinely late or missed, as "***[n]one of the doughnuts were going out the same day***"; and when deliveries were made, the Company's "***quality was just so inconsistent***," with numerous McDonald's locations regularly receiving stale doughnuts that were "***24 to 36 hours old***" and that "***looked like garbage***." Krispy Kreme's sub-standard quality and service only undercut consumer demand, which led numerous McDonald's locations to drastically reduce orders just weeks after the rollout started. As one former employee stated, sales at numerous McDonald's locations went "***down to two or three dozen per store***," which did not even cover the driver's hourly rate to deliver that small quantity of doughnuts: "***[Y]ou figure out pretty quickly that it's not sustainable***."

9. Just three months after Defendants had boasted about the supposedly "successful start to [the] nationwide McDonald's rollout," the truth began to emerge on February 25, 2025, when Krispy Kreme reported that the Company had "seen consumer softness" specifically in its McDonald's expansion, and that "demand has dipped actually a little lower than we expected." Defendants also revealed that the Company was experiencing difficulties in delivering its products as needed under the McDonald's partnership, and as a result, it would have to use a third-party delivery company for "more than half" of the Company's deliveries.

10. On this news, Krispy Kreme's stock price declined by 35% over two days, closing at just $5.97 per share on February 26, 2025. Analysts immediately pointed to McDonald's as the

problem, with Evercore blaming the Company's results on the "McDonald's start-up costs," and Morgan Stanley opining that operating expenses "drove most of the unfavorability."

11. Nevertheless, Defendants prevented an even greater decline in Krispy Kreme's stock price by representing to investors that these issues were only temporary and had no impact on the Company's ability to perform under the McDonald's deal. Indeed, Defendants misleadingly maintained that the poor McDonald's demand was simply due to a lack of marketing and consumer "awareness" that the Company's doughnuts were available in McDonald's stores. Furthermore, Defendants insisted that the McDonald's rollout "***remain[ed] on track to reach about 6,000 restaurants by year-end***," with Krispy Kreme expanding in New York locations that very morning after receiving "very positive" feedback from McDonald's. Defendants also reassured investors that costs for the rollout would be reined in over the rest of the expansion as the Company had found "***more and more ways to leverage our existing capacity***" and had "***increased productivity at our existing hubs***" to "***get doughnuts out to points of access better and better***."

12. The full truth emerged just two months later. On May 8, 2025, Defendants stunned investors by disclosing that the Company's McDonald's partnership—the key to Krispy Kreme's growth strategy—was a complete failure, and as a result, the Company had effectively abandoned the rollout. Specifically, while Defendants had claimed on February 25, 2025 that the Company's McDonald's expansion "remain[ed] on track" and was proceeding according to plan, Defendants now revealed that it had actually *stopped* the McDonald's expansion at the exact same time that they had made those prior claims. Indeed, Defendants disclosed that Krispy Kreme had not opened a single McDonald's location since February 25, 2025, and that the Company "***[did] not expect to launch in any additional restaurants in [the second quarter of 2025]***."

13. Moreover, Defendants revealed that their prior assurances that Krispy Kreme's infrastructure and operations were fully capable of adequately supporting the McDonald's expansion, and that the Company would not incur significant additional capital expenditures, were false. In reality, Krispy Kreme's operations were materially impacted by increased "***costs associated with our U.S. nationwide expansion***," and the Company's operations were so deficient that it would no longer even attempt to distribute its doughnuts to its retail partners and would instead "***fully outsource U.S. logistics***" to reduce costs and "***simplify [] operations***." As a result, Krispy Kreme reported disastrous financial results, including just $15.9 million in adjusted EBITDA for its U.S. segment—***a stunning 62% decline*** compared to the prior year quarter. The Company also withdrew its 2025 outlook entirely without providing replacement guidance, and eliminated its quarterly dividend to conserve cash.

14. In response to this news, Krispy Kreme's stock was decimated, falling by 37% over the following two days from $4.33 to just $2.73—more than 84% lower than the Class Period high of $17.35 after the McDonald's partnership was announced.

15. Analysts excoriated management and explicitly questioned Defendants' credibility given that the Company's disclosures directly contradicted Defendants' prior assurances to investors. For example, on May 8, 2025, Truist highlighted that Defendants had only recently stated that the rollout was going as "expected," and they were therefore "***shocked***" by the announcement given that "***[m]anagement provided a 'everything going as planned message' on the 4Q earnings call in early February and at several conferences YTD***." Morgan Stanley similarly emphasized that the halted rollout was "***surprising***" given Defendants' prior statements, as Defendants had touted "plans as recent[ly] as February [] to be in 6,000 locations by year end." J.P. Morgan also highlighted that the "***McDonald's decision comes as [a] surprise***," underscoring

that the Company's sudden stoppage of the expansion after only launching 20% of the expected locations "***speaks volumes***" as to just how bad things were going.

16. The fallout from Defendants' fraud continued after the end of the Class Period. On June 24, 2025, Krispy Kreme announced that the McDonald's partnership had been entirely terminated specifically because of the deal's "unsustainable" costs. Moreover, contrary to Defendants' prior claims that the major investments the Company incurred during the Class Period were not McDonald's-specific and were adopted for the benefit of the Company's entire DFD operations, Defendants now admitted the opposite. Krispy Kreme reported that the McDonald's partnership contributed to at least ***$51 million*** in asset impairments and termination costs, as well as a massive ***$356 million*** goodwill impairment, which the Company likewise blamed in part on the McDonald's disaster. Tellingly, Defendants' fraud led to a complete overhaul of Krispy Kreme's leadership, as the Company replaced its CFO, removed its Director of Field Operations, installed two different Chief Growth Officers in rapid succession, and ultimately replaced six of its eleven Board members.

17. In total, Defendants' fraud wiped out well over $500 million of market capitalization. This action seeks redress for investors' losses.

## II. JURISDICTION AND VENUE

18. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

19. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

20. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(a)). Substantial acts in furtherance of the alleged fraud

or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

21. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

## III. PARTIES

### A. Lead Plaintiff

22. Lead Plaintiff WPB Police is a defined benefit public pension fund that provides pension, death, and disability benefits to police officers in the City of West Palm Beach, Florida. WPB Police manages up to approximately $500 million in assets for the benefit of approximately 570 active and retired participants and their beneficiaries. As reflected in its PSLRA certification, WPB Police purchased Krispy Kreme securities during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

### B. Defendants

23. Defendant Krispy Kreme is incorporated under the laws of Delaware with its principal executive offices located in Charlotte, North Carolina. Krispy Kreme's securities trade on the NASDAQ exchange under the symbol "DNUT."

24. Defendant Charlesworth has served as President, CEO, and a member of the Company's Board since January 2024. Defendant Charlesworth was Krispy Kreme's Global President from June 2022 to December 2023 and the Company's Chief Operating Officer from

May 2019 to December 2023. Charlesworth served as the Company's CFO from April 2017 to January 2023 and as Krispy Kreme's Corporate Secretary from July 2018 to August 2020. Prior to joining Krispy Kreme, Charlesworth worked in various positions at Mars, Inc. for over 14 years.

25. Defendant Ashukian served as Krispy Kreme's Executive Vice President and CFO from January 2023 until July 11, 2025. Prior to joining Krispy Kreme, he held various CFO roles across North America and Latin America at Mars.

26. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Krispy Kreme, were privy to confidential, proprietary and material adverse non-public information concerning Krispy Kreme, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being actively concealed from, the investing public.

27. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Krispy Kreme's business.

28. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts, and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

29. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Krispy Kreme's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of the Company's securities would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## IV. OVERVIEW OF THE FRAUD

### A. Prior To The Class Period, Krispy Kreme Shifted Its Business Strategy To A "Delivered Fresh Daily" Model To Address The "Lack of Access" That Prevented The Company's Growth

30. Krispy Kreme is a well-known doughnut brand that originally became a public company in 2000, but was taken private by JAB Holdings in 2016. JAB Holdings re-listed Krispy Kreme on public markets again in 2021.

31. Krispy Kreme focuses its operations on the delivery of fresh daily premium quality doughnuts through various channels. Krispy Kreme offers doughnuts to its customers through Company-owned and franchised shops, as well as partnerships with grocery stores, convenience stores, quick-service restaurants, and others. Krispy Kreme's omni-channel strategy is a core component of its business model, designed to meet customers where they are and increase accessibility to fresh doughnuts.

32. The Company has three reported segments: U.S., International, and Market Development. Krispy Kreme's U.S. segment is by far the most important to the Company's business, representing 65% of the Company's total fiscal 2023 revenue and 64% of Krispy Kreme's total fiscal 2024 revenue.

33. Historically, Krispy Kreme operated a business model that employed Hot Light Theater Shops,[1] where the Company both baked and sold their doughnuts. However, building the shops required capital-heavy investments. In 2016, Krispy Kreme changed its business strategy from its older retail model to a "hub and spoke" distribution model to expand its reach. Production "hubs"—which included Krispy Kreme's Hot Light Theater Shops and its non-consumer facing Doughnut Factories[2]—serve as centralized production facilities. Doughnuts were then distributed fresh daily from these hubs to dozens of "spokes," including the Company's own Fresh Shops[3] and Delivered Fresh Daily locations (called "DFD Doors"), which were Krispy Kreme-branded

---

[1] "Hot Light Theater Shops" are the Company's interactive shops featuring an on-site doughnut production line visible to customers, a large "Hot Now" light and digital displays, creating a "theater" where people watch fresh doughnuts get made, glazed, and boxed while serving as local production facilities for Krispy Kreme's network.

[2] "Doughnut Factories" are non-consumer facing production hubs, which provide doughnuts to the Company's spoke locations in certain countries or regions.

[3] "Fresh Shops" are smaller doughnut shops and kiosks, without manufacturing capabilities, selling doughnuts from hub locations.

cabinets and merchandising units inside of partner retailers such as grocery stores, convenience stores, club memberships, drug stores, and quick service or fast casual restaurants ("QSR").

34. After going public for the second time in 2021, Krispy Kreme stated that "by far and away the #1 reason customers [did] not purchase" the Company's doughnuts was "lack of access." As a result, Krispy Kreme's DFD business gained significant momentum as a core part of the Company's omnichannel strategy to grow access points[4] at which customers could buy doughnuts. By 2023, the Company had approximately 6,000 DFD access points in the U.S. and approximately 12,000 access points across the globe. Krispy Kreme's long-term plan was "to increase access to fresh doughnuts through [the Company's] DFD network – a key element of [Krispy Kreme's] omni-channel strategy to attain more than 75,000 Global Points of Access."

### B. The Key To Krispy Kreme's DFD Growth Strategy Was Its McDonald's Partnership, Which Would Enable The Company To Sell Fresh Daily Doughnuts At McDonald's Locations Nationwide

35. On October 18, 2022, McDonald's and Krispy Kreme announced a "small operations test" in which Krispy Kreme doughnuts would be "delivered fresh daily" to nine McDonald's locations in the Louisville, Kentucky area. The small test was quickly expanded.

36. Less than five months later, on February 27, 2023, the companies announced that the test program would grow to 160 McDonald's locations around the Louisville-Lexington, Kentucky area. According to the press release announcing the expansion, the "expanded test" aimed to evaluate the "operational impact" of delivering fresh doughnuts on "a larger scale" and to "explore customer demand" for Krispy Kreme doughnuts at McDonald's locations.

[4] "Access points" or "Global Points of Access" are a "key performance indicator" for the Company and reflect all locations at which the Company's doughnuts can be purchased. Global Points of Access includes all Hot Light Theater Shops, Fresh Shops, Carts and Food Trucks, DFD Doors, and other points at which doughnuts can be purchased, at both Company-owned and franchise locations.

37. The prospect of a large-scale partnership with McDonald's was central to Krispy Kreme's broader strategy of becoming a self-proclaimed "doughnuts logistics company." According to former Krispy Kreme CEO Michael J. Tattersfield, Krispy Kreme "created…this deliver fresh daily logistics model" to get "doughnuts to where customers are." Under this model, the route efficiency—the ability to include numerous drop off locations in any given area—was critically important: it enabled Krispy Kreme to reach additional and further locations it "wouldn't have been able to do on [its] own" because they were "too far and not profitable."

38. As the Company made clear in investor presentations, the ability to have "More Points of Access," which was exactly what McDonald's provided, would lead to "Higher Sales per Hub," which, in turn, meant "Higher EBITDA Margin." Thus, the "unique unlock" of the expanded test was ensuring that the DFD system worked seamlessly to bring fresh doughnuts across all customers on the route—including McDonald's—which the Company assured "it does."

39. Given the importance of a potential nationwide deal with McDonald's, Defendants repeatedly assured investors that they were closely monitoring the expanded McDonald's test for both operational performance and customer demand. Relatedly, Defendants represented that the McDonald's rollout would only proceed if the Company was able to handle the logistics profitably, and that they had carefully analyzed the costs and logistics necessitated by such a major deal. For example, during a Morgan Stanley Global Consumer & Retail Conference held on December 5, 2023, Defendant Charlesworth emphasized that Krispy Kreme had conducted "a lot of detailed work" on the potential McDonald's expansion and concluded that the associated expenses would remain modest. In fact, Charlesworth stated that the Company could service "just under half" of McDonald's locations—approximately 6,000 new doors—using its "***existing capacity***" and requiring little more than "***just [] trucks and drivers***."

### C. Throughout The Class Period, Defendants Repeatedly Assured Investors That The Nationwide McDonald's Rollout Was Proceeding According To Plan, And That Krispy Kreme Had The Infrastructure And Logistics Capability To Deliver Fresh Doughnuts Daily At Scale

40. After promising that Krispy Kreme would only expand its pilot program beyond the initial Kentucky region if the opportunity represented sustainable growth, on March 26, 2024—the first day of the Class Period—the Company announced a nationwide expansion of its McDonald's partnership that was expected to "more than double" DFD access points in the U.S. This expansion followed the "successful test at 160 McDonald's restaurants" in Kentucky "***where consumer excitement and demand exceeded expectations***." Significantly, Krispy Kreme also confirmed to investors that it was ready to begin the nationwide McDonald's expansion precisely because the Company had the infrastructure and logistics capabilities necessary for the rollout to succeed. Indeed, Defendants expressly stated that in furtherance of the expansion, the Company had been busy "scaling its supply chain, building a support team, adding technology and new equipment, and enhancing field training to support its Delivered Fresh Daily expansion."

41. As the Class Period progressed, Defendants continued to represent that the McDonald's deal was proceeding successfully, and that costs attributable to the rollout were supportive of the Company's overall growth expansion and not unique to the McDonald's agreement. For example, on May 9, 2024, Defendants stressed that the rollout would be highly cost-efficient because "[m]uch of the national rollout can happen using ***existing capacity***." Defendants regularly repeated this same narrative—that minimal investment was required because of an underutilized infrastructure. Indeed, Defendants emphasized "***the overall message is that the expansion of delivered fresh daily in the U.S. is leveraging an underutilized system***," and as a result, Krispy Kreme was "***not ramping up CapEx***" to fund the McDonald's expansion. In fact, Defendants represented that half of the expansion—or the first 6,000 McDonald's locations—

could be serviced using "***just our existing production facilities***." Moreover, Defendants repeatedly made clear that whatever capital expenditures the Company *was* making were not "***obligations specific to the relationship with McDonald's***." To the contrary, those "capital expenditures" would "***support the overall DFD and retail channels and are not directly attributable to, or required by***," the McDonald's deal.

### D. Defendants Unequivocally Represented To Investors That The McDonald's Rollout Was A Complete "Success," Even Claiming That Due To The Successful Launch, They Were Accelerating the Pace of Expansion

42. After the expansion ramped up in early October, Defendants boasted to investors that the rollout was a resounding "success." Specifically, in a November 7, 2024 investor presentation, Defendants praised the "***successful start to [the] nationwide McDonald's rollout***," and Defendants specifically credited Krispy Kreme's purportedly "***strong operational execution***" and "***[p]ositive consumer response***" for the expansion's success.

43. On the Company's Q3 2024 earnings call, Defendant Charlesworth went further, announcing that the "***successful start of [the] nationwide rollout of McDonald's***" prompted Krispy Kreme to ***accelerate*** its expansion plans. Whereas the Company previously planned on serving 1,000 McDonald's locations by year-end, the resounding start led Krispy Kreme to ***double*** that target, with the Company now expecting to deliver "melt-in-your-mouth doughnuts, fresh daily in nearly 2,000 McDonald's restaurants by the end of 2024." In Charlesworth's words: "***the success is having us sort of accelerate to service more restaurants as fast as we can***."

44. Analysts were laser-focused on the McDonald's news. In response to an analyst's question about the "early learnings from the McDonald's rollout," Charlesworth emphasized that the strong results were driven by Krispy Kreme's operational and logistics prowess, as the Company was supposedly "***doing a great job***" ensuring that doughnuts arrived at "***the right time [and] the right quantities***" at McDonald's stores. And in response to a follow up question about

the McDonald's rollout, Charlesworth touted that the Company had effectively ramped up production while maintaining the "highest quality" of its products, stating that the doughnuts being delivered were "***well presented and always the freshest and highest quality***." The operations were so flawless that, according to Defendants, the "McDonald's team" was delighted by "***our service and quality doughnuts***."

45. Aside from the operations, Defendants assured the market that "***consumer response has been positive***" as well. Indeed, in response to analysts' questions about McDonald's demand, Defendants stated that McDonald's customers were "***clearly excited to see our fresh doughnuts on the menu***," and that demand was completely "***in line with our original assumptions***." This was not guesswork. Defendants explained that they were closely monitoring how the doughnut sales were performing, explaining to investors that at McDonald's "***we can track the deliveries. We can track any that are unsold. And, indeed, we can see that they clearly sold throughout the day***." Moreover, Defendants represented that McDonald's was also happy with the performance because "everything we see" gave Krispy Kreme "confidence that this [strategy] resonates with the consumer and ***the feedback from McDonald's definitely shows that***."

46. During the earnings call, Defendants acknowledged that Krispy Kreme was lowering its adjusted EBITDA guidance for the remainder of the year by about 5%. In response to a pointed analyst question about whether this change was because the Company was experiencing costs associated with McDonald's that were "greater than even you had thought," Defendants flatly denied that was the case. Instead, they claimed that the costs were merely reflective of the "***intentional decision to accelerate***" the rollout and therefore any increased costs were simply a "***pull forward versus anything unexpected***." Accordingly, Defendants assured

investors in no uncertain terms that "***yes, we're on track***" with the McDonald's rollout, and that Defendants were "confident around our ability to meet the obviously accelerated expansion."

47. Notably, Defendants continued to promote the progress of the rollout up until the very end of the Class Period. Indeed, even as late as February 25, 2025—just two months before the full truth would be revealed—Defendants still represented to the market all was well with the McDonald's expansion, stating that the rollout "***remain[ed] on track***," that Krispy Kreme was then-operating in 2,500 McDonald's locations nationwide, and that the Company would "reach about 6,000 [McDonald's] restaurants by year-end."

### E. In Truth, The McDonald's Expansion Was Immediately Disastrous And Costly

48. Defendants' statements throughout the Class Period detailed herein that demand at McDonald's "exceeded expectations," that the Company had a "successful start of the nationwide rollout," and that the early rollout did not require a significant "increase in capital expenditure," were false when made. In truth, Defendants knew even before the rollout began that Krispy Kreme lacked the infrastructure necessary to execute daily fresh deliveries to thousands of McDonald's locations and that the expansion would require massive upfront investments, with costs set to escalate exponentially.

49. Defendants further understood that demand within McDonald's had never been accurately tested, providing no reasonable basis to believe that these substantial investments and increased operating costs would ever yield profitable growth. Once the rollout commenced, Defendants immediately recognized that Krispy Kreme's deficient infrastructure prevented the Company from delivering fresh doughnuts to McDonald's and that operational breakdowns caused costs to spiral out of control. Furthermore, delivering stale, aged doughnuts made any meaningful demand unsustainable, as McDonald's began drastically reducing its orders almost immediately.

50. The underlying truth of what was happening before and during the rollout is confirmed in the cross-corroborating and detailed accounts of over 11 former Krispy Kreme and McDonald's employees—many of whom were directly responsible for the McDonald's expansion, and each of whom have direct knowledge of the facts from observations made in the ordinary course and scope of their employment.[5]

**1. Desperate To Publicly Announce The "Next Great Venture" That Would Boost Krispy Kreme's Growth, Defendants Failed To Perform Adequate Due Diligence On The Viability Of The McDonald's Deal**

51. Leading up to the Class Period, Krispy Kreme reported quarter after quarter of disappointing financial results and issued weak guidance for 2024. Desperate to stem this tide, numerous former employees of the Company confirmed that Defendants—without any reasonable basis and with inadequate due diligence—placed all of their chips on the Company's McDonald's partnership bet in order to quell market fears that Krispy Kreme was losing ground.

52. A former Senior Director of Outsourcing for International Business who was employed at Krispy Kreme between March 2022 and January 2025, CW 1,[6] explained that "the financial reporting was coming out and they needed something, and that was to show that McDonald's was going to be a great next venture for KK." Similarly, CW 2,[7] the Company's former Vice President of Investor Relations who worked on the March 26, 2024 press release announcing the McDonald's expansion, confirmed that the rollout was initiated because Krispy

---

[5] Former Krispy Kreme employees are referred to herein as "CW#" and are all referenced using feminine pronouns to maintain their confidentiality.

[6] CW 1 was with Krispy Kreme from March 2022 until January 2025 and was the Senior Director of Sourcing for International Business. CW 1 was laid off in January 2025 which she indicated was, part of "massive layoffs after the McDonald's deal fell through."

[7] CW 2 was a VP of Investor Relations from August 2023 through March 2024. She reported to Defendant Ashukian.

Kreme's business had been contracting, and Defendants were scrambling for a way to show that they could somehow reverse the negative trajectory. CW 3,[8] a former Senior Field Training Manager who worked at the Company from February 2023 to March 2025, and who was a part of the McDonald's rollout team, noted that Krispy Kreme needed to show growth because in 2024, "people weren't spending and our in-store sales were not the best."

53. Due to Defendants' need to quickly and dramatically boost sales and access points for doughnuts, they ignored numerous red flags regarding the exorbitant costs of the McDonald's project and the lack of a path to profitability—even when directly confronted with this information by high level management. For example, according to CW 1, there was a tremendous push to finalize the McDonald's agreement even though the Company failed to perform adequate due diligence on the viability of the deal and the associated costs—to the point that internally it was widely known that the "deal would not last because the due diligence was not properly done."

54. Similarly, CW 4—a former Krispy Kreme Senior Director, McDonald's Business Unit,[9] who was brought on board in November 2024 to help rectify the flailing situation because she had a long history of working with McDonald's suppliers—explained that upon her arrival, it was clear that she was "brought into the game in the eighth inning." She explained that the Company's rush to the contract led to fatal flaws because they had no one advising about what a McDonald's buildout actually entailed, what McDonald's expected from its suppliers, how

[8] CW 3 was a Senior Manager Field Training in the U.S. and worked at Krispy Kreme from February 2021 through March 2025. She was added to the McDonald's rollout team in the summer of 2023, even before the expansion was finalized. She reported to the Vice President of Human Resources, James Dunworth, and sat in on many meetings with Amy Hine, the Director of Field Operations.

[9] CW 4 was with Krispy Kreme from November 2024 until she quit in June 2025. She was based in Chicago and was Krispy Kreme's Senior Director, McDonald's Business Unit. CW 4 advised that she was hired to manage the McDonald's partnership.

McDonald's franchisees ordered and managed their inventory, or how McDonald's would assist—or, more importantly, not assist—in advertising supplier's products.

55. Contrary to Defendants' repeated claims that the expansion could be accomplished with the Company's already-existing "excess capacity" and that the rollout was "on track," Krispy Kreme's operations were incapable of scaling to service hundreds, let alone thousands, of new DFD doors. It was apparent to everyone within the Company—and Defendants—that the rollout would be far more expensive than publicly represented, and that the ramp-up investments necessitated by the deal were untenable. Indeed, a former Implementation Consultant hired specifically to work on the rollout, CW 5,[10] explained that the McDonald's deal was supposed to save the Company, "***but Krispy Kreme just wasn't ready***," forcing the Company to "sign[] up for something that was unrealistic."

### 2. "*Get It Done, Get It Done, Get It Done*": Defendants Deliberately Ignored—And Publicly Concealed—The Massive Cost Increases Needed To Fund The McDonald's Expansion, Which Were Internally Quantified Through A Project Called "*Project Ray*"

56. According to multiple former employees, including CW 3 and CW 6,[11] Defendants were well aware of these exorbitant costs because they were quantified and presented to them by the Director of Field Operations, Amy Hine, during the summer of 2023 through a project referred to internally as "***Project Ray***."

---

[10] CW 5 was a Krispy Kreme DFD Implementation Consultant from June 2024 to May 2025. She met regularly with Amy Hine, the Director of Field Operations, and reported to Keith Katz, Senior Manager of Operations Market Implementation, both of whom oversaw the McDonald's rollout.

[11] CW 6 was a Data Analyst from January 2024 to July 2025 who worked out of Krispy Kreme's Winston-Salem office and reported to Amy Hine. CW 6's job included loss prevention, and therefore she monitored employees through cameras placed inside the shops. This access gave CW 6 firsthand knowledge into what was happening in the production facilities.

57. For example, CW 3 described how Amy Hine's comprehensive analysis of what the McDonald's launches would cost was presented to the Company's Board of Directors (which includes Defendant Charlesworth) prior to the March 2024 announcement. Hine detailed the magnitude of the required investments, including the specific rationale underlying each component, and provided an analysis across all relevant cost categories, expressing concern about the cost parameters associated with the project. CW 3 recalled that "Amy asked the question many, many times: ***are you sure you want to proceed if it's going to cost this much money up front***?" CW 3 further explained that, given the scale of the required investment, "there was no way that they were going to get that [money] back anytime soon."

58. According to CW 6, these cost estimates were regularly conveyed to the Company's senior officers, including the Vice President of Operations, the COO, and the CEO, as all such expenditures required executive-level approval. CW 6 explained that, because Krispy Kreme was cash poor, all rollout expenses needed to be run through Amy Hine, who would then get approval from the VP of Operations or CEO Charlesworth, as "Hine had meetings with both of them."

59. Despite being warned of the prohibitive upfront costs directly, Defendants pushed to get the deal consummated and the mantra within the Company, as CW 1 relayed, was "***get it done, get it done, get it done***." This was confirmed by the former Senior Director who was brought in specifically to oversee the McDonald's rollout, who acknowledged that the terms of the McDonald's deal were not favorable to Krispy Kreme. CW 4 explained that after her November 2024 arrival, she "realized that everything was already signed" and the contractual terms were "problematic" and highly unfavorable for the Company. Those "problematic" terms included the fact that McDonald's did not have minimum order requirements under the contract, and allowed McDonald's franchisees to order any quantity of doughnuts they wanted. In addition, while the

agreement called for a "marketing playbook," there was no guarantee from McDonald's that it would actually include Krispy Kreme in advertisements.

60. Moreover, the contractual arrangement specifying which party would pay for unsold doughnuts was ambiguous, causing McDonald's franchisees to limit their orders. The contract called for a complex formula where Krispy Kreme covered some "waste," but as sales fell, McDonald's would be on the hook for more of the waste as well. This was fundamentally different than anything else McDonald's ordered, and caused McDonald's franchisees to be highly concerned about being stuck with the bill for leftovers—making it easier to just minimize orders to avoid the issue entirely. CW 4 felt that having anyone on the staff with McDonald's experience would have easily avoided these contractual problems.

61. CW 3 similarly explained that, unlike other Krispy Kreme customers like Speedway and Walmart, McDonald's had no minimum ordering requirements as "they could order whatever they wanted," but Krispy Kreme still had to deliver even if the orders were miniscule. This upset CW 3 because "with the way that McDonald's could tweak their orders, we would have never made money, ever," yet "somehow in the contract with McDonald's, we allowed that to happen and that's where we got screwed."

62. Other former employees corroborated these accounts. For example, CW 7,[12] a former Krispy Kreme General Manager who worked at the Company for over seven years and was directly involved in McDonald's rollouts at several locations, stated: "When we allowed McDonald's to control their ordering after the initial rollout, ***the sales went right into the toilet***,"

[12] CW 7 was a former Krispy Kreme General Manager in the Grand Rapids, Michigan area from June 2018 through August 2025. CW 7 was directly responsible for store openings, DFD rollouts and McDonald's rollouts at numerous Company locations. CW 7 reported to Brendan Wolmak and worked personally with Director of Field Operations, Amy Hine, on a number of occasions, including with regard to store rollouts.

which "***ruined the program***." CW 7 recalled that, "within the first three weeks," sales went "down to two or three dozen per store," with some McDonald's locations producing only $15 to $25 per day, ***which did not even cover the driver's hourly rate***. "***You figure out pretty quickly that it's not sustainable***."

63. CW 4 stated that numerous underlying assumptions behind the deal were flawed, such as the initial cost estimate of $15 to deliver doughnuts, which was quickly revised to $30. That was also dependent upon reaching a certain amount of sales numbers, which Krispy Kreme consistently failed to meet.

64. Furthermore, the upfront costs involved in preparing for and conducting the launch were "dramatic and drastic," according to CW 1. This was confirmed by CW 5 and CW 11[13] who were two of the eleven consultants tasked with implementing the McDonald's rollout. CW 5 said from the inception of the deal, the team knew that Krispy Kreme "***had bitten off more than they could ever chew***" with McDonald's. CW 7, a former General Manager for Krispy Kreme, likewise stated that she knew "***from the beginning***" that the McDonald's partnership was not going to work for the Company because of the costs involved, as "***[w]hat they were asking of the stores was pretty astronomical***." CW 7 further stated that the Company was "***spending money left and right, doing whatever needed to be done*** . . . ***we were over-staffing locations and spending money like crazy on labor***."

### 3. Numerous Former Employees Confirmed That Krispy Kreme's Infrastructure And Facilities Were Woefully Inadequate For The McDonald's Expansion, Which Also Led To Increased Costs

65. CW 5 labeled Krispy Kreme's factory conditions "disgusting": shops needed complete and expensive overhauls, with "rodents, rats, mice, roaches, and no standards of

[13] CW 11 was an Implementation Consultant who worked on the McDonald's expansion. She worked at the Company from June 2024 through June 2025 and reported to Keith Katz.

cleanliness," and production lines often full of mold. All eleven of the expansion consultants were in "complete shock," and flagged these issues to Amy Hine—who reported directly to Charlesworth—and Keith Katz, the Senior Manager, Operations Market Implementation. CW 5, who prepared at least 40 Krispy Kreme shops for McDonald's launches in Illinois, Ohio, New York, Indiana, Kentucky, and West Virginia, reported that these problems were pervasive in each one she assisted. According to CW 5, she told Senior Operations Manager Katz, "Keith send me to a shop that [actually] looks the way it is supposed to look so that I have something to compare these bad ones to." CW 5 never had the opportunity to see a competent Krispy Kreme facility, and only saw shops that were "disgusting" and required expensive remediation before the McDonald's contract was canceled. She advised that she no longer allows her kids to eat Krispy Kreme doughnuts. CW 11, another implementation consultant, confirmed that many of the shops were older and had structural gaps, allowing rodents to enter. She recounted one of the shops that was being tested as a McDonald's facility had a full infestation and had to be shut down for several days for remediation.

66. CW 3, a Senior Manager, Field Training, who was responsible for implementing trainings in connection with McDonald's expansion, similarly confirmed that even before the rollout, many Krispy Kreme facilities were on performance improvement plans specifically because of their poor food safety records. CW 6, who also reported to Amy Hine and was present at multiple McDonald's rollout meetings, confirmed that there was often mold, rodents, or other sanitary issues in the Krispy Kreme hubs, including ones she personally visited. CW 8—a Customer Logistic Manager in a Chicago area Krispy Kreme from May 2024 to October 2025—relayed that there were rodents in and around her shop, and generally described the condition of the store as "really bad" because none of the general managers cared about cleanliness.

67. The factory conditions were especially problematic and costly because, as part of the contract, McDonald's required audits of the Krispy Kreme factories to ensure they were up to McDonald's standards. McDonald's used a third-party auditor, McClement, to ensure that Krispy Kreme's production was up to par. According to CW 3, McClement's standards were far higher than those employed by Krispy Kreme and therefore Krispy Kreme had to spend heavily "getting our shops that were identified to be McDonald's locations, up to a higher standard." This included increased safety documentation, hygiene training, sick policies, personal cleanliness, and additional headcount for cleaning. As just one example of increased costs, CW 3 recounted that McClement required Krispy Kreme to purchase numerous swabbing machines that tested for bacteria that came with upfront costs as well as disposable swabs at over $500 per pack. CW 6 similarly recalled that McDonald's mandated a "very rigorous audit process" that covered a couple hundred questions and was far more demanding than what Krispy Kreme had been using. Thus, CW 6 recalled that to prepare for the audits, Krispy Kreme sent out teams of specialists to the shops to perform an entire "backhouse reset" to overhaul the operations. Indeed, CW 11 confirmed that as part of the backhouse reset, the implementation team assessed where the compliance gaps were and prepared the stores to meet applicable FDA standards and pass the McClement audits.

68. CW 5 explained that the consultants had fourteen weeks to prepare the shops for McDonald's deliveries—but that was not enough time. This costly process included sanitizing the facilities and removing mold, fixing broken down machinery, and reorganizing the stores to accommodate the extra food carts and supplies, and in some instances full renovation of the physical layout to allow for increased production. CW 11 similarly confirmed that she would regularly work with Krispy Kreme's facilities department to address structural issues in the buildings, often caused by a lack of maintenance.

69. Furthermore, aside from mold remediation and sterilization, the factories lacked the capabilities to operate at the near 24/7 capacity to meet the necessary production volume. CW 8 called the increase in production in her store "a giant leap." Krispy Kreme added second and third bakery shifts via an expensive hiring spree. However, Krispy Kreme was so desperate they hired whoever walked through the door, and did not have the time or wherewithal to adequately train them. According to CW 5, this led to problems as "half the time [the factories] didn't have a doughnut maker" and the ones who did were producing poor quality doughnuts. The training—led by CW 3—was being done at "lightning speed," and required Krispy Kreme to hire expensive third parties to assist in trainings. CW 3 explained that the Company budgeted $1 million just to rewrite the new-employee training programs so that it complied with McClement's standards, but the Company well-exceeded that budget. When hiring was not possible, Krispy Kreme resorted to paying much more in overtime for existing employees to handle the production, as explained by CW 6.

70. In addition, the machinery was not fit for sustained high-volume use. CW 3 revealed that Krispy Kreme had long avoided investing in its machinery, "putting Band-Aids on things" when machines wore down. This was well known within the Company because Krispy Kreme tracked what it called "deferred maintenance." The increased capacity added stress on the outdated machinery, which led to frequent breakdowns and costly fixes. According to CW 3, the Company knew it would be pouring tons of money into "equipment maintenance" once the McDonald's rollout began, as there was too much "strain" on the production lines: "When you run a machine that hard, it turns into some pretty big expenses." This was confirmed by CW 6, who reported that "there were a lot of systems issues, many were too old and not capable of handling the volume Krispy Kreme was doing." CW 6 detailed that the baking machines in many locations

were ten to fifteen years old, and the Company had consistently "put off doing maintenance" figuring "we'll get there when we get there." This directly led to many instances where the baking lines broke down because Krispy Kreme waited too long to service them. CW 7 likewise stated that "[t]here was repair and maintenance that hadn't been done in a while." CW 11 confirmed that there was "absolutely" a severe problem with deferred maintenance. Krispy Kreme had only two employees capable of performing major production-line repairs—one based in Tennessee and the other in New Jersey—so when a line went down, it could take days before anyone could even arrive to address the issue. CW 11 recounted instances in which shipments could not be made because critical machinery was out of service.

71. Even with running machines and increased staff, Krispy Kreme lacked the ability to produce the volume needed for the rollout. CW 5 noted that factories went from 12,000 doughnuts per day to 60,000, but timely production was impossible: "***There was not enough infrastructure to meet the demand***," Krispy Kreme "***just wasn't ready***." CW 6 stated that to increase production Krispy Kreme needed to restructure its production lines, and sometimes perform full renovations, just to make room for the number of rolling carts needed to move and store the doughnuts. As CW 6 put it, "***looking at doubling what you already have, and knowing the inefficiencies of the system, which was already very worrisome, and the capital needed to be invested, and fact that sales were already not looking good, it was not good***." CW 6 knew in January 2024—before the nationwide rollout was even announced—that an expansive McDonald's relationship would fail given the upfront costs.

72. The McDonald's expansion came along with other additional costs. The FDA requires that food production facilities, as opposed to restaurants, have multiple check points to ensure that hazardous material is not introduced during production, also known as hazardous

analysis critical control points ("HACCP"). A restaurant becomes a food production facility when more than half its sales were made via the "backdoor"—*i.e.*, shipped or delivered to other parties—rather than from customers coming to dine. CW 3 reported that because the McDonald's contract tipped the scale for numerous Krispy Kreme locations from a restaurant to a wholesale food manufacturer, Krispy Kreme purchased metal detectors for its U.S. facilities at immense cost. The decision to purchase metal detectors was confirmed by CW 6, CW 4, CW 5, and CW 7.

73. According to CW 3, CW 6, CW 5 and CW 7, the metal detectors cost anywhere between $40,000 to $65,000 per unit, with additional costs for shipping and installation making the all-in costs more than $75,000 per machine. The baking facilities required between two and three detectors per site. According to CW 6, who was in charge of monitoring metal detector compliance, Krispy Kreme ordered the metal detectors for about half its U.S. hubs, or approximately 120 locations. This meant that the metal detectors necessitated by the McDonald's contract required a capital expenditure that exceeded $18 million. CW 3 reported that after the McDonald's contract expired, Krispy Kreme simply ceased using the metal detectors in almost all its locations.

74. The delivery logistics were also highly expensive. Krispy Kreme had to hire many new drivers and purchase hundreds of additional trucks to support the expanded deliveries. CW 8 reported that the two Chicago facilities that she managed went from having just two drivers each to fifteen and twelve drivers, respectively. Furthermore, the corresponding delivery trucks were very expensive, coming in at over $100,000 each. According to CWs 6 and CW 3, Krispy Kreme ordered so many trucks, it exceeded current truck supply.

75. CW 1, a Senior Director of Sourcing, International who collaborated with the domestic team on certain cost initiatives, similarly explained that the Company knew the increased

expenses—including extra equipment needed to satisfy the McDonald's volume—rendered the McDonald's plan unsustainable. "***When you looked at the costing, we were not making money, the deal is not going to work***." For example, CW 1 indicated that the increase in procurement on baking goods such as flour and sugar alone ranged from 30-50% or more.

76. CW 3 succinctly summarized that once the plan was approved, Krispy Kreme was "blazing through all this money" in preparation for the launch. This included upgrades to outdated facilities, machinery fixes, accelerated trainings, increased hiring, metal detectors, and food safety compliance.

#### 4. Contrary To Defendants' Public Claims, The Limited Scope Of The Company's Kentucky Pilot Program Provided No Meaningful Data To Gauge Demand On A Nationwide Level

77. In addition to ignoring repeated presentations of the necessary costs required for the ramp up to the deal, Defendants forged ahead despite having little useful data from their pilot program. Indeed, contrary to Defendants' claims to the market that the Kentucky pilot proved demand within McDonald's "exceeded expectations" and would allow for "profitable US expansion," Defendants knew the test was fundamentally flawed and woefully deficient to support such claims.

78. The problem stemmed from the fact that the Kentucky demand was artificially capped by McDonald's and offered no insight into nationwide scalability. According to CW 3, McDonald's primary goal during the test was to ensure zero waste—not to assess true demand. McDonald's cut orders if sales dipped even slightly; if doughnuts sold out, McDonald's was satisfied and refused to increase supply, as it did not want to get stuck with large numbers of stale, unsellable doughnuts. Thus, Defendants knew that McDonald's locations consistently sold out only because they were stocked with minimal quantities. As CW 3 explained, the test never

explored whether higher volumes would sell, rendering it meaningless as a gauge of actual demand.

79. CW 3 learned of this artificial cap when she personally went on a delivery ride-along in Lexington, Kentucky during the test phase. She recalled that during the seven-hour McDonald's-dedicated route, the driver delivered to only eight McDonald's locations and supplied less than 200 total doughnuts—under 25 per store—because that "***was all McDonald's ordered***." CW 3 spoke with the McDonald's managers during the route, who said that the doughnuts would sell out, but that McDonald's refused to increase the orders in order to avoid waste. CW 3 said that this phenomenon was widely discussed within Krispy Kreme, with multiple employees agitated that the contract permitted McDonald's to deliberately under-order, leaving sales on the table. Krispy Kreme was spending "***all this money but only delivering a couple of trays of doughnuts***." CW 3 advised: "***do the math, 200 doughnuts is not going to pay for a driver at $18.00 an hour***."

80. According to CW 3, given the contract dynamics during the Kentucky test, everyone at Krispy Kreme understood the Company did not know the true demand for doughnuts within McDonald's restaurants, making expansion hugely risky. CW 9[14]—an Executive Vice President and Chief Global Supply Chain Officer—similarly explained that the results of the Kentucky pilot program did not show a "justification" for a larger expansion. She stated that management ignored the fact that McDonald's cut orders "almost from day one." CW 1 likewise confirmed that sales at each McDonald's location "seemed to be stagnant or dropping."

---

[14] CW 9 was the Executive Vice President – Chief Global Supply Chain Officer from July 2021 to January 2025.

81. Furthermore, although she started after the Kentucky pilot, CW 4 recalled that the sales figures from the pilot were not stellar, but desperate to show growth, Krispy Kreme ran with the very top range of all possible projections to support the expansion—even though the high-end projections included consistent advertising paid for by McDonald's, which was not called-for under the terms of the partnership. Indeed, because Defendants failed to confer with anyone with McDonald's experience, this failed to recognize that suppliers do not have the ability to influence McDonald's advertising products, and thus the lack of due diligence meant the rollout projections were doomed from the start. In fact, according to CW 4, Krispy Kreme's CMO—Dave Skena—began meeting with McDonald's CMO to try and rectify the advertising issues, but those meetings were unsuccessful as McDonald's never increased advertising. This was especially true with the New York rollout, where the advertising was paltry. CW 4 attempted to restructure the contracts to allow for McDonald's lesser contributions, but was unable to because she was brought "into the game" too late.

82. This Kentucky pattern predictably repeated in each rollout city. According to CW 4, under the McDonald's contract, Krispy Kreme and McDonald's used a third-party consultant to determine the number of doughnuts to deliver to any McDonald's location upon launch, and that the amount was "locked" for the first few weeks. Thereafter, McDonald's had the ability to change the ordering as it saw fit. CW 4 recalled that ordering numbers plummeted after the lock-up period expired as McDonald's franchisees were desperate to avoid waste, just as what happened in Kentucky—a fact that was corroborated by numerous other former employees, including CW 7, CW 3 and CW 8, among others. CW 11 conveyed that the cutbacks in McDonald's ordering occurred with every launch, and CW 6 recalled that the reduction was apparent by autumn 2024.

83. CW 3 confirmed that, within weeks after launch, McDonald's would limit the ordering to just a couple of trays per location to avoid having any excess. CW 3 remembers this occurring in the Chicago market in particular, a fact that was confirmed by CW 8. Indeed, CW 8 relayed that, at launch, each Chicago area store started with deliveries of sixteen dozen doughnuts—nearly two hundred individual doughnuts—but that only lasted a couple of weeks. As CW 8 recalled, her Chicago facility quadrupled from producing 1,000 dozen doughnuts to 4,000 dozen upon the launch, but just a few weeks later, production was cut to just 2,000 dozen due to McDonald's decreased ordering. CW 8 explained that management only had to look at the diminishing orders McDonald's was placing to understand very early on that the deal was not working out.

84. A former McDonald's Kitchen Manager in a Chicago area location—CW 10[15]—reported that by the second week of the rollout, her store had already scaled back orders to only a dozen of each flavor, amounting to just thirty-six doughnuts. This was true for many of the sister stores owned by her franchisee who also began decreasing their orders in November 2024. By January, all twenty of the franchisee's locations were instructed to limit their Krispy Kreme order to just six of each flavor, or just eighteen total doughnuts.

### 5. Defendants Had Access To Real-Time Data, Which Showed Throughout The Class Period That Sales Figures Did Not Support Defendants' Wholly Positive Statements To Investors

85. The declining sales trends at the test sites were no secret to Defendants, who had real time access to sales data and full access to information concerning how well the national partnership was going. Defendants themselves stated on November 7, 2024 that "***we can track***

[15] CW 10 was a Kitchen Manager at McDonald's during the rollout. She reported to the store's General Manager, and had constant interaction with the franchisee, who owned twenty McDonald's locations in the Chicago area.

***the deliveries. We can track any that are unsold. And, indeed, we can see that they clearly sold throughout the day***."

86. Indeed, CW 2 explained that Krispy Kreme's senior leadership had real-time visibility into the Company's financial and operational data. She stated, "I know that they could do it [pull the numbers] every single day, and I know from [Charlesworth's] explanation to me that it was extremely accurate." According to CW 2, CEO Josh Charlesworth routinely demonstrated the level of operational transparency available to him. When meeting with investors, he would "pull his phone out" and show precisely "what came in on what day and what went in and out." Charlesworth had the ability to identify, at any given time, the number of doughnuts in each shop, and he monitored the Company's performance "every single day." CW 2 also explained that executives had access to accounting information through a system called Hyperion.

87. Krispy Kreme's tracking of McDonald's orders was specifically recorded through handheld devices used by delivery drivers, ensuring that management had accurate, real-time data regarding the Company's sales figures. CW 4 confirmed that sales numbers were generated based upon input from Krispy Kreme's handheld devices which the Company's drivers carried. CW 5 explained that the data captured through the handheld devices were automatically fed into the Company's internal systems, ensuring continuous, real-time visibility into delivery volumes, returns, and sales performance. CW 1 explained that management and the C-suite personnel all had access to data from McDonald's showing the sales numbers, deliveries and returns.

### 6. "*A Complete Sh*t Show*": The McDonald's Rollout Was A Disaster Due To Krispy Kreme's Poor Infrastructure And Logistics, Which Led To Missed Or Incorrect Deliveries And Further Increased Costs

88. Once the rollout process began, it was immediately clear that the problems were so pervasive that they could not be overcome. CW 5 attended weekly calls with the other eleven rollout consultants where they all voiced similar complaints. On these calls, the consultants raised

issues of disgusting facilities, insufficient infrastructure to bake the necessary doughnuts, and poor staffing. CW 5 recounted that a regular discussion on the calls was regarding the audits required under the McDonald's partnership: "***oh my God, we didn't pass an audit, we failed another audit, we have no staff in this one, we have nobody to make doughnuts here, we have mold on the line here***." The best way CW 5 could describe it was "***it was just a complete sh*t show***." These calls were attended by Amy Hine, who reported directly to Defendant Charlesworth, and Keith Katz, a senior operations executive.

89. A significant issue, according to CW 5, was that none of the systems and protocols necessary for a successful launch of this magnitude were in place. One of her colleagues was asked by Katz in mid-2024 to design a system for how the physical delivery of doughnuts could be effectuated, with Katz acknowledging that "***[w]e are building the plane as we're flying it***." By June 2024, senior leadership knew the expansion could not be profitable because Krispy Kreme "***was not ready***." Senior Manager Katz told CW 5 the Company needed "***another three or four years of preparation***" to fix the internal problems and build the necessary infrastructure for the rollout.

90. Furthermore, while Krispy Kreme knew it had to hire numerous drivers, it failed to train them. New drivers would show up for work and were told to start delivering to McDonald's, but they did not know their routes, how to properly handle the doughnuts, or when the doughnuts should be delivered. This was a big problem for McDonald's. CW 6 explained that some McDonald's locations had tight delivery windows, which drivers often missed, causing rejections and returns. CW 6 said this was a key reason Krispy Kreme sought to outsource delivery. CW 4 similarly explained that "[w]ith McDonald's you have to be 100% on time with your deliveries and Krispy Kreme just wasn't there."

91. CW 5 added that often the newly hired drivers just did not show up whatsoever, leading to missed deliveries entirely. This became such a common occurrence that Krispy Kreme actually paid extra drivers to be on standby in case of a no-show, according to CW 6. "We had to hire backup drivers. Krispy Kreme had to develop all these contingency plans to prepare for people not showing up." CW 7 corroborated this, stating that Krispy Kreme had major issues with deliveries because drivers would not show up: "They were calling out left and right." As a result, Krispy Kreme had to hire extra drivers or rely on costly third-party logistics companies. Furthermore, many drivers did not like that their shifts began at 2:00 a.m., and therefore even finding sufficient drivers was hugely problematic. As a result, according to CW 4, Krispy Kreme needed to pay its drivers bonuses just to retain them, further increasing labor costs.

92. The operational breakdowns that resulted from overworked machinery and poor delivery protocols meant that Krispy Kreme often failed to provide McDonald's with the appropriate quantity of doughnuts at the right time. As CW 4 explained, the shops were not equipped to handle the baking volume which directly led to delayed and "inconsistent delivery." Furthermore, Krispy Kreme could not provide "consistent quality," and sometimes failed to deliver at all, forcing McDonald's to tell its customers "***we don't have Krispy Kreme today, they haven't shown up***." CW 4 remembers fielding about 250 complaints a week from McDonald's locations relating to delivery issues, including late deliveries, improper quantities, and physical damage caused by Krispy Kreme drivers. CW 4 personally saw that McDonald's locations with inconsistent delivery stopped ordering doughnuts; it was the delivery and manufacturing problems that "***did Krispy Kreme in***."

93. Basic protocols were also missing. Delivery trays went to McDonald's and were returned the next day without washing. Trays quickly became filthy and when Krispy Kreme shops

began washing them, they became moldy. The poor trays were specifically raised as a complaint by multiple McDonald's locations, as relayed by CW 4.

94. The problems only got worse. Starting in November 2024, CW 4 was *personally* involved in communicating with McDonald's about operational problems affecting delivery. CW 4 explained that McDonald's meticulously tracked shipments from other vendors and knew exactly when product was coming and in what amounts. However, Krispy Kreme lacked the technical capabilities to allow for such tracking, and therefore, all service issues needed to be communicated manually, which CW 4 oversaw. She recalled daily calls and email with McDonald's from November 2024 through May 2025 about doughnut deliveries that were going to be late or lacking.

95. In November 2024, CW 4 recalled raising serious concerns to her boss, Scott Bacco, Krispy Kreme's Chief Commercial Officer. The issues ranged from delivery and logistical issues to quality issues and detailed how Krispy Kreme was not ready for McDonald's. However, her concerns were ignored. CW 4 continued to raise operational concerns to Tom Heinzmann, the VP of U.S. Operations, prompting CEO Charlesworth to convene a meeting with McDonald's in Columbus, Ohio—***which CW 4 personally attended***. At the meeting, McDonald's franchisees raised the exact problems CW 4 had been voicing: inconsistent deliveries, unsanitary procedures, and subpar doughnut quality. CW 4 recalled being surprised by the strength of McDonald's message to Krispy Kreme's CEO, which she described as very "firm" that the operational problems could not continue.

96. Despite the public claims of success, Krispy Kreme overhauled its McDonald's team. On November 7, 2024, Chief Growth Officer Matthew Spanjers—who oversaw the DFD expansion—resigned. Multiple CWs, including CW 3 and CW 6, also reported that this was part of a wave of layoffs in November 2024. CW 11 considered the November layoffs to be a big red

flag because the executives let go were key players in the McDonald's launch and contract negotiations, but the replacements "had not been in the room." CW 11 also heard that these layoffs made "McDonald's … upset because those were their points of contact." Another wave of layoffs occurred in January 2024, which included Amy Hine, the principal "architect" of the McDonald's rollout, who was released when Krispy Kreme's footprint was still under 2,000 McDonald's locations. According to CW 5, escalating McDonald's complaints to top Krispy Kreme executives led to Hine's removal. Indeed, CW 5 recalled that Hine started having weekly calls with McDonald's executives leading up to her exit from Krispy Kreme. Furthermore, on January 9, 2025, the Company named a new COO, Chief Growth Officer, and Chief Product Officer. Such wholesale changes were not consistent with a successful strategy, especially because, as CW 3 explained, none of the new appointees "had ever been in or sat in on a meeting for McDonald's." Thus, it was obvious within the Company, including to CW 3, that the partnership was already over.

97. By mid-March of 2025, Defendant Charlesworth told CW 4 directly that Krispy Kreme was losing money on the McDonald's deal due to significant cost pressures. When CW 4 asked how bad things were, Charlesworth said "in some cases we are losing 30 cents a doughnut."

**7. "*None Of The Doughnuts Were Going Out The Same Day*": Krispy Kreme's Deficient Operations Resulted In Deliveries Of Old And Stale Doughnuts To McDonald's Locations, Undercutting Demand**

98. The operational and delivery failures degraded the quality of doughnuts provided throughout the rollout, which, in turn, obliterated whatever demand there was. Indeed, Krispy Kreme consistently delivered old, stale doughnuts—angering McDonald's and the end-customers. Multiple former employees explained that the poor-quality doughnuts was a major reason the McDonald's project failed.

99. According to CW 5, the doughnuts were not delivered the day they were baked. In her words: "***[n]one of the doughnuts were going out the same day***," instead, the product was a day old "by the time the drivers got there the next day." Often, doughnuts were delivered three days after they were baked. While the Company claimed it was delivering fresh doughnuts daily, CW 5 explained "***that is a lie***."

100. CW 8 conveyed that at her Chicago area facility "***all the doughnuts looked like garbage***" and the "***quality was just so inconsistent***." The doughnuts looked unappealing, were often way undersized or otherwise disformed. Moreover, they were generally more than 24 hours old when they were delivered. From speaking with colleagues, CW 8 "found out very quickly that a lot of other stores had the same issue" with their doughnut quality as well.

101. According to CW 8, the quality issues had a big impact on demand. McDonald's "***saw that the quality sucked, they started dropping their orders***." CW 8 recalled receiving over 1,000 photos of poor-quality doughnuts from McDonald's locations in the first six months of service. As McDonald's decreased its orders, with some locations only wanting three doughnuts a day, Krispy Kreme was left with excess inventory, and, rather than throw them away, the facility exacerbated the problem by delivering the old doughnuts to McDonald's the following day. CW 8 explained that there were "constantly [] eight to ten carts just sitting around" for "***multiple days***" awaiting delivery, and that, at times, the doughnuts ultimately delivered were as many as three days old. On one occasion, CW 8 observed her facility taking returned doughnuts and "***sending those old doughnuts back out***" for delivery.

102. CW 6 similarly explained that the sub-par operations meant that "half of the doughnuts" that were going to McDonald's were at least "a day old." "***Sometimes you were***

***getting a doughnut that was 24 to 36 hours old***." CW 4 also recalled that about a third of the complaints she fielded from McDonald's locations were directly tied to poor doughnut quality.

103. In fact, as explained by CW 4, Krispy Kreme even set up a website for McDonald's stores to upload photographs documenting poor doughnut quality. According to CW 10, the McDonald's Kitchen Manager in the Chicago area, had issues with the products that ranged from quality to delivery. Starting in September 2024, she began receiving shipments which steadily decreased in quality resulting in more than 50% waste (stale or inedible doughnuts). She communicated these problems to Krispy Kreme in real time through scanning a QR code that led to the website Krispy Kreme established. CW 10 relayed that she was scanning the QR code daily to complain: "I was scanning that thing all the time." The problems were not limited to CW 10's location. All twenty stores owned by her franchisee within the area from Indiana to Illinois spoke frequently about the severity of the delivery and quality issues.

104. Defendants were well-aware of the quality and operational issues because they had access to the real-time complaints submitted by McDonald's regarding delivery and product quality failures via the QR code. CW 8 detailed that the Company aggregated the complaints in a "Smart Sheet" that portrayed all the complaints from McDonald's restaurants in the greater Chicago area, and could be filtered by location and by nature of the problem, such as product quality, delivery issues, or quantity issues. CW 8 explained that all Krispy Kreme management above the Vice President level had access to the Smart Sheet, including the CEO, and therefore she was "100%" certain that upper-level management knew of the mounting problems. She explained that in just the first couple weeks of the Chicago rollout there were over 400 complaints of poor-quality product and delivery issues, and while the delivery complaints lessened over time, the complaints over "the quality was a never-ending story."

### F. The Truth Emerges, But Defendants Continue To Mislead Investors Regarding The True State Of The McDonald's Expansion, Concealing The Full Extent Of Krispy Kreme's Operational Deficiencies And Increased Costs

105. On February 25, 2025, just three months after unabashedly praising the "success" of the rollout, the truth about the Company's partnership with McDonald's began to emerge. On that date, Krispy Kreme announced poor Q4 2024 results and issued full-year 2025 guidance that fell far short of expectations. Specifically, for Q4 2024, the Company reported net revenue of $404 million—missing analysts' $415 million estimate—and $45.9 million in adjusted EBITDA, far below analysts' consensus of $58.7 million. In addition, while analysts had been projecting 2025 revenues between $1.76 billion and $1.94 billion, Krispy Kreme now forecasted just $1.55 billion to $1.65 billion—a reduction of approximately 12% to 15%. Further, while adjusted EBITDA estimates had been $235 million to $259 million, Krispy Kreme's guidance was only $180 million to $200 million, a 15% to 31% shortfall amid increased costs. Projected earnings per share fared even worse, as the Company now expected $0.04 to $0.08 in EPS—72% to 86% below the Street's $0.29 estimate.

106. Significantly, during the earnings call held the same day, Defendant Ashukian acknowledged that the Company had in fact experienced issues with the McDonald's expansion. Specifically, Defendants acknowledged that Krispy Kreme had "seen consumer softness" specifically in McDonald's where "demand has dipped actually a little lower than we expected." Moreover, the Company also expected "margin compression" due to the need to make "long-term business investments" to fund the national rollout. Thus, contrary to Defendants' prior statements that the Company would be able to leverage existing capacity with limited investment, the "start-up costs from [the] US expansion" were now higher than the Company had previously let on. Moreover, despite previously claiming that Krispy Kreme could rely on its "existing capacity," with the Company only needing to make modest investments in items like "trucks and drivers,"

the Company would now engage a third-party company to execute "more than half of our DFD deliveries by year-end," which Defendant Charlesworth explained would provide "predictability in costs" and a "more streamlined set of operations."

107. In response to the news, Krispy Kreme stock decreased 35% over the following two days from a close of $9.13 on February 24, 2025 to just $5.97 on February 26, 2025.

108. While Defendants tried to explain away some of the poor results on a cybersecurity incident that occurred in November 2024, analysts understood that there was more to the picture. Indeed, Capital One commented that "this incident does not fully explain the operating expense uptick" and that the weak 2025 guidance was "another indicator that the 4Q24 cybersecurity incident was ***not*** the primary story here." Instead, analysts focused on the McDonald's-related costs and poor demand as the primary reason for the Company's financial results. Evercore, for example, commented that "Adjusted EBITDA weakness was ***likely due to McDonald's start-up costs***." CL King similarly noted that the Company's 2025 guidance was disappointing due to "***McDonald's [r]elated [c]osts***" together with "***greater-than-anticipated softening***" of McDonald's demand. Morgan Stanley downgraded its Krispy Kreme rating to "underweight" due to the increased operating expenses that "drove most of the unfavorability" and the fact that McDonald's demand "***dropped more than expected***." Piper Sandler recognized that these issues meant it was time to "acknowledge that [the] upgrade to [over weight] of DNUT last year has been wrong."

109. Significantly, while Defendants disclosed some issues with the McDonald's partnership, Defendants prevented an even greater stock price decline by minimizing the problems with the McDonald's expansion and steadfastly maintaining that the rollout remained entirely "on track." First, Defendants assured investors that the lower demand at McDonald's locations was

simply due to a lack of marketing and consumer "awareness" that the doughnuts were available in the McDonald's stores—and *not* to any infrastructure or logistics deficiencies that plagued the Company's operations.

110. Second, Defendant Charlesworth continued to tout the purported success of the McDonald's expansion, boasting that Krispy Kreme was already delivering to 2,500 McDonald's locations and "***remain[ed] on track to reach about 6,000 restaurants by year-end***." In fact, Charlesworth emphasized that Krispy Kreme "launched daily deliveries to approximately 500 McDonald's restaurants in the Greater New York City area" that very morning, and that Krispy Kreme's service and quality was resonating, as "the ***feedback from McDonald's is very positive***."

111. Third, Charlesworth assuaged investors' concerns about increased costs by claiming that Krispy Kreme was finding "more and more ways to ***leverage our existing capacity***," through "***increased productivity at our existing hubs***" and improving Krispy Kreme's ability "***to get the doughnuts out to the points of access better and better***." As a result of these purported efficiencies, the Company would not need to invest as much as the McDonald's rollout continued.

112. Krispy Kreme's 2024 Annual Report, filed on February 27, 2025, again assured investors that any investments the Company made were prudent and were not McDonald's-specific. Specifically, the Annual Report claimed that "these capital expenditures support the overall DFD and retail channels and are ***not directly attributable to, or required by, the agreement with McDonald's***."

### G. The Full Truth Was Revealed Just Months Later: The McDonald's Partnership Was An Abject Failure Precisely Due To The Company's Abysmal Infrastructure Operations And "Unsustainable" Spiraling Costs

113. On May 8, 2025, the full truth emerged. Significantly, on that date, Defendants were finally forced to admit that their Class Period representations to investors regarding the McDonald's expansion were false. In stark contrast to their repeated assurances just two months

earlier that the McDonald's rollout remained entirely "on track," Defendants now admitted that the exact opposite was true: they had effectively abandoned the McDonald's expansion by no later than February 2025. Specifically, after representing to the market on February 25, 2025 that Krispy Kreme had "today" expanded into 2,500 McDonald's locations, the Company now revealed that Krispy Kreme had not added a ***single new McDonald's*** location since February 25, 2025, and that the number of its McDonald's locations had actually *decreased*, as it was servicing only 2,400 McDonald's as of the May 8, 2025 call. Moreover, the Company disclosed that it did "***not expect to launch in any additional restaurants in the second quarter of 2025***," and that the McDonald's expansion was ceased precisely because Krispy Kreme had not "***achieve[d] a profitable business model***" with the McDonald's partnership.

114. Furthermore, contrary to Defendants' prior statements that there were no "unexpected" costs in connection with the rollout, and that Krispy Kreme had only seen a "[p]ositive consumer response," Defendant Charlesworth now admitted that for the Company "[t]o deliver sustainable, profitable growth," Krispy Kreme needed to both "increase sales by stimulating higher demand and cutting costs by simplifying operations." Defendant Charlesworth further added how the Company needed to "improve sales, simplify operations" with McDonald's.

115. Moreover, while Defendants had previously touted the Company's "strong operational execution" and that it was delivering "always so fresh" doughnuts every day at the "right time [and] right quantities," Defendants now revealed that the Company's infrastructure was so poor that Krispy Kreme would completely remove itself from the distribution process and "***fully outsource U.S. logistics***" by mid-2026 for all customers. In addition, Defendant Charlesworth acknowledged that the Company needed to overhaul baking operations to be as "simplified and streamlined as they can be." Similarly, given the Company's poor operational performance,

Defendant Charlesworth revealed that Krispy Kreme implemented a "new technology" to "better assess performance and make data-driven decisions to improve quality, service and efficiency."

116. As a result of these severe problems with the McDonald's partnership, Krispy Kreme issued disastrous financial results, reporting just $15.9 million of adjusted EBITDA for its U.S. segment— ***a 62% decline*** as compared to Q1 2024—which it primarily blamed on "***costs associated with our U.S. nationwide expansion***." In addition, the Company pulled its 2025 outlook completely without providing alternative guidance, and in a desperate attempt to save cash, Defendants announced that Krispy Kreme would scrap its $0.35 quarterly dividend that the Company had been consistently paying since 2021.

117. The market reacted sharply to this news. After closing at $4.33 per share on May 7, 2025, Krispy Kreme's shares plunged 37% over the following two days to close at just $2.73 per share on May 9, 2025.

118. Analysts were incensed. During the earnings call, a Truist analyst directly confronted Defendants, emphasizing that in "the past few months" Defendants had publicly stated that the rollout was going as "expected," and therefore questioned "where the change came from." Later that day, Truist issued a scathing report directly challenging management's credibility given the whiplash in Defendants' representations to investors, stating: "***We are shocked by the speed at which the story fell apart***. ***Management provided a 'everything going as planned message' on the 4Q earnings call in early February and at several conferences YTD***." As a result, Truist lost its "high conviction in management's previously stated strategy," downgraded its rating from "buy" to "hold," and was no longer providing ***any*** price target for Krispy Kreme shares.

119. Other analysts were similarly stunned. Morgan Stanley found it "***surprising***" that the Company was pausing the McDonald's expansion, especially "when plans as recently as

February were to be in 6,000 locations by year end." J.P. Morgan also noted that the "***McDonald's decision comes as a surprise***" and highlighted that the decision to stop the project after just 20% of the expected rollout "***speaks volumes***" as to how ineffective and expensive the program was. As a result, J.P. Morgan downgraded its Krispy Kreme rating to "Neutral" and withdrew its price target entirely. Evercore called out the "***weaker than expected incremental margin in [the] rollout***," and highlighted that outsourcing the logistics "could bolster delivery execution (shipped on time and in-full) and help lower the cost of a delivered donut." Bloomberg reported that the stock price drop in response to the news was a "***record one-day drop***."

### H. Post Class Period Events Further Confirm the Fraud

120. Following the end of the Class Period, additional events further confirmed the extent to which Defendants' Class Period representations to investors were false. Indeed, one month after the end of the Class Period, on June 24, 2025, Krispy Kreme announced that the McDonald's partnership was not merely paused, but terminated entirely, specifically because of the enormous costs and lack of demand for the rollout. In announcing the termination, Defendant Charlesworth acknowledged that the "***efforts to bring our costs in line with unit demand were unsuccessful, making the partnership unsustainable***" for Krispy Kreme.

121. Just three days later, the Company cleaned house. On June 27, 2025, both Defendant Ashukian, the Company's CFO, as well as David Skena, Krispy Kreme's Chief Growth Officer stepped down from their roles. Skena was not even in that role for more than six months.[16]

[16] This came on the heels of a widespread management overhaul. First, in January 2025, Krispy Kreme appointed a new Chief Operating Officer, Nicola Steele, who started her new role on March 3, 2025. Second, on April 23, 2025, the Company announced that six of its eleven Board members—more than half—were not being nominated for reelection. In making the announcement, Krispy Kreme told investors that the "refreshed Board" will focus on "profitable U.S. expansion."

122. On July 4, 2025, a *Wall Street Journal* investigation further corroborated the falsity of Defendants' Class Period representations to the market—and reported findings that were entirely consistent with the accounts of the former Krispy Kreme employees included herein. Specifically, in an article titled "*Why Krispy Kreme and McDonald's Broke Up*," *The Wall Street Journal* found that Krispy Kreme's logistical failures and inconsistent product quality were the major factors in the collapse of the McDonald's partnership. *The Wall Street Journal*'s investigation found that the Krispy Kreme "supply was uneven" as McDonald's "franchisees said deliveries were irregular, with a day sometimes passing between each one." These problems stemmed from the fact that the Company was unable to handle the logistics required from the partnership, as "Krispy Kreme stores were overwhelmed by the volume of pastries they needed to make and pack for McDonald's." Compounding the problem, quality was "inconsistent," with doughnuts arriving with "scant sprinkles, smeared with cream or cold." *The Wall Street Journal* also obtained an internal McDonald's memo circulated to franchisees, noting that during the partnership, McDonald's had "sought improvements across [Krispy Kreme's] invoicing, operations, and distribution approach" before terminating the partnership.

123. Then, on August 7, 2025, Defendants made a series of additional admissions that laid bare the falsity of their prior statements. For example, Krispy Kreme flatly admitted that Defendants' prior claims that all investment tied to the McDonald's rollout were beneficial to overall U.S. expansion were false. Indeed, in revealing a new "turnaround plan to deleverage the balance sheet," Defendant Charlesworth explained that Krispy Kreme was "quickly removing [the] costs related to the McDonald's partnership" to allow the Company to "begin recouping profitability in the third quarter." Notably, Krispy Kreme was still committed to "[e]xpansion in the U.S." through growth with other customers like "Costco, Walmart, Target, and Kroger" and

was not abandoning the DFD strategy. This admission established that, contrary to Defendants' claims, the Company's Class Period investments were in fact directly tied to the McDonald's rollout—and conferred no benefit to the Company's overall, non-McDonald's DFD strategy. The financial impact of these never-before-disclosed McDonald's investments were significant. Krispy Kreme wrote off ***at least $51 million of assets*** simply as unusable elsewhere. As set forth in the Company's Q2 2025 earnings release, "Krispy Kreme recorded long-lived asset non-cash impairment charges of $22.1 million and lease impairment and termination costs of $28.9 million," which were specifically attributable to the "termination of the Business Relationship Agreement with McDonald's USA." Notably, the $51 million was material to the Company, as it represented ***more than 45%*** of the Company's U.S. adjusted EBITDA of $112 million in all of fiscal year 2024.

124. Further, the Company also revealed that the McDonald's termination was a trigger for a massive goodwill impairment charge ***of $356 million***. Critically, more than $270 million of this charge was tied to Krispy Kreme's U.S. segment, which lost over 40% of its goodwill value due in part to the McDonald's debacle. Krispy Kreme admitted the impairments were "impacted" "by the termination of the agreement with McDonald's USA." Such a drastic write-down is not a routine accounting adjustment, and further reflects that the Company's Class Period investments in the DFD operations did not benefit the Company overall.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

125. During the Class Period, Defendants made materially false and misleading statements and omitted material facts, in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Throughout the Class Period, Defendants' SEC filings, press releases, and analyst and investor presentations included material misstatements and omissions concerning Krispy Kreme's financial and operational condition, which included, among

other misrepresentations, statements concerning the Company's national partnership with McDonald's, Krispy Kreme's logistical capabilities to provide fresh doughnuts, demand for the Company's doughnuts at McDonald's, and the cost of the McDonald's rollout.

126. As discussed above and further below, Defendants' representations were materially false and misleading when made, and omitted material facts either required to be disclosed or necessary to make the statements not misleading. These material misstatements and omissions had the effect of creating an unrealistically positive assessment of Krispy Kreme's business and operational status. In truth, Defendants had falsely presented to investors a materially misleading portrayal of the Company.

## A. March 2024 Statements

127. On March 26, 2024, Krispy Kreme and McDonald's issued a joint press release announcing their expanded partnership. The press release, which the Company filed with the SEC on Form 8-K and was signed by Defendant Charlesworth, boasted of the Company's expanded national partnership with McDonald's. The press release stated:

> The Golden Arches and Krispy Kreme, one of the most beloved sweet treat brands in the world, are teaming up for a national expansion. Fans will begin spotting Krispy Kreme doughnuts in their local McDonald's restaurants later this year as part of a phased market rollout across the country. Nationwide availability at participating restaurants is expected by the end of 2026. Three of Krispy Kreme's most popular doughnuts ***will be delivered fresh to McDonald's restaurants every day.***

128. The press release noted that the expansion followed "***a successful test at 160 McDonald's restaurants in Lexington and Louisville, Kentucky areas where consumer excitement and demand exceeded expectations***." The announcement also emphasized that "***Krispy Kreme More than Doubles Points of Access***," stating:

> "Significantly, by making Kreme Krispy accessible to fans nationwide through this partnership, we expect to more than double our points of access by the end of 2026. ***The partnership accelerates the development of our existing Delivered Fresh***

> ***Daily channel, creating operating leverage through distribution density and production utilization***," said Charlesworth.
>
> ***Krispy Kreme has been scaling its supply chain, building a support team, adding technology and new equipment, and enhancing field training to support its Delivered Fresh Daily expansion, which includes this phased rollout***.

129. The statements in ¶¶127-28 were materially false and misleading, and omitted material facts when made. Contrary to Defendants' representations that the Company would create "operating leverage" through increased "production utilization," in reality, Krispy Kreme's infrastructure and operations were a disaster and were wholly incapable of sustaining the production volumes, service, and quality needed to successfully complete the McDonald's expansion. Indeed, numerous former employees with direct knowledge of the McDonald's expansion at numerous locations confirmed that the Company's operations were "***a complete sh*t show***." *See e.g.*, ¶88; §§IV.D.3, IV.D.6, IV.D.7. These former employees independently corroborated that Krispy Kreme deliveries were routinely late or missed entirely because "***none of the doughnuts were going out the same day***," and as a result, quality was abysmal, as McDonald's locations received stale doughnuts that were up to three days old and "***looked like garbage***." *See e.g.*, ¶¶99-100; §IV.D.7.

130. Significantly, the accounts of these numerous former employees were entirely consistent with Defendants' own admissions at the end of the Class Period. Specifically, Defendants ultimately admitted that the Company's infrastructure was so poor that Krispy Kreme was forced to abandon the McDonald's expansion because it could not "deliver sustainable, profitable growth" with the McDonald's partnership. In addition, the Company ultimately completely removed itself from the distribution process and planned to "fully outsource U.S. logistics" by mid-2026 for all customers.

131. Moreover, contrary to Defendants' statements above, the McDonald's deal would not create "operating leverage" because it imposed substantial undisclosed costs, including extensive remediation to bring facilities up to the specifications necessary to pass McDonald's rigorous audits; at least $18 million for metal detectors; and substantial costs for bacteria testing equipment, additional drivers and trucks, and increased staffing. *See e.g.,* §§IV.D.2, IV.D.3. Defendants were not merely aware of the Company's costly systemic failures—they were repeatedly confronted with them. Execution breakdowns and ballooning costs were impossible to ignore. Indeed, former employees described a 2023 internal initiative, "Project Ray," that laid out the staggering investment required for the McDonald's expansion. Project leaders also did not mince words, warning Defendants: "Are you sure you want to proceed if it's going to cost this much money up front?" *See e.g.,* ¶57; §IV.D.2. Furthermore, Defendants themselves ultimately conceded—directly contradicting their public assurances—that Krispy Kreme's operations were materially strained by the mounting "costs associated with our U.S. nationwide expansion."

132. In addition, Defendants' representations that the changes attendant to the McDonald's deal—such as "scaling its supply chain" and "adding technology and new equipment"—could be utilized for its entire "Delivered Fresh Daily" program, were also false. In reality, the costs incurred were unique to the McDonald's deal, and were expressly required by McDonald's, such as installation of metal detectors and having to comply with new audit requirements. *See e.g.,* §IV.D.3. Defendants' own admissions also flatly contradicted their claims that the Company's investments were not McDonald's-specific. Krispy Kreme disclosed at least $51 million in asset impairments and termination costs tied directly to the "termination of the Business Relationship Agreement with McDonald's USA." Accordingly, due to these skewed

costs and pervasive operational difficulties, Defendants lacked any rational basis for the statement that the McDonald's deal could double Krispy Kreme's access points by 2026.

133. Lastly, it was misleading to claim that the Kentucky pilot represented a "successful test" in which "consumer excitement and demand exceeded expectations," because the pilot was never designed to effectively measure demand. McDonald's artificially constrained demand during the test by limiting restaurants to just 25 doughnuts per store to avoid waste—a trivial amount that did not even cover the delivery driver's fees for the seven-hour shift and offered no meaningful basis to assess market demand or justify a nationwide rollout. *See* ¶¶78-80; *see also* §§IV.D.1, IV.D.4.

134. Not surprisingly, given the rosy picture painted by Defendants regarding the rollout and that Krispy Kreme would more than double its access points, the Company's stock price soared and market analysts reacted favorably. For example, Citi emphasized that Krispy Kreme was "***unlocking new revenue/profit streams***," and calculated that McDonald's partnership alone would add "***~$400M in revenue***" and $85 million in adjusted EBITDA once the rollout was complete. CL King likewise called the deal the "***[b]eginning of a [b]eautiful [f]riendship***," and similarly calculated that McDonald's sales would add "***$375MM-$400MM in incremental sales***" to Krispy Kreme, resulting to "***$82MM-$90MM in pretax earnings***."

135. Krispy Kreme's share price skyrocketed 40% on the news, from a close of $12.42 per share on March 25, 2024—the day before the announcement—to a close of $17.40 per share on March 27, 2024, the day after, a price Krispy Kreme stock had not reached in years.

**B. May 2024 Statements**

136. On May 9, 2024, Krispy Kreme reported its financial results for the quarter ended March 31, 2024 ("Q1 2024"). In the Company's press release announcing the Q1 2024 results, which Krispy Kreme filed with the SEC on Form 8-K and was signed by Defendant Ashukian,

Defendant Charlesworth assured investors that not much needed to be done for the McDonald's national rollout to succeed because of the purported strength of the Company's existing infrastructure, stating that "***[w]e'll support much of this nationwide rollout using existing capacity, while adding distribution with other major customers as we grow***."

137. On May 9, 2024, Krispy Kreme also published an investor presentation accompanying the Company's Q1 2024 results. The investor presentation highlighted that the McDonald's partnership was "***accelerating profitable U.S. expansion***" because the Company was able to have its doughnuts "***delivered fresh daily***" at "***>12,000 restaurants expected by end of 2026***." The slide is reproduced below.




138. During the Company's Q1 2024 earnings call held the same day, Charlesworth reiterated his message from the press release regarding handling the rollout with existing capacity, stating that "***[m]uch of the national rollout can happen using existing capacity***." When an analyst questioned whether it made sense to add fresh shops in the U.S. given that "***the logistics and volume of doughnuts that will be delivered to McDonald's would be similar to what you would get at a fresh shop***," Charlesworth assured that "with the vast opportunity of deliver fresh

daily with these great national partners" i.e., McDonald's and other national partners, "***we're focusing our attention in the U.S. on what is a very capital-efficient model and leveraging the excess capacity of the production hubs through these off-premise DFD doors … We've got the excess capacity in the U.S***.," Charlesworth proclaimed.

139. The statements in ¶¶136-38 were materially false and misleading, and omitted material facts when made. The "existing capacity" was insufficient of supporting even 20% of the national rollout. In reality, Defendants were aware that Krispy Kreme's facilitates "were too old and not capable of handling the volume Krispy Kreme" needed. *See* ¶70; *see also* §§IV.D.3, IV.D.6. Furthermore, contrary to the claim that "we've got excess capacity in the U.S.," Defendants ultimately admitted, that Krispy Kreme actually required undisclosed "long-term business investments" to fund the national US rollout. Among other things, these investments included complete "backhouse resets," sanitizing the facilities, remediating mold, fixing broken down machinery, reorganizing or renovating the stores to allow for increased production, and investing millions in food safety machinery, including at least $18 million on metal detectors. Defendants knew of these immense costs because, at their direction, the Director of Field Operations, Amy Hine, conducted an in-depth cost analysis demonstrating these very issues, which culminated in her asking C-suite management numerous times whether they were sure they "want[ed] to proceed if it's going to cost this much money up front." *See* ¶¶56-58.

140. Furthermore, Krispy Kreme was not operating a "capital-efficient model" for the McDonald's deal. To the contrary, the Company was eventually forced to impair $51 million in McDonald's specific assets—representing more than 45% of its U.S. annual earnings—which were unusable for any other part of the business. Indeed, just after the McDonald's debacle, Defendants announced "long-lived asset non-cash impairment charges of $22.1 million and lease impairment

and termination costs of $28.9 million," expressly attributable to the "termination of the Business Relationship Agreement with McDonald's USA."

141. Later during the call, Defendant Charlesworth dismissed any concerns regarding the McDonald's partnership. In response to an analyst question about the "level of commitment" for the McDonald's deal and whether the Company was "fully committed to going to that 12,000 [locations] through 2026," Charlesworth emphasized that "***the partnership is going really great so far after what was obviously a great Kentucky test and very thorough test that demonstrated that consumer demand outstripped both [McDonald's] and our expectations***." When analyst followed-up by asking Charlesworth to provide more color on how the McDonald's partnership "expands the [Company's] overall doughnut market" and "what your [Kentucky] test showed from that standpoint," Charlesworth further touted that Krispy Kreme "***obviously, had a prolonged period of time with the Kentucky test to see the impact of that incrementality***." Charlesworth therefore assured the market that "***yes, we've done the analysis and the numbers that are in the incrementality that [the Company] shared today [were] based off a very thoughtful analysis***."

142. The same day, on May 9, 2024, Defendant Charlesworth echoed Defendants' positive statements about the McDonald's partnership during the Company's earnings call when he appeared on a published Yahoo! Finance news program. In response to the interviewer's question regarding "what exactly happened during that 160 store test that gave you the confidence that you could expand this nationally," Charlesworth responded that "***the consumer reaction***" and "***the partnership with the McDonald's team … both work[ed] really well***." Charlesworth again conveyed to investors that "***consumer demand exceeded our expectations***" during the Kentucky test providing "***a lot of confidence for a national rollout [with] McDonald's but also the incrementality of that business [] for Krispy Kreme overall***."

143. The statements in ¶¶141-42 were materially false and misleading, and omitted material facts when made. Contrary to Defendants' statements, the Kentucky pilot could not possibly provide a "lot of confidence for a national rollout" based on the "consumer reaction" and "consumer demand" because the pilot was never designed to measure demand. As confirmed by the corroborating accounts of the Company's former employees, the pilot was never designed to measure demand because McDonald's artificially constrained the test by designing it to avoid any waste. *See* §IV.D.4. McDonald's reduced its orders whenever product remained at the end of the day, but refused to increase the volume when sales were strong. This prevented Krispy Kreme from assessing actual demand at the McDonald's locations and provided no "justification" to claim that demand would support a broader rollout. *See* ¶80. In fact, CW 3 personally participated in a seven-hour McDonald's ride-along in Kentucky that delivered only 200 doughnuts in total—just 25 per stop—which certainly was not a "thorough" exploration of consumer demand, regardless of its "prolonged" time period. *See* ¶¶78-80. Rather than conducting any meaningful demand testing, Defendants knowingly chose to rely on the highest-end projections from the Kentucky pilot, despite knowing those projections assumed full McDonald's advertising support—support that the contract did not require McDonald's to provide. As a result, Defendants presented an unrealistic and unsupported assessment to the market regarding the McDonald's nationwide rollout while knowing that true demand had never been tested.

### C. August 2024 Statements

144. On August 8, 2024, Krispy Kreme reported its financial results for the quarter ended June 30, 2024 ("Q2 2024"). In the Company's press release announcing the Q2 2024 results, which Krispy Kreme filed with the SEC on Form 8-K and was signed by Defendant Ashukian, Defendant Charlesworth was quoted as stating that the Company's "***profitable nationwide***

***expansion is accelerating***," which "***includes the nationwide rollout to McDonald's***, starting this fall in the Midwest with Chicago."

145. On the same day, the Company also published an investor presentation accompanying Krispy Kreme's Q2 2024 results. The investor presentation highlighted how the McDonald's partnership was "***accelerating profitable U.S. expansion***" by "serving fresh doughnuts." The slide is reproduced below.




146. The first question asked by analysts during the question-and-answer portion of the Company's August 8 call was about confirmation of whether Defendants were "still on track" with the McDonald's rollout: "I wanted to ask about -- you mentioned the McDonald's rollout and just basically thinking about -- are you still . . . are you still on track? I think the idea had been to kind of increase ratably the number of stores over time. Does that still sound like the right kind of rollout plan?" In response, Charlesworth assured "***Yes, the McDonald's partnership is going very well in general. And the rollout is on track***… ***We have a dedicated cross-functional team there to***

***make sure the facilities and our people are ready.*** In fact, we're also making improvements to the production lines and even doing our best to improve productivity and up our game as we go. We're very focused on delivering a really high quality service to the McDonald's restaurants so that people get awesome fresh donuts every day at the same quality level they're expecting Krispy Kreme and other channels."

147. The statements in ¶¶144-46 were materially false and misleading, and omitted material facts when made. It was misleading to convey that the Company was "[a]ccelerating profitable U.S. expansion" with McDonald's while simultaneously claiming that the Company's "cross-functional team" was ensuring the facilities were prepared for the rollout. These statements left investors with the impression that the limited required investments were insignificant and would not preclude profitability. In reality, as Charlesworth later admitted, the known "costs associated with [the] U.S. nationwide expansion" with McDonald's prevented the Company from achieving "sustainable, profitable growth." Defendants knew before the launch that these improvements "to make sure the facilities and our people are ready" for McDonald's were more than just incidental start-up costs. Indeed, Defendants were presented with detailed analyses showing the substantial up-front investments required for the rollout and were repeatedly asked: "[A]re you sure you want to do this if it's going to cost this much money up front?" *See* ¶57; §IV.D.2. Multiple former employees corroborated that these McDonald's-related costs included extensive factory remediation and renovation to meet McDonald's heightened audit standards, increased staffing and training, significant food-safety upgrades, including at least $18 million in metal detectors, and expanded delivery capacity. *See e.g.*, §IV.D.3. In addition, the Company ultimately impaired at least $51 million in McDonald's specific assets—more than 45% of the Company's U.S. earnings—which impeded rather than "accelerate[d] profitable U.S. expansion."

148. Furthermore, rather than having the correct protocols in place at the start of the launch, multiple former employees confirm the exact opposite was true: senior leadership knew Krispy Kreme "***wasn't ready***." *See e.g.,* ¶¶55, 71; §IV.D.2. Senior Manager Katz told CW 5 that the Company needed "***another three or four years of preparation***" to fix the internal problems and build the necessary infrastructure for the rollout. Indeed, Defendants were "building the plane as [they were] flying it" and did not even have a proper delivery system established. *See e.g.,* ¶¶89-91. In fact, Defendants ultimately admitted Krispy Kreme needed to exit the logistics side and outsource distribution altogether.

149. On the Q2 2024 earnings call, Charlesworth later hammered home the message that costs for McDonald's expansion would not be overly high, or preclude profitable expansion, explaining "***the overall message is that the expansion of delivered fresh daily in the U.S. is leveraging an underutilized system, the additional densification of all that distribution means you get flow through to the bottom line. .*** ." According to Charlesworth, "***[i]n the early months, nearly all of the expansion is serviced by existing production hubs.***"

150. The statements in ¶149 were materially false and misleading, and omitted material facts when made. The "existing production hubs" could not support the rollout because in truth, the Company needed "another three or four years of preparation" to fix the internal problems and build the necessary infrastructure for the rollout. *See, e.g.*, ¶89; §§IV.D.3, IV.D.6, IV.D.7. Indeed, Krispy Kreme "just wasn't ready" as the Company's operations were "***a complete sh*t show***," and "[t]here was not enough infrastructure to meet the demand." ¶¶71, 88. Moreover, Defendants knew that even attempting to increase productivity at existing hubs would only trigger major maintenance costs due to years of "deferred maintenance," which the Company tracked. ¶70.

151. Furthermore, the expansion was not "leveraging an underutilized system" because, as Defendants knew, the necessary costs to increase production were "pretty astronomical" as Krispy Kreme was "blazing through [] money" and "spending money left and right" to accomplish the launch. *See e.g.,* ¶¶64, 76. Metal detectors and other food-safety equipment required by the McDonald's deal cost at least $18 million; new-employee training programs to meet McDonald's auditor's standards exceeded $1 million; and other large-scale investments were necessary, such that upon termination Krispy Kreme was forced to impair $51 million in assets which it attributed to the McDonald's partnership—more than 45% of yearly U.S. earnings. In addition, the facilities were "disgusting" and required full "backhouse resets" at each shop, mold remediation, and full renovations of certain locations, to get the facilities "up to a higher standard" to pass McDonald's comprehensive audits. *See e.g.*, ¶¶65, 67; §IV.D.3. Defendants knew of these prohibitive costs because they were presented with "Project Ray" which laid out the staggering investment required for the McDonald's expansion. ¶¶56-58. Defendants ultimately admitted that the Krispy Kreme expected "margin compression" due to the need to make "long-term business investments" to fund the national rollout, and that the necessary costs and investments made the McDonald's "partnership unsustainable."

**D. September 2024 Statements**

152. On September 10, 2024, Defendants Ashukian and Charlesworth participated in the Piper Sandler Growth Frontiers Conference, where the analyst's first question was about how the Company would expand its hub-and-spoke model in the U.S. to accommodate the McDonald's partnership. In response, Charlesworth commented on how the Company was able to handle expansion "***with just our existing production facilities, a lot of them former franchisees, a few***

***years old, heavily underutilized. So, we're able to leverage that to service the demand***," with "***a very clear path to support [the McDonald's] expansion***." Specifically, Charlesworth stated:

> ***Specifically on production, we're able to go from at the first 6,000 with just our existing production facilities, a lot of them former franchisees, a few years old, heavily underutilized. So, we're able to leverage that to service the demand.*** We are able to also take some doughnut shops, which I believe that don't even serve off-premise locations and convert them to support the expansion. And then, of course, we need to add. So, we've basically identified literally every McDonald's in the country that we'll be distributing to, that's more than 12,000, map them against all the production hubs that we have today, the ones that we convert and bring online. And then, that leaves about 25 that we need to build. The vast majority of those are already either under construction, going through permitting or signed leases. ***And so, we have a very clear path to support that expansion.***

153. Defendants further assured investors that the McDonald's expansion would not be overly costly. Indeed, Defendant Ashukian explicitly stated: "EBITDA will be the main source of deleverage in the future, especially as we kind of ramp up McDonald's. We typically spend 6% to 7%, 7% to 8% on CapEx, so ***we're not ramping up CapEx over the next couple years to fund some of the expansion in the US***."

154. The statements in ¶¶152-53 were materially false and misleading, and omitted material facts when made. Defendants did not have "a very clear path to support [the McDonald's] expansion" but instead were "building the plane as they were flying it." *See* ¶89. In reality, as former employees confirm, Defendants knew that the McDonald's rollout required far more than "just [the Company's] existing production facilities" that were supposedly "heavily underutilized." *See e.g.,* §§IV.D.1, IV.D.2, IV.D.3, IV.D.6, IV.D.7. Indeed, Defendants were aware that the facilities "were too old and not capable of handling the volume Krispy Kreme" needed to service McDonald's, and the Company required at least "another three or four years" to build the necessary infrastructure to handle the expansion. *See* ¶¶70, 89.

155. Furthermore, as numerous former employees explained, Krispy Kreme could not use its "existing" facilities to "service the demand" without first undertaking substantial and costly

upgrades to meet the "higher standards" mandated by McDonald's. The factories needed complete and expensive "backhouse resets" before they could even pass McDonald's thorough audits and begin producing for McDonald's, and, even then, the neglected machinery needed costly repairs due to years of deferred maintenance. Furthermore, Krispy Kreme needed to spend tens-of-millions for metal detectors and other food-safety equipment in addition to millions in additional drivers and trucks, and increased staffing. *See* §IV.D.3. Thus, the Company could not just "leverage" the supposedly "heavily underutilized" facilities without massive costs—costs which Defendants ultimately admitted precluded Krispy Kreme from "achiev[ing] a profitable business model" with McDonald's.

156. Moreover, multiple former employees explained that it was clear that the costs associated with the McDonald's rollout meant that the Company "was not making money" and the "deal was not going to work." *See e.g.*, ¶75, §IV.D.2. These accounts were entirely consistent with Defendants' own admissions at the end of the Class Period. Indeed, contrary to Defendants' representations, Defendants ultimately admitted that Krispy Kreme was in fact "ramping up CapEx" to fund the expansion. Defendants ultimately admitted that the Company expected "margin compression" due to "long-term business investments" needed to fund the national rollout, and that the "costs associated with [the] U.S. nationwide expansion" through McDonald's prevented Krispy Kreme from achieving "sustainable, profitable growth." The Company also disclosed that it impaired at least $51 million in McDonald's-related assets specifically due to the "termination of the Business Relationship Agreement with McDonald's USA" as those investments were not useful in other aspects of the business.

**E. October 2024 Statements**

157. On September 30, 2024, the SEC wrote to Defendant Ashukian, stating that the SEC's Division of Corporation Finance, Office of Trade & Services had reviewed Krispy Kreme's

SEC filings, including the Company's Q2 2024 Form 10-Q, and requested that Ashukian "disclose the material terms of your Business Relationship Agreement with McDonald's." Material terms listed by the SEC included the Company's "rights and obligations under the agreement, the estimated capital expenditure necessary to meet such obligations, the duration of the agreement, and the terms of cancellation." The letter "remind[ed] [Ashukian] that the [C]ompany and its management are responsible for the accuracy and adequacy of their disclosures . . . ."

158. Defendant Ashukian responded on October 10, 2024 via a public letter. In his response, regarding capital expenditures, Ashukian conveyed that Krispy Kreme was "***not subject to capital expenditure commitments or obligations specific to the relationship with McDonald's. We plan to support much of this expansion using existing capacity, and do not expect a significant increase in capital expenditures as a percentage of revenue in 2024***." Ashukian added that while Defendants expected "U.S. capital expenditures as a percentage of revenue to increase in fiscal 2025 and 2026 associated with acceleration of the overall U.S. business expansion, ***these capital expenditures support the overall DFD and retail channels and are not directly attributable to, or required by, this agreement***."

159. The statements in ¶158 were materially false and misleading, and omitted material facts when made. The investments undertaken for the McDonald's rollout did not "support the overall DFD retail channels" and—contrary to Defendant' claims—were, in fact, "directly attributable" to the McDonald's expansion. Indeed, Defendants ultimately recorded $51 million in asset impairment charges directly tied to the "termination of the Business Relationship Agreement with McDonald's USA" because these assets were rendered useless once the contract was terminated. These investments were unusable even as Krispy Kreme continued expanding nationwide with other customers, confirming that the McDonald's-related assets lacked any

broader application and were, in fact, "required" solely for the McDonald's rollout. Moreover, the Company was forced to recognize a $356 million goodwill impairment charge, the vast majority of which was assigned to its U.S. operations and directly tied to the failure of the McDonald's partnership. This massive impairment further confirms that the investments associated with the McDonald's rollout did not support the "overall U.S. business expansion," but instead reflected the collapse of a strategy dependent on McDonald's-specific assets and infrastructure.

160. In addition, the claim that Krispy Kreme did not need a "significant increase in in capital expenditures" because it would "support much of this expansion using existing capacity" was materially misleading. As numerous former employees revealed, the McDonald's expansion required "astronomical" upgrades and costly investments to merely make the "existing capacity" usable for McDonald's. *See e.g.,* ¶55, 64, §IV.D.2, §IV.D.3, §IV.D.6. Krispy Kreme was "blazing through [] money" to upgrade outdated facilities, increase food-safety compliance, purchase $18 million worth of metal detectors, repair neglected machinery, purchase trucks, and hire additional staff and drivers. ¶¶76, §IV.D.3. Even then, the infrastructure in the Company's facilities lacked the "excess capacity" needed to produce the volume required for numerous McDonald's locations, making daily delivery of fresh doughnuts impossible. Thus, far from avoiding a "significant increase in capital expenditures," the Company disregarded Amy Hine's warnings about the "upfront costs" and was "spending money like crazy" to try and service McDonald's. *See e.g.,* ¶¶56-58, 64.

**F. November 2024 Statements**

161. On November 7, 2024, Krispy Kreme reported its financial results for the quarter ended September 29, 2024 ("Q3 2024"). The Company's press release, which was filed with the SEC on Form 8-K and was signed by Defendant Ashukian, included a statement by Defendant Charlesworth, where he touted "***[t]he successful start of our nationwide U.S. rollout at***

***McDonald's which began in Chicago in October and continues next week across Ohio and Indiana***."

162. On November 7, 2024, the Company also published an investor presentation accompanying Krispy Kreme's Q3 2024 results. The presentation echoed the Company's press release, further highlighting Krispy Kreme's "***successful start to nationwide McDonald's rollout***," while Defendants attributed to the Company's purportedly "***strong operation execution***" and "***positive consumer response***." The slide is reproduced below:




163. The statements in ¶¶161-62 were materially false and misleading, and omitted material facts when made. The rollout with McDonald's was not "successful" as there was neither "strong operation execution" nor "positive consumer response." Former employees explained that operationally Krispy Kreme was a "sh*t show" and unprepared for the launch. *See* ¶¶88-97. Factories were understaffed—at times operating without a doughnut maker—and newly hired staff

produced poor quality doughnuts that were "inconsistent" and "looked like garbage." *See* ¶¶100, 129.

164. In addition, because of the "deferred maintenance," the doughnut machines would break down causing production shortfalls. Krispy Kreme also suffered from "inconsistent delivery" with drivers failing to show up at all or routinely missing McDonald's delivery windows, which led to returns and rejections. McDonald's uploaded more than 400 complaints in the first couple of weeks in Chicago, and the Company was forced to make daily calls to McDonald's to apologize for missed or late deliveries and to report physical damage to McDonald's property caused during the delivery process. *See* ¶104; §§IV.D.6, IV.D.7. The consumer response was also poor. Krispy Kreme regularly delivered stale doughnuts that were often 24 to 36 hours old, which harmed consumer demand. In fact, according to former employees who worked in Chicago, McDonald's "saw that the quality sucked" and "started dropping their orders." *See* ¶¶98-104. By "autumn" McDonald's began drastically cutting orders to avoid waste, as confirmed by multiple former Krispy Kreme and McDonald's employees. *See* ¶¶82-83.

165. During his opening statement at Krispy Kreme's Q3 2024 earnings call held on November 7, 2024, Defendant Charlesworth, not only again touted "***[t]he successful start of our nationwide U.S. rollout of McDonald's***," but that "***[t]he consumer response has been positive***," with the Company "***off to a strong start on our journey to meet our goal of making fresh Krispy Kreme Doughnuts available in more than 12,000 McDonald's by the end of 2026***." Charlesworth made sure to stress that a reason for success was because Company's classic "Original Glazed" doughnut was "***always so fresh***" throughout "***all sales channels***."

> ***The successful start of our nationwide U.S. rollout of McDonald's,*** which began in Chicago in October and continues next week in Ohio and Indiana is a major milestone on this journey. . .

* * *

***We make sure that [the doughnuts are] always so fresh and enjoyed throughout the day in all sales channels, representing excellent value to the consumer****. . .*

***The nationwide rollout to McDonald's has started well, with fresh doughnuts delivered daily*** *. . .* ***The consumer response has been positive, and the pace of growth accelerates from here*** with more than 1,000 additional restaurants launching this month alone in Ohio, Indiana, Pennsylvania and West Virginia. ***We're off to a strong start on our journey to meet our goal of making fresh Krispy Kreme Doughnuts available in more than 12,000 McDonald's by the end of 2026.***

166. Analysts immediately picked up on Defendants' representations regarding the rollout going smoothly, but wanted more details. In response, Defendant Charlesworth explained that Defendants were "***really pleased with the start***" of the rollout "***both from a consumer response point of view and the reception we've got from the McDonald's team about our service and quality doughnuts***." Charlesworth made clear that the Company was purportedly seeing "***a really good response in line with our original assumptions***" and "***plenty of positive feedback from the McDonald's teams***." Charlesworth added that the rollout was going so well that Defendants were "accelerat[ing]" the expansion and would add more locations "***as fast as we can***."

Joshua Charlesworth: Yes. Well, McDonald's customers, they're clearly excited to see our fresh doughnuts on the menu… ***So what we're seeing so far is a really good response in line with our original assumptions***. We're seeing incrementality in Chicago, no obvious impact on our existing doughnut shops there and ***plenty of positive feedback from the McDonald's teams***. And regarding the reception of the brand in Chicago, I think that the strong support McDonald's is putting behind this is no doubt part of that. And indeed, you heard us reference earlier today, ***the confidence that we have from the success is having us sort of accelerate to service more restaurants as fast as we can, all align with our strategy of becoming bigger and better***. ***So we're really pleased with the start, both from a consumer response point of view and the reception we've got from the McDonald's team about our service and quality doughnuts.***

167. In response to an analyst question asking Charlesworth to "share any early learnings from the McDonald's rollout," Charlesworth stressed the rollout was "***working as we expected***" specifically because Krispy Kreme was "***doing a great job***" in its operations and logistics to

provide "***fresh doughnuts***" that were delivered at "***the right time [and] the right quantities***" to the McDonald's locations.

> Joshua Charlesworth: Well, I think ***the learnings are that it's working as we expected***. I think that clearly, the McDonald's team have been making preparations since the Kentucky pilot through to the Chicago launch, which really set it apart. … ***And our teams are doing a great job and making sure that they get at the right time, the right quantities and adapting to feedback as it comes***. I think probably the biggest challenge has probably been more on the delivery side, making sure that we know all the best routes to all these locations. Imagine more than 400 McDonald's added in a day for us. There's bound to be small operational adjustments needed. But I think the team have really taken that to heart and taken all learning they can and applying it to the pending rollouts. I mean with more than 1,000 going over the next couple of weeks, obviously, this now takes us to another level, and we need to scale and hence, our commitment to get it right. ***There's a few start-up costs.*** There's a few extra people making sure that we deliver right first time. But the team will settle into it and certainly been impressed with the partnership from the restaurant operators at McDonald's.

168. The statements in ¶¶165-67 were materially false and misleading, and omitted material facts when made. The rollout with McDonald's was not off to a "successful" or "strong start." Former employees explained that operationally Krispy Kreme was a "sh*t show" and unprepared for the launch. Rather than merely needing "a few start-up costs," the Company's factories were in dire shape and required full "backhouse resets." Moreover, the factories were understaffed and newly hired staff produced poor quality doughnuts that "looked like garbage" while new drivers missed delivery windows or failed to show up at all. *See e.g.,* ¶100; §§IV.D.6, IV.D.7. Furthermore, according to both former Krispy Kreme and McDonald's employees, Krispy Kreme was not providing "fresh doughnuts," "quality doughnuts," or "great doughnuts" at the "right time." Instead, "[n]one of the doughnuts were going out the same day" they were baked, with Krispy Kreme often delivering doughnuts that were "24 to 36 hours old," causing McDonald's to regularly complain about poor quality products, with over 400 complaints in just the first couple of weeks. *See* ¶¶101-04.

169. Indeed, on some occasions, Krispy Kreme failed to make deliveries at all, forcing McDonald's to tell its patrons the "***we don't have [Krispy Kreme] today, they haven't shown up.***" *See, e.g*, ¶92. The logistical problems were so bad that the Company decided to outsource the deliveries to McDonald's less than three months later. And, despite claiming otherwise, the Company was not receiving "positive feedback," McDonald's was consistently lodging complaints about unsanitary trays, late deliveries, and poor doughnut quality. Consumer response also was not "in line with [the] original assumptions," as the poor-quality doughnuts actually caused McDonald's to drastically cut orders to avoid waste in the first few weeks of the rollout—a far cry from "success" in the new markets. Finally, less than three months later, Defendants conceded that, there was no positive "consumer response," as the Company had "seen consumer softness" in the McDonald's expansion, with demand "a little lower than we expected."

170. While Defendants relayed the message to investors about the smooth rollout that triggered accelerated expansion, analysts still wanted more information about demand and sales on the McDonald's side, as Defendants were asked: "on the McDonald's side. . . I'm just trying to get a sense of how it can translate into a good retail demand and if there is any upside to the numbers we discussed in the past on the weekly sales?" In response, Charlesworth reiterated that consumers were responding well to the Company's doughnuts in McDonald's restaurants, stating "***What we can see is good response from the consumer.*** Obviously, we're making -- we can track the deliveries. We can track any that are unsold. ***And indeed, we can see that they [are] clearly sold throughout the day. We're very pleased that the McDonald's team [is] making sure that we're not out of stock and our product is well presented and always the freshest and highest quality. Everything we see gives us confidence that this resonates with the consumer. And the feedback from McDonald's definitely shows that***."

171. The statements in ¶170 were materially false and misleading, and omitted material facts when made. By November 2024, Krispy Kreme had already brought in CW 4 in a last-ditch effort to try and remedy the pervasive problems plaguing the McDonald's deal's execution. ¶54. CW 4 had no real chance to fix the situation. By the time she was "brought into the game in the eighth inning," she was stuck with contractual terms that made profitability for Krispy Kreme flatly impossible. *Id.* Defendants had absolutely no credible basis to deliver such a positive answer to the analyst's direct question about sales. And in reality, there was no "good response from the consumer" and no delivery of the "freshest and highest quality doughnuts." Former Krispy Kreme and McDonald's employees uniformly confirmed that the truth was the exact opposite. Instead, "none of the doughnuts were going out the same day" they were baked, with Krispy Kreme regularly delivering doughnuts that were "24 to 36 hours old," causing McDonald's to lodge over 400 complaints in just the first couple of weeks of the rollout. *See* ¶¶101-04.

172. In addition to pressing about the success of the rollout and demand, analysts also sought out further information regarding the costs involved for the rollout. In response to an analyst question about whether the Company's lowered adjusted EBITDA guidance was due to McDonald's-related costs, Defendant Ashukian stated that the costs were merely reflective of the "***intentional decision to accelerate***" the rollout and therefore any increased costs were simply a "***pull forward versus anything unexpected***."

> Jeremiah Ashukian: And maybe I'll start with the revenue kind of point and work back. But our guide of 5% to 7% organic revenue for the year, reflects our confidence in our ability to continue to grow revenue amidst choppiness in traditional retail locations, which in the guide is being offset. So we're seeing some softness in retail by the small contribution of incremental top line due to the accelerated expansion. So we feel good that we can hold the top line. ***The full year guide on EBITDA was updated to reflect the impact of higher logistics costs in the quarter, our intentional decision to accelerate start-up costs. So it's a pull forward versus anything unexpected*** and the carve-out of Insomnia, the largest impact being the logistics cost, followed by the start-up investments and then a

> small amount on the kind of carve-out of Insomnia. As mentioned on the call, I think it's important to note that we are committed to continuing to drive a better business. We believe we'll return to operating leverage in the fourth quarter.

173. In response to analyst questions about whether Defendants anticipated any "big upfront costs in the first half of next year where it really impacts profitability or even for the full year," Defendants asserted that this was not the case. Rather, Defendant Ashukian unequivocally assured investors that there was "***no surprise on the cost front to ensure a smooth rollout***."

174. The statements in ¶¶172-73 were materially false and misleading, and omitted material facts when made. Contrary to simply "pull forward" or routine "start-up investments" that were not a "surprise," Krispy Kreme was "blazing through [] money" because it was unprepared for the launch. *See, e.g.,* ¶76. The Company was paying significantly more overtime to its employees to handle the volume increases, suffered expenses on broken machines strained by the extra output, and had to cover McDonald's costs for property damage caused by drivers. *See e.g.,* §§IV.D.3, IV.D.6. Indeed, the logistics breakdowns, increased staffing, driver issues, and other rising costs meant that Krispy Kreme's costs were significantly higher than expected. Moreover, these statements were made halfway through Q4 2024 and less than three months before Defendants announced poor Q4 2024 results, including increased "costs associated with our U.S. nationwide expansion" that resulted in a 28.4% decline in adjusted EBITDA. As Defendants ultimately conceded that the "costs associated with [the] U.S. nationwide expansion" with McDonald's prevented the Company from achieving "sustainable, profitable growth." Furthermore, there, in fact, was "a surprise on the cost front" that did not "ensure a smooth rollout" as evidenced by the $51 million in McDonald's-specific asset impairments and termination costs directly attributed to the "termination of the Business Relationship Agreement with McDonald's USA." These asset impairments contributed to a stunning $356 million goodwill impairment

which likewise was blamed in part by the McDonald's blunder, further demonstrating that the related investments were not minor and did not support the Company's overall operations.

175. On November 8, 2024, Krispy Kreme filed its Q3 2024 Form 10-Q, which was signed and certified by Defendants Ashukian and Charlesworth. The Q3 2024 Form 10-Q, again repeated the claim that any investment made in the McDonald's rollout was a prudent investment as "***these capital expenditures support the overall DFD and retail channels and are not directly attributable to, or required by, the agreement with McDonald's***," which was false and misleading for the reasons set forth in ¶159.

**G. February 2025 Statements**

176. As discussed above, Defendants' false and misleading statements and omissions of material facts, first began to be revealed on February 25, 2025, when the Company announced disappointing results for the fourth quarter of 2024, including increased costs that resulted in a 28.4% decline in adjusted EBITDA, and 2025 sales and EBITDA guidance below consensus estimates. CEO Charlesworth also admitted that demand for Krispy Kreme doughnuts "has dipped actually a little lower than we expected." However, the partial corrective disclosures on that date were accompanied by Defendants' strong false reassurances and other false statements and omissions that continued to artificially inflate Krispy Kreme's stock price.

177. Specifically, during the Company's earnings call held on February 25, 2025, Charlesworth announced that "this very morning, we launched daily deliveries to approximately 500 McDonald's restaurants in the Greater New York City area and ***remain on track to reach about 6,000 [McDonald's] restaurants by year-end.***"

178. In response to an analyst's question about the Company's business with McDonald's including "how '24 came out versus internal expectations, top and bottom line" and "any updates" for 2025 "based on results," Charlesworth stated that the "***rollout is on track***,"

proclaiming that "***the feedback from McDonald's is very positive; they tell us it's working well. And we're working hard with them to maximize the opportunity, make sure that the launch goes well.***" Charlesworth further assured investors that the demand for Krispy Kreme doughnuts at McDonald's was "***very strong.***"

> Andrew Paul Wolf: ***I wanted to ask you about your business with McDonald's, just how '24 came out versus internal expectations, top and bottom line, and what is kind of reflected, however specifically you can speak to it, in 2025, with any updates based on results.***
>
> Joshua Charlesworth: Andrew, we started the phased rollout of McDonald's just in October. We're already in actually 2,500 restaurants today. We're launching in New York just today. ***We expect to be in about 6,000 by the end of the year and 12,000 by the end of 2026. So that rollout is on track.***
>
> It's important to understand as well that the phased nationwide rollout of McDonald's is part of a broader strategy to make our fresh doughnuts more accessible, as mentioned earlier, with Walmart, Target, Kroger, Costco and others.
>
> So all that being said, ***the feedback from McDonald's is very positive; they tell us it's working well. And we're working hard with them to maximize the opportunity, make sure that the launch goes well.*** And we've seen during the launch phase that with local marketing, the team at McDonald's is able to raise awareness, make sure that people know it's on the menu, ***driving very strong demand*** and no visible cannibalization of our other sales channels.

179. The statements in ¶¶177-78 were materially false and misleading, and omitted material facts when made. The rollout was nowhere near "on track." As of the end of February, Defendants had decided to effectively abandon the McDonald's partnership. Indeed, contrary to the claim that Krispy Kreme would be servicing 6,000 McDonald's locations by year-end, Defendants did not expand to ***any*** additional McDonald's locations after February 25, because Krispy Kreme could not "deliver sustainable, profitable growth" with McDonald's. As Defendants later admitted, they did not launch any additional stores between February 25 and the end of the second quarter, and analysts specifically highlighted Defendants' "everything going as planned message" as misleading.

180. Furthermore, it was misleading to state that the feedback from McDonald's was "very positive." In reality, the severe operational problems such as delivery failures, machine breakdowns, and defective production processes resulted in Krispy Kreme providing McDonald's with "inconsistent deliveries" and sub-par doughnuts. McDonald's, in turn, lodged daily complaints regarding delivery issues and poor product quality, including by sending thousands of photographs documenting these deficiencies. *See* §IV.D.7. Moreover, demand was not "very strong," as operational failures caused McDonald's to drastically reduce its orders, with some locations by this point down to as few as three doughnuts per day. *See, e.g.,* ¶101.

181. Later during the call, in response to an analyst question about the amount of cash that the Company was spending, Charlesworth reassured investors that the Company was "***leverage[ing] existing capacity***" and had "***increased productivity***" at its existing hubs:

> [F]rom an operational point of view, that as we prepare for this nationwide footprint in the US and we expand with the national partners, ***we're finding more and more ways to leverage our existing capacity***, whether it's because ***we've increased productivity at our existing hubs or we're learning how to get the doughnuts out to the points of access better and better***. So there is an opportunity, we think, ***going forward to invest a little less than we originally expected in the hubs***, which means that we'll probably only build about five to seven new hubs this year in the US, which is a little less than we had previously expected, reflecting the ability to leverage that existing capacity better.

182. The statements in ¶181 were materially false and misleading, and omitted material facts when made. In reality, Krispy Kreme was not finding "more and more ways to leverage [the] existing capacity." Instead, the Company was "spending money left and right" on labor and delivery costs to get the existing production facilities to produce sufficient capacity such that Krispy Kreme was losing money on each McDonald's delivery. *See, e.g.,* ¶¶64, 97; §IV.D.3; IV.D.6. Nor was Krispy Kreme "getting the doughnuts out to the points of access better and better." To the contrary, "none of the doughnuts were going out the same day," and the Company was

ultimately forced to fully outsource its logistics function in an effort to alleviate delivery failures. *See* ¶99; §IV.D.7.

183. The same day, on February 25, 2025, Defendant Charlesworth appeared on a Yahoo! Finance news program where the reporters pointed out how Krispy Kreme's stock was at "an all-time low," and was "plunging after missing Wall Street expectations for the fourth quarter, also issuing weaker than expected guidance."

184. In response to an analyst's question asking, "how do you boost investor confidence right now?" Charlesworth responded by pointing out how "***expanding with [] national partners in the U.S.***" like McDonald's, had "***continued to grow very well … the strategy is working … as we prepare for this National roll out in the U.S. . . . we're confident for [] the long-term profitable growth***." Regarding the McDonald's rollout, Charlesworth again claimed that "***the feedback from McDonald's [] has been [] positive***" and how the rollout would expand to "***6,000 by the end of this year, 12,000 by the end of next year***." The partnership was described as "***an important program for [] our growth***," with Charlesworth adding that "***the doughnuts [] are fresh, freshly made [] they are delivered daily from our hub and spoke network so [] they're very similar to what you get in a Krispy Kreme store***."

185. The statements in ¶184 were materially false and misleading, and omitted material facts when made. The claim that McDonald's was an "important program for [] our growth" and the Company was expanding to 6,000 McDonald's locations "by the end of this year" was false and misleading. In truth, the Company had already effectively decided to stop the rollout and, in fact, did not add a single McDonald's location after February 25 because Krispy Kreme could not "deliver sustainable, profitable growth" with McDonald's. Indeed, analysts specifically highlighted the February messaging of the rollout going according to plan as misleading.

186. Furthermore, the feedback from McDonald's was not "positive," the U.S. expansion strategy was not "working," and the Company was not providing "profitable growth." Krispy Kreme's operational problems including inconsistent deliveries, producing doughnuts that "looked like garbage," and providing McDonald's with doughnuts that were three days old caused McDonald's to regularly complain about the deficiencies. *See* ¶100; §IV.D.7. Indeed, McDonald's employees were scanning the provided QR code "all the time" to report operational problems to Krispy Kreme, and the complaints over "the quality was a never-ending story." *See* ¶¶103-04. Moreover, Krispy Kreme was not providing "fresh, freshly made" doughnuts "daily," as "none of the doughnuts were going out the same day" they were baked and the doughnuts were "sitting around" for multiple days in the Krispy Kreme factories before getting delivered. *See* ¶¶99, 101. As a result, McDonald's drastically reduced its orders—with some locations ordering as few as three doughnuts per day—which ensured that McDonald's was not an "important program for [Krispy Kreme's] growth."

187. On February 27, 2025, Krispy Kreme filed with the SEC its Annual Report on Form 10-K, discussing the financial results for the fiscal year ended December 31, 2024 (the "2024 10-K"), which was signed and certified by Defendants Charlesworth and Ashukian. The 2024 10-K also made substantially identical representations as those contained in the 3Q 2024 10-Q as set forth in ¶175 which were materially false and misleading, and omitted material facts when made, for the reasons set forth in ¶159.

## VI. ADDITIONAL ALLEGATIONS OF SCIENTER

188. Numerous facts including those detailed above, considered collectively, demonstrate that Defendants knew they were making the above-detailed materially false and misleading statements and omissions of material fact, or, at minimum, acted recklessly in making

those statements and omissions. Certain allegations reflecting Defendants' scienter are summarized below.

189. *The Individual Defendants' specific, regular public remarks and assurances about the Company's national partnership with McDonald's, Krispy Kreme's logistical capabilities to provide fresh doughnuts, demand for the Company's doughnuts at McDonald's, and the cost of the McDonald's rollout to investors—including in response to questioning from the SEC and direct analyst inquiries—demonstrate their intimate knowledge about those subjects*. Defendants made a plethora of specific statements throughout the Class Period that (i) boasted of the Company's "successful test" at the 160 McDonald's restaurants in Kentucky "where consumer excitement and demand exceeded expectations," thereby assuring investors that the rollout would succeed; (ii) assured investors that much of the rollout would use "existing capacity" and that the Company only needed modest "start-up costs" in items like "just trucks and drivers" to accomplish expansion; (iii) conveyed that "the McDonald's partnership is going very well," "the feedback from McDonald's is very positive," and "the rollout is on track"; (iv) that Krispy Kreme was "doing a great job" providing "fresh doughnuts" that were at "the right time [and] the right quantities" to the McDonald's locations; and (v) the demand for Krispy Kreme doughnuts at McDonald's was "very strong."

190. Defendants made these statements in direct response to specific inquiries from market analysts and the SEC reflecting concern about those very topics, and Defendants' statements in fact reassured investors regarding the health and success of the Company and Krispy Kreme's partnership with McDonald's. The specificity and constant repetition of Defendants' statements themselves are probative of scienter.

191. *Defendants made several admissions that directly contradicted their prior public representations*. For example, on May 8, 2025, at the end of the Class Period, Defendants admitted that the Company halted the McDonald's rollout since February because Krispy Kreme could not "deliver sustainable, profitable growth" with its McDonald's partnership. Contrary to their repeated Class Period assurances that the rollout only required modest investment and was supported by demand that "exceeded expectations," Defendants acknowledged the exact opposite: Krispy Kreme needed to "increase sales by stimulating higher demand and cut[] costs by simplifying operations." Defendants further admitted that Krispy Kreme needed to "fully outsource U.S. logistics" to a third-party provider as a means of reducing costs and "simplifying operations"—a stark admission that directly undercut their Class Period representations that touted the Company's flawless operations during the national rollout due to Krispy Kreme's operational and logistics teams who were "doing a great job" providing "fresh doughnuts" that were at "the right time [and] the right quantities" to the McDonald's locations. Moreover, despite claiming just two months prior that the McDonald's expansion "remained on track," Krispy Kreme admitted that it did "not expect to launch any additional restaurants in Q2."

192. Defendants' admissions were all the more startling once the Class Period ended, further confirming that the truth they revealed afterward stood in stark contrast to what they knew during the Class Period. Contrary to Defendants' repeated claims that the substantial investments would benefit the entire DFD operation and were "not dependent specifically, for example, on McDonald's," the truth was the exact opposite. Krispy Kreme was forced to record at least $51 million in asset impairments and termination costs tied directly to the "termination of the Business Relationship Agreement with McDonald's USA" despite the fact that the Company was continuing its U.S. expansion with other customers. These impairments, in turn, helped drive a staggering

$356 million goodwill impairment—an outcome the Company itself partially attributed to the McDonald's debacle—further confirming that the investments were never supporting the Company's broader operations, but were instead overwhelmingly dependent on a partnership Defendants knew was failing.

193. *Detailed accounts of former Krispy Kreme and McDonald's employees confirm Defendants' fraud.* The cross-corroborating and detailed accounts of several high-ranking former Krispy Kreme employees and McDonald's employees—many of whom were directly responsible for the McDonald's expansion—confirm that Defendants ignored numerous red flags regarding the high costs of the McDonald's project and the lack of a path to profitability. The CWs describe how Krispy Kreme lacked the infrastructure necessary to execute daily fresh deliveries to thousands of McDonald's locations and that Defendants knew that the expansion would require massive upfront investments, with costs set to escalate exponentially. These CW accounts leave no doubt that demand within McDonald's was never meaningfully tested, the proper due diligence was not done, leaving Defendants with no reasonable basis to believe that the nationwide partnership could ever produce profitable growth.

194. *The Individual Defendants acknowledged that they oversaw the McDonald's rollout, making clear that they knew of and were accountable for the failures at issue.* For example, during the Morgan Stanley Global Consumer & Retail Conference held on December 5, 2023, Defendant Charlesworth stated, "we've obviously looked at what it would take to support a customer like McDonald's. And so we've done a lot of detailed work on this." Additionally, on the Company's November 7, 2024 earning call, Defendant Ashukian stated, "we're meeting daily as we execute the rollout of McDonald's and start to expand in different cities, just to take the learnings, as Josh kind of mentioned, and applying course correct as we go. So we feel pretty good

that we're making the right choices, trade-offs. We have an ecosystem in place where we're managing issues real time and making choices where we need to be to make sure that we're seeing the flow-through that we need to." Charlesworth also stated on that call, "we can track the deliveries. We can track any that are unsold. And, indeed, we can see that they clearly sold throughout the day."

195. Defendants' assertions were corroborated by the accounts of former Krispy Kreme and McDonald's employees, who confirmed that Defendants had full access to information concerning how well the national partnership was going and the Company's sales data. For example, CW 2 explained that Krispy Kreme's senior leadership had real-time visibility into the Company's financial and operational data. She stated, "I know that they could do it [pull the numbers] every single day, and I know from [Charlesworth's] explanation to me that it was extremely accurate." According to CW 2, Charlesworth had detailed sales data on his phone and he monitored the Company's performance "every single day."

196. In addition, as detailed by CW 3 and 6, Defendants were shown Amy Hine's comprehensive analysis of the McDonald's rollout, including all the necessary start-up costs, and knew that Amy "asked the question many, many times: are you sure you want to proceed if it's going to cost this much money up front?" Moreover, CW 6 relayed that Amy Hine had regular meetings with Charlesworth where she would seek approval for all the rollout expenses.

197. Former employees, including CW 4 and CW 5 also explained that once the rollout got underway, Krispy Kreme had precise visibility into McDonald's sales performance because the Company used the driver's hand-held devices to track the number of doughnuts delivered and subsequently retrieved from each location. This provided continuous, real-time visibility into

delivery volumes, returns, and sales performance. CW 1 confirmed that management and the C-suite personnel all had access to McDonald's sales information.

198. In addition, management had access to real-time complaints submitted by McDonald's regarding delivery and product quality failures via the QR code provided to McDonald's restaurants. Using the QR code McDonald's employees uploaded complaints, along with picture evidence, which were then aggregated in a "Smart Sheet" available to the Defendants. CW 8 noted that all the complaints could be filtered by location and by nature of the problem, such as product quality, delivery issues, or quantity issues and that Krispy Kreme management above the Vice President level—including the Individual Defendants—had access to the Smart Sheet. According to former McDonald's employee CW 10, nearly every delivery triggered a quality-related complaint, and CW 8 explained that there were more than 400 complaints within the first two weeks of the McDonald's Chicago rollout. It is absurd to suggest that Defendants were unaware of this level of operational failure affecting the most important—and costly— venture at Krispy Kreme.

199. *The reaction of sophisticated analysts to Defendants' end-of-Class-Period disclosures strongly reinforces the inference of scienter.* These sophisticated market participants highlighted the stark contrast from Defendants' prior representations in recent months. For example, on the May 8, 2025 call, a Truist analyst highlighted that Defendants had conveyed over the past few months that the rollout was going as "expected" and therefore, wanted to know "where the change came from." The same analyst wrote that he was "***shocked by the speed at which the story fell apart***" given "***Management provided a 'everything going as planned message' on the 4Q earnings call in early February and at several conferences YTD***." Truist's report added: "We no longer have high conviction in management's previously stated strategy and execution of these

initiatives, and it will likely take several quarters before we or investors can regain confidence." As a result, Truist no longer assigned a price target to the Company's shares.

200. J.P. Morgan also highlighted that the "***McDonald's decision comes as surprise***" and the sudden stoppage after only launching at 20% of the expected locations "speaks volumes especially when long-term-focused MCD is the customer" as to just how bad things were going. A Morgan Stanley report similarly noted the halted rollout was "***surprising***" specifically because "***plans as recently as February were to be in 6,000 locations by year end***."

201. *Executive departures and overhaul of the Company's Board support a strong inference of scienter*. During and immediately after Krispy Kreme's failed partnership with McDonald's, Krispy Kreme cycled through leadership at a rapid pace —with its Chief Financial Officer exiting amid the fallout, the Company removing its Director of Field Operations, burning through two Chief Growth Officers in rapid succession, and ultimately replacing six of its eleven Board members. The sheer volume of turnover underscores how deeply the Company's known, costly missteps rattled the organization.

202. On November 7, 2024, Chief Growth Officer Matthew Spanjers—who oversaw the DFD expansion—resigned. Multiple CWs reported that this was part of a wave of layoffs commencing in November 2024. Another wave of layoffs occurred in January 2025 which included Amy Hine, the principal "architect" of the McDonald's rollout. According to CW 5, escalating McDonald's complaints to top Krispy Kreme executives led to Hine's removal.

203. On January 9, 2025, Krispy Kreme "announced changes to its Global Leadership Team aligning talent to maximize profitable expansion in the U.S." The employees appointed to "report to Charlesworth" were Dave Skena who was named as Chief Growth Officer "responsible for omni-channel growth of [] DFD…"; Alison Holder as Chief Product Officer "responsible for

bringing innovative, fresh doughnuts to Krispy Kreme fans;" and Nicola Steele "responsible for global operations excellence including modernizing doughnut production and maximizing hub-and-spoke efficiency" who assumed the role of Chief Operating Officer on March 3, 2025. Notably, none of the new management was involved with McDonald's up to that point.

204. Then, on April 23, 2025, the Company proposed what news outlets called "a massive change to its board" and "shakeup amid [the Company's] stock plunge." Specifically, ahead of the Company's June 17 annual meeting, Krispy Kreme announced that it was nominating a "[r]efreshed [s]late of [d]irectors to [s]upport [the] Company's [t]ransformation." In making the announcement, Krispy Kreme told investors that the "refreshed Board" will focus on "profitable U.S. expansion." In response to this news, Restaurant Business reported, "[i]t's unusual for companies to nominate so many newcomers to a board of directors like this."

205. On June 27, 2025, three days after Krispy Kreme announced that its partnership with McDonald's would end, the Company announced the resignations of CFO Jeremiah Ashukian and Chief Growth Officer David Skena.

206. *Krispy Kreme's sudden termination of its national partnership with McDonald's marked a decisive reversal of what had been positioned as an easy undertaking that could be done with existing production hubs and minimal investment.* Krispy Kreme abruptly killed its nationwide partnership with McDonald's, ending what was supposed to be a pillar of its growth strategy for more than two-years, and triggering a major, self-inflicted blow to its plan to accelerate U.S. expansion through the DFD model. While Defendants informed the market at the close of the Class Period on May 8, 2025, that the McDonald's partnership had merely been paused, just six weeks later, on June 24, 2025, they abruptly terminated the unprofitable venture altogether. Charlesworth announced, "[u]ltimately, efforts to bring our costs in line with unit demand were

unsuccessful, making the partnership unsustainable for us." This stood in sharp contrast to Defendants' assurances just four months earlier that the rollout remained "on track," that expansion with McDonald's had "continued to grow very well," and that the strategy was "working," instilling confidence in "long-term profitable growth."

207. A strategic long-term initiative of this magnitude does not collapse in a matter of weeks absent long-standing, undisclosed problems. The point is driven home by the staggering financial consequences—namely, a $51 million asset impairment and a $356 million reduction in goodwill. The timing of the termination — occurring just six weeks after Defendants assured the market that the partnership was merely "paused" — makes it implausible that the underlying issues only became known after the Class Period ended. Rather, the sudden reversal strongly indicates that Defendants were aware of the partnership's deteriorating condition well before their disclosures and chose to withhold that information while continuing to issue positive statements that directly contradicted internal reality. The magnitude, timing, and decisiveness of the termination thus reinforce the inference that Defendants acted with scienter.

208. *The McDonald's partnership implicated the very core of the Company's business, with the collaboration central to Krispy Kreme's strategic and operational focus.* Krispy Kreme's DFD business was a central pillar of the Company's omnichannel strategy to grow access points at which customers could buy doughnuts. Krispy Kreme's long-term plan was "to increase access to fresh doughnuts through [the Company's] DFD network – a key element of [Krispy Kreme's] omni-channel strategy to attain more than 75,000 Global Points of Access." The national partnership with McDonald's in the U.S. was central to this strategy, as it would not only add approximately 12,000 new access points, but was also touted by Defendants as creating opportunities to expand distribution to other major retailers, including Walmart, Costco, and

Target. The McDonald's partnership was also expected to materially expand the Company's most critical business unit—its U.S. segment—which accounted for 65% of total revenue in fiscal year 2023 and 64% in fiscal year 2024. Defendants themselves stressed the importance of the opportunity with the "iconic world-class brand like McDonald's," a "significant growth lever for us."

209. The foregoing facts, particularly when considered holistically, support a strong inference of Defendants' scienter.

## VII. LOSS CAUSATION

210. During the Class Period, shares of Krispy Kreme's publicly traded securities traded on the NASDAQ. The market for shares of Krispy Kreme's securities was open, well-developed and efficient at all relevant times.

211. Throughout the Class Period, the price of Krispy Kreme's securities was artificially inflated as a result of Defendants' materially false and misleading statements and omissions identified above. Defendants engaged in a scheme to deceive the market, and a course of conduct that operated as a fraud or deceit on Class Period purchasers of Krispy Kreme securities, by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Krispy Kreme securities fell precipitously as the prior artificial inflation dissipated. As a result of their purchases of Krispy Kreme securities during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.

212. By issuing materially false and misleading financial statements, among other adverse facts detailed herein, Defendants presented a misleading picture of Krispy Kreme's business. Defendants' false and misleading statements had the intended effect and caused Krispy Kreme's securities to trade at artificially inflated levels throughout the Class Period.

### A. February 25, 2025 Disclosure

213. On February 25, 2025, prior to the markets opening, Krispy Kreme issued a press release disclosing disappointing results for the fourth quarter of 2024, including a 28.4% decline in adjusted EBITDA, and 2025 sales and EBITDA guidance below consensus. Later on the accompanying conference call with analysts, CEO Charlesworth admitted that demand for Krispy Kreme doughnuts "has dipped actually a little lower than we expected" and that the Company expected "margin compression" due to the need to make "long-term business investments." *See also infra*, §IV.E.

214. In response to these disclosures, Krispy Kreme's stock price fell approximately 35% from a closing price of $9.13 per share on February 24, 2025, to a closing price of $5.97 on February 26, 2025.

215. Notwithstanding the price decline following Defendants' February 25, 2025 disclosure, the price of Krispy Kreme securities remained artificially inflated because Defendants continued to materially mislead the market regarding the true state of Krispy Kreme's business, including by concealing the full extent of the Company's issues with the McDonald's partnership.

### B. May 8, 2025 Disclosure

216. On May 8, 2025, prior to the markets opening, Krispy Kreme issued a press release disclosing disappointing results for the first quarter of 2025, including a 62.7% year-over-year decrease in U.S. Adjusted EBITDA. Krispy Kreme also announced that the Company was "reassessing the deployment schedule together with McDonald's" and that it did "not expect to launch in any additional restaurants in the second quarter of 2025." In addition, Krispy Kreme announced that given "the uncertainty around the McDonald's deployment schedule, the Company is withdrawing its prior full year outlook and not updating it at this time." The Company also was

discontinuing its quarterly dividend because the capital was needed to "pay down debt." *See also infra*, §IV.F.

217. In response to Defendants' admissions, the Company's share price plummeted 37% from a closing price of $4.33 per share on May 7, 2025, to a closing price of $2.73 per share on May 9, 2025.

## VIII. PRESUMPTION OF RELIANCE

218. At all relevant times, the market for the Company's securities was an open, efficient and well-developed market for the following reasons, among others:

a) Krispy Kreme's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b) As a regulated issuer, Krispy Kreme filed periodic reports with the SEC and the NASDAQ;

c) Krispy Kreme regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d) Krispy Kreme was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace.

219. As a result of the foregoing, the market for Krispy Kreme's securities reasonably and promptly digested current information regarding the Company from all publicly available

sources and reflected such information in the price of the Company's securities. All investors who purchased the Company's securities during the Class Period suffered similar injury through their purchase of Krispy Kreme's securities at artificially inflated prices, and a presumption of reliance applies.

220. A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Krispy Kreme's business and operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the material misstatements and omissions set forth above, that requirement is satisfied here.

## IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

221. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

222. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false, and the statement was authorized and/or approved by an executive officer and/or director of Krispy Kreme who knew that such statement was false when made.

## X. CLASS ACTION ALLEGATIONS

223. Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities that purchased or otherwise acquired Krispy Kreme securities between March 26, 2024 and May 7, 2025, inclusive (the "Class"), and were damaged thereby. Excluded from the Class are Defendants, the officers and directors of Krispy Kreme at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

224. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Krispy Kreme's shares were actively traded on the NASDAQ. As of April 30, 2024, the Company had more than 168 million shares outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least thousands of members of the proposed Class. Record owners and other members of the Class may

be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

225. Lead Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

226. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests that conflict with those of the Class.

227. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b) whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

c) whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders misrepresented material facts about the business, operations, and prospects of Krispy Kreme;

d) whether statements made by Defendants to the investing public misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Krispy Kreme;

e) whether the market price of Krispy Kreme shares during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f) the extent to which the members of the Class have sustained damages and the proper measure of damages.

228. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## XI. CLAIMS FOR RELIEF

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants**

229. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

230. Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Krispy Kreme shares; and (iii) cause Lead Plaintiff and other members of the Class to purchase Krispy Kreme shares at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

231. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for Krispy Kreme shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

232. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Krispy Kreme's business, operations, and prospects, as specified herein. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Krispy Kreme's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Krispy Kreme and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

233. Each of the Individual Defendants' primary liability and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as

a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

234. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Krispy Kreme's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations, and prospects, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

235. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Krispy Kreme shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the stock trades, and/or

in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Lead Plaintiff and the other members of the Class purchased Krispy Kreme securities during the Class Period at artificially inflated prices and were damaged thereby.

236. At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known of the truth regarding the problems that Krispy Kreme was experiencing, which were not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased their Krispy Kreme securities, or, if they had purchased such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

237. By virtue of the foregoing, Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

238. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

239. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

240. The Individual Defendants acted as controlling persons of Krispy Kreme within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and

intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

241. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

242. As set forth above, Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## XII. PRAYER FOR RELIEF

243. WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

a) Declaring this action to be a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b) Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiff and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c) Awarding Lead Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d) Awarding such other and further relief as this Court deems appropriate.

## XIII. JURY DEMAND

244. Lead Plaintiff demands a trial by jury.

Dated: January 30, 2026

Respectfully submitted,

**TERPENING LAW PLLC**

By: /s/ William R. Terpening
William R. Terpening
NC Bar No. 36418
221 West 11th Street
Charlotte, NC 28202
Tel.: (980) 265-1700
terpening@terpeninglaw.com

*Local Counsel for Lead Plaintiff and Local Counsel for the Class*

**SAXENA WHITE P.A.**
Maya Saxena (admitted *pro hac vice*)
Lester R. Hooker (admitted *pro hac vice*)
Jonathan Lamet (admitted *pro hac vice*)
Dianne Pitre (admitted *pro hac vice*)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
msaxena@saxenawhite.com
lhooker@saxenawhite.com
jlamet@saxenawhite.com

dpitre@saxenawhite.com

**SAXENA WHITE P.A.**
Steven B. Singer (*pro hac vice* forthcoming)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 216-2220
ssinger@saxenawhite.com

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Class*

**KLAUSNER KAUFMAN JENSEN**
**& LEVINSON**
Robert D. Klausner
7080 NW 4th Street
Plantation, Florida 33317
Tel.: (954) 916-1202
Fax: (954) 916-1232
bob@robertdklausner.com

*Additional Counsel for Lead Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2026, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

Respectfully submitted,

By: */s/ William R. Terpening*
William R. Terpening