UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| | : |
| | : Case No. 3:25-cv-00332-MOC-SCR |
| IN RE KRISPY KREME, INC. | : |
| SECURITIES LITIGATION | : **<u>Oral Argument Requested</u>** |
| | : |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' <u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>

ROBINSON, BRADSHAW
& HINSON, P.A.
Robert E. Harrington
N.C. Bar No. 26967
rharrington@robinsonbradshaw.com
Amanda P. Nitto
N.C. Bar No. 45158
anitto@robinsonbradshaw.com
600 South Tryon Street, Suite 2300
Charlotte, North Carolina 28202
Telephone: (704) 377.2536
Facsimile: (704) 378.4000

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Scott D. Musoff
Alexander C. Drylewski
One Manhattan West
New York, New York 10001
(212) 735-3000
scott.musoff@skadden.com
alexander.drylewski@skadden.com

*Attorneys for Defendants*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 4

    A.    Krispy Kreme's Business and "Delivered Fresh Daily" Strategy ........................... 4

    B.    Krispy Kreme Successfully Completes Pilot
Program at 160 Locations in Kentucky ................................................................. 4

    C.    Krispy Kreme and McDonald's Announce Their Nationwide Expansion
But Warn That Sales, Store Deployment and Profits Are Not Guaranteed ............. 5

    D.    Krispy Kreme Prepares for the Nationwide McDonald's Rollout ........................... 5

    E.    The McDonald's Rollout Commences in October 2024 ......................................... 7

    F.    Krispy Kreme Discloses "Consumer Softness" Months After the Start of
the Rollout ........................................................................................................... 7

    G.    Krispy Kreme and McDonald's Pause the Rollout in May 2025 ........................... 8

    H.    Krispy Kreme and McDonald's Jointly Terminate the Partnership in June
2025 ..................................................................................................................... 8

ARGUMENT ................................................................................................................... 9

I.      PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(b) ............................. 9

    A.    Plaintiff Has Not Adequately Pled a Material Misrepresentation or
Omission ............................................................................................................. 9

          1.    Plaintiff Mischaracterizes Many of Defendants' Statements ..................... 10

          2.    Plaintiff Does Not Otherwise Allege That Any of Defendants'
Class Period Statements Were False or Misleading When Made ............. 13

          3.    The Remaining Alleged Misstatements Are Non-Actionable as
Forward-Looking Statements or Statements of Opinion under
*Omnicare* ........................................................................................... 16

    B.    Plaintiff Fails to Plead Scienter ........................................................................... 18

          1.    Plaintiff Fails to Plead Any Motive to Commit Fraud ............................. 19

i

2.      Plaintiff Fails to Plead Conscious Misbehavior or Recklessness ..............19

3.      Any Inference of Scienter Is Far Less Compelling Than Opposing Inferences ...................................................................................................24

II.     PLAINTIFF HAS NOT STATED A CLAIM UNDER SECTION 20(a) .........................25

CONCLUSION...................................................................................................................25

## CASES

*In re aaiPharma, Inc. Securities Litigation*,
521 F. Supp. 2d 507 (E.D.N.C. 2007)................................................................................24

*Ash v. PowerSecure International Inc.*,
No. 4:14-CV-92-D, 2015 WL 5444741 (E.D.N.C. Sept. 15, 2015) ..................................19

*Beaumont v. Paucek*,
No. 24-cv-1723-ABA, 2025 WL 2494347 (D. Md. Aug. 29, 2025) ..................................18

*In re Biogen Inc. Securities Litigation*,
857 F.3d 34 (1st Cir. 2017)...............................................................................................20

*Boykin v. K12, Inc.*,
54 F.4th 175 (4th Cir. 2022) ..................................................................................... *passim*

*In re ChannelAdvisor Corp. Securities Litigation*,
No. 5:15-CV-00307-F, 2016 WL 1381772 (E.D.N.C. Apr. 6, 2016), aff'd per
curiam sub nom. *Dice v. Challenadvisor Corp.*, 671 F. App'x 111 (4th Cir. 2016) .........17

*City of Southfield General Employees Retirement System v. Advance Auto Parts, Inc.*,
167 F.4th 637 (4th Cir. 2026) ................................................................................... *passim*

*Cozzarelli v. Inspire Pharmaceuticals Inc.*,
549 F.3d 618 (4th Cir. 2008) ..........................................................................................9, 12

*Docdeer Foundation v. BioNTech SE*,
No. 24 Civ. 5310 (KPF), 2025 WL 2781381 (S.D.N.Y. Sept. 30, 2025).........................11

*In re DXC Technology Co. Securities Litigation*,
No. 1:24-cv-01351-AJT-WEF, 2025 WL 950398
(E.D. Va. Mar. 27, 2025) ...........................................................................3, 10, 14, 17, 22

*In re DXC Technology Co. Securities Litigation*,
No. 1:18cv01599 (AJT/MSN), 2020 WL 3456129 (E.D. Va. June 2, 2020), *aff'd
sub nom. KBC Asset Management NV v. DXC Technology Co.*, 19 F.4th 601 (4th
Cir. 2021) ..........................................................................................................................23

*Employees' Retirement System of Baton Rouge v. Macrogenics, Inc.*,
61 F.4th 369 (4th Cir. 2023) .............................................................................................14

*Fanucchi v. Enviva Inc.*,
No. DKC 22-2844, 2024 WL 3302564 (D. Md. July 3, 2024)..........................................21

*Goines v. Valley Community Services Board*,
    822 F.3d 159 (4th Cir. 2016) .......................................................................................12

*In re First Union Corp. Securities Litigation*,
    128 F. Supp. 2d 871 (W.D.N.C. 2001) ........................................................3, 9, 13, 14, 15

*Janus Capital Group, Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011)................................................................................................9, 24

*Johnson v. Pozen Inc.*,
    No. 1:07CV599, 2009 WL 426235 (M.D.N.C. Feb. 19, 2009) *report and
    recommendation adopted*, No. 1:07CV599, 2009 WL 10680297 (M.D.N.C. Sept.
    29, 2009) ...........................................................................................................24

*KBC Asset Management NV v. DXC Technology Co.*,
    19 F.4th 601 (4th Cir. 2021) ..........................................................4, 18, 21, 22, 23

*Maguire Financial, LP v. PowerSecure International, Inc.*,
    876 F.3d 541 (4th Cir. 2017) ...............................................................................18, 20

*In re Marriott International, Inc.*,
    31 F.4th 898 (4th Cir. 2022) .........................................................9, 10, 12, 13, 16

*In re Municipal Mortgage & Equity LLC, Securities & Derivative Litigation*,
    876 F. Supp. 2d 616 (D. Md. 2012), *aff'd sub nom. Yates v. Municipal Mortgage
    & Equity LLC*, 744 F.3d 874 (4th Cir. 2023).............................................................21, 23

*Ollila v. Babcock & Wilson Enterprises, Inc.*,
    No. 3:17-cv-109, 2018 WL 792069 (W.D.N.C. 2018)................................................10, 14

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015)................................................................................................10, 18

*Pipefitters Local No. 636 Defined Benefit Plan v. Tekelec*,
    No. 5:11–CV–4–D,
    2013 WL 1192004 (E.D.N.C. Mar. 22, 2013) ........................................................ *passim*

*Plymouth County Retirement Ass'n v. Primo Water Corp.*,
    966 F. Supp. 2d 525 (M.D.N.C. 2013) ..............................................................................13

*Raab v. General Physics Corp.*,
    4 F.3d 286 (4th Cir. 1993) ...............................................................................................17

*San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*,
    75 F.4th 232 (4th Cir. 2023) ........................................................................... *passim*

*Teachers' Retirement System of LA v. Hunter*,
    477 F.3d 162 (4th Cir. 2007) ...............................................................11, 12, 15, 21, 22, 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..................................................................................................4, 9, 18, 24

*In re Triangle Capital Corp. Securities Litigation*,
    988 F.3d 743 (4th Cir. 2021) ...............................................................................19, 20, 25

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ........................................................................................17

## STATUTES

15 U.S.C. § 78u-5(c) ...............................................................................................................16

15 U.S.C. § 78u-4(b).................................................................................................................9

15 U.S.C. 78u-4(b)(1), (2) .......................................................................................................2

## OTHER AUTHORITIES

Memorandum Opinion, *Barpar v. Elanco Animal Health Inc. Securities*,
    No. 1:24-cv-02912-BAH (D. Md. Mar. 26, 2026), ECF No. 49 .........................................2

H.R. Conf. Rep. No. 104-369 (1995)......................................................................................16

Defendants Krispy Kreme, Inc. ("Krispy Kreme" or the "Company"), Joshua Charlesworth and Jeremiah Ashukian (together, the "Defendants") respectfully submit this brief in support of their motion to dismiss the Amended Complaint (ECF No. 65, the "AC").[1]

## PRELIMINARY STATEMENT

This action is emblematic of an unfortunate trend in securities litigation: the plaintiff highlights a negative event in the life of a corporation, points to a stock price decline, and claims—in conclusory and hindsight fashion—that "securities fraud" must have occurred. But hindsight does not establish fraud, and courts have routinely dismissed attempts at "Monday morning quarterbacking" as insufficient to state a claim under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Indeed, the PSLRA acts as a "check against abusive litigation by private parties," and its heightened standards "addressed the problem of suits being routinely filed whenever there was a significant change in an issuer's stock price, without regard to underlying culpability." *City of Southfield Gen. Emps. Ret. Sys. v. Advance Auto Parts*, 167 F.4th 637, 646 (4th Cir. 2026); *Boykin v. K12, Inc.*, 54 F.4th 175, 182 (4th Cir. 2022) ("The mere incidence of a declining stock price . . . should not elicit lawyer-driven litigation.").

The target here is Krispy Kreme, a North Carolina-based global doughnut business. In March 2024, following a successful pilot program, the Company announced that it would partner with McDonald's USA ("McDonald's") to sell its doughnuts at McDonald's locations nationwide. While Krispy Kreme expressed hope that this new venture would succeed, it also warned investors of the many risks it faced, cautioning that it did not guarantee Krispy Kreme any particular level of deployment, sales, or profits. Over the next year, the Company kept investors apprised of its business strategy and disclosed that, despite investments made to support the expansion and efforts

---

[1] Unless otherwise noted, all emphasis is added and internal citations are omitted. Referenced exhibits are attached to the accompanying Declaration of Alexander C. Drylewski.

to increase sales, demand for doughnuts at participating locations had fallen below expectations. In June 2025, Krispy Kreme and McDonald's jointly agreed to terminate the partnership.

Seeking to capitalize on these events, Plaintiff seizes on the drop in Krispy Kreme's stock price, recites snippets from the Company's past disclosures, and asserts in hindsight fashion that Krispy Kreme's trading losses revealed a scheme to defraud investors. Not so. To survive a motion to dismiss under the PSLRA, unlike in other cases, Plaintiff must plead with particularity "each statement alleged to have been misleading, [and] the reason or reasons why," and "facts giving rise to a *strong inference*" that *each* defendant acted with scienter (*i.e.*, an intent to defraud). 15 U.S.C. 78u-4(b)(1), (2). Far from meeting these standards, the AC boils down to a single, untenable allegation: because Krispy Kreme's partnership with McDonald's did not ultimately succeed, Defendants must have known—and concealed from investors—that it was doomed from the start. This theory of fraud defies reason, providing no explanation as to why Defendants would proceed with a business venture that was, in Plaintiff's words, "unsustainable." Nor does it explain why Defendants would mislead investors as to the venture's prospects while knowing that they would inevitably have to reveal its poor results, and that McDonald's could reveal the so-called "truth" at any moment, all while reaping no cognizable benefit from the alleged scheme. After all, courts "generally do not presume that defendants would tout a contract that they knew was doomed to fail without some ulterior motive." *San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*, 75 F.4th 232, 242 (4th Cir. 2023). The AC should be dismissed for the following reasons:

*First,* Plaintiff does not adequately allege a single actionable misstatement or omission. (*Infra* §I(A).)[2] The "practice of alleging 'fraud by hindsight'—claiming that defendants knew of

---

[2] For the Court's convenience, attached as **Appendix A** is a table listing each challenged statement and the bases for dismissal set forth herein. *See Barpar v. Elanco Animal Health Inc. Sec.*, 1:24-cv-02912, ECF No. 49, at 29 (D. Md. 2026) (such tables can be a "helpful guide to the Court").

facts at an earlier time based on subsequent disclosures—has been categorically rejected by numerous courts." *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 884 (W.D.N.C. 2001). Here, unable to plead with particularity how or why any of Defendants' statements were false **when made**, *see id.*, Plaintiff mischaracterizes what Defendants actually said, attacks forward-looking statements protected (indeed, encouraged) under the PSLRA's "safe harbor," or impugns statements of opinion or corporate optimism—none of which can sustain a claim for fraud.

*Second*, Plaintiff also fails to plead particularized facts giving rise to a strong inference of scienter as to *any* Defendant, much less *all* of them.  (*Infra* §I(B).)  Critically, Plaintiff fails to allege any cognizable motive to commit fraud.  While Plaintiff alleges generically that Defendants were motivated to "artificially inflate" Krispy Kreme's stock price, this is a "generalized motive . . . shared by *all* companies" that is "insufficient to plead scienter under the PSLRA." *Boykin* 54 F.4th at 186.  Plaintiff also does not plead any "circumstantial evidence of fraud," which must be "correspondingly greater" to overcome the lack of motive.  *San Antonio Fire*, 75 F.4th at 242. Plaintiff does not point to a single document, record or communication showing that Defendants knew their challenged statements were false when made.  And Plaintiff's hodgepodge of allegations from anonymous, so-called "confidential witnesses" ("CWs") amount to nothing more than operational critiques of the McDonald's venture—not well-pled facts that Defendants knowingly committed securities fraud.  Notably, not a single CW is alleged to have communicated these critiques to Defendants.  Even if they had, "subjective assessments from employees who disagree with managers' courses of conduct do not demonstrate that those managers knew that their conduct would be unsuccessful or that their statements would be misleading to investors." *In re DXC Tech. Co. Sec. Litig.*, 2025 WL 950398, at *12 (E.D. Va. 2025).

Far from establishing a "strong inference" that Defendants intentionally committed fraud,

3

the AC gives rise to a far more compelling inference of *non*-fraud: that Defendants genuinely believed in the success of the McDonald's partnership, made repeated efforts to see it succeed, and promptly informed investors when it did not. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313-14 (2007) (requiring courts to weigh non-fraudulent inferences drawn from securities fraud complaint). If the AC were sufficient to state a claim, then any public company that undertakes an unsuccessful business venture would be subject to claims of fraud under the federal securities laws—precisely the type of result that the PSLRA was enacted to prevent.

### STATEMENT OF FACTS[3]

**A.      Krispy Kreme's Business and "Delivered Fresh Daily" Strategy**

Krispy Kreme is a global doughnut company. (AC ¶¶30-2.) It employs a "hub and spoke" distribution model, using centralized production hubs (*i.e.*, Krispy Kreme stores and factories) to make doughnuts and sell them in-store or distribute them to other Krispy Kreme stores or "points of access" in the area, including grocery, convenience and drug stores, wholesalers and restaurants. (AC ¶¶33-4.) Through the expansion of its "Delivered Fresh Daily" ("DFD") strategy, Krispy Kreme has sought to make its doughnuts more accessible to customers by partnering with retailers such as Walmart, Target, and Kroger to sell doughnuts in their stores. (AC ¶¶1, 33-4, 37, 178.)

**B.      Krispy Kreme Successfully Completes Pilot Program at 160 Locations in Kentucky**

In October 2022, Krispy Kreme began testing the sale of its doughnuts at nine McDonald's locations in Kentucky, later growing to 160 locations. (AC ¶¶35-6.) As a result of the "successful test," in which "consumer excitement and demand exceeded expectations," in March 2024, Krispy Kreme and McDonald's agreed to expand the partnership into restaurants nationwide. (AC ¶40.)

---

[3] The facts are drawn from the AC, the "documents incorporated . . . by reference, and matters of which a court may take judicial notice," *Tellabs,* 551 U.S. at 322, including the content of relevant SEC filings. *See KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 607 (4th Cir. 2021).

4

**C.** **Krispy Kreme and McDonald's Announce Their Nationwide Expansion But Warn That Sales, Store Deployment and Profits Are Not Guaranteed**

On March 26, 2024, Krispy Kreme and McDonald's announced that the nationwide expansion would begin later that year. (AC ¶127.) Krispy Kreme noted that it had been "scaling its supply chain, building a support team, adding technology and new equipment, and enhancing field training to support its [DFD] expansion, which includes this phased rollout." (AC ¶128.) Krispy Kreme's agreement with McDonald's provided that the parties would "work together to develop a deployment schedule" for the rollout—but critically, Krispy Kreme expressly warned investors that the agreement with McDonald's did "**not guarantee Krispy Kreme any particular level of [business unit] deployment, sales, or profits**." (Ex. B, 3/26/24 8-K at 2.) Krispy Kreme also incorporated the "Risk Factors" disclosed in its annual report (*id.* at 5-6), including:

- That the "industry is highly susceptible to shifts in consumer preferences" and "a loss or significant decrease in sales" to a retailer "could have a negative impact on our business's health, financial stability, and operational results" (Ex. A, 2/27/24 10-K at 14, 17);

- "[C]osts associated with integrating . . . strategic partnerships into our existing structure," and the "risk of not achieving expected revenue" therefrom (*id.* at 16);

- That Krispy Kreme's "DFD channels . . . necessitate a substantial infrastructure with notable fixed and semi-fixed costs," and relationships with retail customers "are not bound by long-term contracts; rather, purchases are influenced by factors like pricing, product quality, consumer demand, and service excellence" (*id.* at 17);

- That the "ongoing expansion of the omni-channel business model involves substantial costs and uncertainties," including "enhancement of manufacturing capabilities" and "logistics systems" (*id.* at 18); and

- That the expansion's success depended on "building and sustaining the manufacturing and logistical capabilities required to fulfill our delivery commitments," with "no assurance that we will attain the expected benefits or achieve the cost savings, revenue growth, and other positive outcomes needed to counterbalance [its] costs and risks." (*Id.*)

**D.** **Krispy Kreme Prepares for the Nationwide McDonald's Rollout**

Throughout the Spring and Summer of 2024, the Company continued to make investments to support its expansion and prepare for the McDonald's rollout, which it announced in August

2024 would begin in Chicago in Fall 2024. (AC ¶¶144-5.) Krispy Kreme's CEO, Joshua Charlesworth, explained that the Company would "support much of this nationwide rollout using [the] existing capacity" (AC ¶136) of its roughly 150 production hubs in the U.S., but Krispy Kreme would "also invest in our business to increase Production Hubs with Spokes."[4] The Company was further "making improvements to the production lines" in preparation for the rollout, investing in customer service and marketing, "making sure that we've got extra drivers in place to get the doughnuts there," and testing the outsourcing of delivery to third-party providers. (Ex. J, 8/8/24 Tr. at 6, 9; Ex. E, 5/9/24 Tr. at 4, 8.) In *each* quarter of the alleged "Class Period," Krispy Kreme repeated the "risk factors" noted above, and further cautioned that it "*expect[ed] to incur additional capital expenditures related to our accelerated U.S. expansion* . . . including via QSR channels such as *the McDonald's U.S. national rollout*."[5]

In the first three quarters of 2024, Krispy Kreme disclosed investments of $29.1, $31.7 and $26.1 million, respectively, in capital expenditures, "*driven primarily by investments in the Hub and Spoke model in preparation for the U.S. expansion of our [DFD] network*," as well as that it had incurred "costs associated" with "preparing for the McDonald's U.S. Expansion."[6] Defendants also emphasized that the expansion was "in the midst of a startup phase" and Krispy Kreme was "*incurring costs ahead of revenue*," which was expected to reduce its earnings margins into 2025 and 2026. (Ex. L, 9/10/24 Tr. at 5; Ex. O, 11/7/24 Tr. at 12.) And while the partnership with McDonald's was "going very well in general" (AC ¶146), Krispy Kreme

---

[4] Ex. E, 5/9/24 Tr. at 4 (explaining that adding McDonald's and other "points of access" through the DFD expansion would allow for "increased utilization of our production Hubs and increased distribution density on our delivery routes"); Ex. J, 8/8/24 Tr. at 4 (same).

[5] Ex. D, 5/9/24 10-Q at 22, 35; Ex. I, 8/8/24 10-Q at 23, 40; Ex. Q, 11/8/24 10-Q at 27, 46; Ex. U, 2/27/25 10-K at 15, 18, 21, 50. Plaintiff alleges a "Class Period" of Mar. 26, 2024 to May 7, 2025.

[6] Ex. C, 5/9/24 8-K at 5, 12; Ex. H, 8/8/24 8-K at 5, 12; Ex. N, 11/7/24 8-K at 5, 12.

6

repeatedly warned that the McDonald's agreement did not guarantee any level of sales or profits.[7]

## E. The McDonald's Rollout Commences in October 2024

In mid-October, Krispy Kreme commenced the national rollout at 400 McDonald's stores in Chicago. (AC ¶167; Ex. O, 11/7/24 Tr. at 4.) In November 2024, Krispy Kreme began deliveries to over 1,000 additional locations across the Midwest. (AC ¶165.) While Defendant Charlesworth was positive, stating the rollout had "started well," his comments made clear that it was based on data they had seen "*so far*" in just the first few weeks. (AC ¶¶165-6.) Nonetheless, Krispy Kreme disclosed that its third quarter U.S. earnings had decreased *37.5%* compared to the year prior, due in part to "*McDonald's start-up costs*." (Ex. N, 11/7/24 8-K at 5.) Charlesworth addressed the Company's "early learnings" and the challenges it was experiencing regarding the McDonald's venture, disclosing that "the biggest challenge has probably been more on the delivery side . . . [i]magine more than 400 McDonald's added in a day for us. There's bound to be small operational adjustments needed." (AC ¶167.) Charlesworth added that "[t]here's a few start-up costs," and "a few extra people making sure that we deliver right [the] first time." (*Id.*) Krispy Kreme also announced that it had launched an RFP process for third-party delivery services, seeking to "improve capital efficiency" and "increas[e] [the] utilization of production hubs." (Ex. P, 11/7/24 Deck at 11; *see also* Ex. O, 11/7/24 Tr. at 11.) Jeremiah Ashukian, Krispy Kreme's CFO, emphasized that "*we do expect margins to be pressured as a result of some new start-up costs* ahead of revenue throughout the first half of 2025." (*Id.* at 12.)

## F. Krispy Kreme Discloses "Consumer Softness" Months After the Start of the Rollout

On February 25, 2025, Krispy Kreme released "disappointing" fourth quarter and year-end 2024 results, including a nearly 30% decline in earnings. (AC ¶176.) As to the McDonald's

---

[7] Ex. D, 5/9/24 10-Q at 23; Ex. I, 8/8/24 10-Q at 24; Ex. M, 10/10/24 Ltr. at 5; Ex. Q, 11/8/24 10-Q at 9, 28; Ex. U, 2/27/25 10-K at 36, 74.

rollout, Krispy Kreme had launched deliveries to about 500 McDonald's locations in New York that morning and "remain[ed] on track to reach about 6,000 restaurants by year-end." (AC ¶110.) Charlesworth noted that its "strategy is working," (AC ¶184), in reference to expanding with national partners, making it more convenient for people to buy Krispy Kreme doughnuts, and "bringing everyday value to customers," but acknowledged that it had been a "choppy start to the year." (Ex. T, 2/25/25 Yahoo Tr. at 4:1-4:12.) Specifically, Charlesworth warned that after the initial McDonald's launch, "demand has dipped actually a little lower than we expected," and Ashukian echoed that Krispy Kreme had seen "consumer softness" in 2025. (AC ¶106.)

## G.     Krispy Kreme and McDonald's Pause the Rollout in May 2025

On May 8, 2025, Krispy Kreme announced that it "d[id] not expect to launch in any additional restaurants in the second quarter of 2025." (AC ¶113.) While Krispy Kreme was "pleased with many aspects of the program," Charlesworth explained that "demand [had] dropped below our expectations, requiring intervention." (Ex. V, 5/8/25 Tr. at 4.) Going forward, "[t]o deliver sustainable, profitable growth, we are partnering with McDonald's to increase sales by stimulating higher demand and cutting costs by simplifying operations," and Krispy Kreme intended to "fully outsource US logistics" by mid-2026. (*Id.*)

## H.     Krispy Kreme and McDonald's Jointly Terminate the Partnership in June 2025

On June 24, 2025, Krispy Kreme and McDonald's announced that the companies had jointly decided to terminate their partnership, effective July 2, 2025. (AC ¶120.) Charlesworth noted that "[u]ltimately, the efforts to bring our costs in line with unit demand were unsuccessful, making the partnership unsustainable for us." (AC ¶¶120, 206.) McDonald's stated that it "had strong collaboration with Krispy Kreme *and they delivered a great, high-quality product for us, and while the partnership met our expectations for McDonald's* . . . this needed to be a profitable business model for Krispy Kreme as well." (Ex. W, 6/24/2025 8-K at 4.)

8

## ARGUMENT

Securities fraud complaints must satisfy both Rule 9(b) and the heightened pleading standards of the PSLRA. *In re First Union*, 128 F. Supp. at 884. Under Rule 9(b), a plaintiff must plead all elements of fraud with particularity—the "who, what, where, why and when." *Id.* When alleging a violation of Section 10(b) or Rule 10b-5, the pleading standard is even higher. 15 U.S.C. §78u-4(b). Plaintiff must "specify each statement by defendants alleged to have been misleading" and "supply the reason or reasons why." *Boykin*, 54 F.4th at 182. Plaintiff must also "state with particularity facts giving rise to a strong inference of defendants' culpable state of mind"—*i.e.*, Defendants' "intention to deceive, manipulate or defraud." *Id.* at 182, 186. The inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 186; *Tellabs*, 551 U.S. at 314. As demonstrated below, the AC falls far short of meeting the PSLRA's "exacting" standards.[8]

## I. PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(b)

### A. Plaintiff Has Not Adequately Pled a Material Misrepresentation or Omission

First, Plaintiff has not adequately alleged that any of Defendants' statements were false or misleading when made. *See In re Marriott Int'l, Inc.*, 31 F.4th 898, 901 (4th Cir. 2022).[9] Plaintiff "must identify a *factual* statement or omission—that is, one that is demonstrable as being true or false." *Id.* As to each challenged statement in the AC, Plaintiff has failed to meet its pleading burden because: (1) Plaintiff mischaracterizes the alleged statement or otherwise (2) fails to plead its falsity, including because it amounts to immaterial "puffery" and not a demonstrable fact; or

---

[8] *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 623 (4th Cir. 2008) (courts must be "vigilant in preventing meritless securities fraud claims from reaching the discovery phase of litigation").

[9] While Plaintiff groups Charlesworth and Ashukian together, under §10(b), individual defendants "cannot be held liable" for any statements they "did not make." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 138, 142 (2011) ("One 'makes' a statement by stating it.").

9

(3) the challenged statement is forward-looking and protected by the PSLRA's "safe harbor," and/or is subjective opinion that is non-actionable under *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015).[10]

### 1. Plaintiff Mischaracterizes Many of Defendants' Statements

Many of Defendants' statements are not adequately alleged to be false or misleading because Plaintiff takes them out of context or mischaracterizes them. *See Marriott*, 31 F.4th at 904 ("[W]e must first strip . . . allegations of mischaracterizations and exaggeration, [and] focus on whether the exact statement in its true context constitutes a material representation.").

### (a) Statements Concerning McDonald's-Specific Expansion Costs

For example, throughout the AC, Plaintiff claims that Defendants misled investors into believing that Krispy Kreme's class-period investments "were not McDonald's-specific." (*See* AC ¶¶16, 41, 112, 123, 132, 159, 174.) Plaintiff claims this misleading behavior was revealed when the Company later disclosed $51 million in McDonald's-related asset impairments and termination costs. (*Id.*) But Defendants never represented that Krispy Kreme would not incur ***any*** McDonald's-specific expansion costs. Rather, Krispy Kreme repeatedly told investors that it "expect[ed] to incur capital expenditures related to our accelerated U.S. expansion, including . . . ***the McDonald's U.S. national rollout***"; reported, in each quarter, "costs associated" with "preparing for ***the McDonald's U.S. expansion***"; and immediately after the rollout began, disclosed that earnings had decreased 37.5% compared to the prior year due partly to "***McDonald's start-up costs***." (*Infra* at 6-7.) These repeated disclosures—which the AC ignores—eviscerate Plaintiff's allegation that McDonald's-specific investments were "never-before-disclosed." (AC

---

[10] *See In re DXC*, 2025 WL 950398, at *9 (distinguishing cases that involved "concrete representations of specific facts, rather than, as in this case, statements that are either (1) true, (2) vague corporate puffery, or (3) covered by the PSLRA's safe harbor") (citing, *e.g.*, *Ollila v. Babcock & Wilson Enters., Inc.*, 2018 WL 792069, at *2 (W.D.N.C. 2018)).

¶123); *see Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 182 (4th Cir. 2007); *Docdeer Found. v. BioNTech SE*, 2025 WL 2781381, at *14 (S.D.N.Y. 2025) ("[D]ismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed.").[11]

        (b)        <u>Statements Regarding Investments Required for the Rollout</u>

Plaintiff also mischaracterizes Defendants' statements regarding investments needed to support Krispy Kreme's expansion. Notwithstanding that many of these statements are forward-looking (*infra* §I(A)(3)), Defendants never said that overall investment would be "minimal," "modest," "insignificant," or require "little more than just trucks and drivers." (*Cf.* AC ¶¶4, 39, 41, 106, 147.) Rather, Defendants repeatedly explained that the Company, among others:

- Had "teams focused on partnering with the customers . . . and customer service and then marketing," "[s]o there is investment there," and was "making improvements to the production lines" (Ex. J, 8/8/24 Tr. at 6, 9);

- Was investing in "increased training and development," "overstaffing drivers to ensure availability early and ensure that we're driving service," "improving capability in manufacturing operations," and "upgrading doughnut production lines and our delivery logistics network" (Ex. O, 11/7/24 Tr. at 12); and, indeed,

- Expected "U.S. capital expenditures as a percentage of revenue to increase in fiscal 2025 and 2026 associated with the acceleration of the overall U.S. business expansion."[12]

Thus, Plaintiff's allegations that Defendants assured investors "minimal investment was required" for the rollout (*see, e.g.*, AC ¶41) is belied by the "true context" of Defendants' public statements

---

[11] Plaintiff's comparison is also not apples-to-apples: the $28.9 million in "lease impairment and termination costs" resulted from the ***termination*** of the McDonald's contract (not start-up costs), and the $22.1 million in "long-lived asset ***non-cash*** impairment charges" recorded in August 2025 is not equivalent to ***cash*** investments made to fund Krispy Kreme's expansion during the alleged "Class Period." (Ex. X, 8/7/25 8-K at 6.) The same is true of the goodwill impairment charge, attributable to Krispy Kreme's declining stock price in the U.S. and four other countries. (*Id.*)

[12] *See* Ex. M, 10/10/24 Ltr. at 4; Ex. Q, 11/8/24 10-Q at 46; Ex. U, 2/27/25 10-K at 50. Plaintiff also fails to allege that the statement "these capital expenditures support the overall DFD and retail channels and are not directly attributable to, or required by, this [McDonald's] agreement" was false or misleading in any way regarding the terms of the McDonald's contract (*cf.* AC ¶¶158-9).

and should be rejected. *Marriott*, 31 F.4th at 904; *see also Tchrs.' Ret. Sys.*, 477 F.3d at 182.[13]

(c)      Statements Regarding "Profitable" U.S. Expansion

Next, Plaintiff alleges that it was "misleading to convey that the Company was '[a]ccelerating profitable U.S. expansion' *with McDonald's*" based on an excerpted slide from Krispy Kreme's August 2024 investor presentation. (AC ¶¶145, 147.) But, contrary to Plaintiff's suggestion, that slide did not say that Krispy Kreme was accelerating profitable expansion "*with McDonald's*." Under the heading "Accelerating Profitable U.S. Expansion," Krispy Kreme first noted the "Coast-to-Coast Expansion of [the] Delivered Fresh Daily Network," picturing Target as an example. (Ex. K, 8/8/24 Deck at 11.) Under the same heading on the next slide, Krispy Kreme stated, as to McDonald's, "*Nationwide Rollout Starting This Fall in the Midwest*." (*Id.* at 12.) No reasonable investor would interpret this forward-looking statement as a representation that the McDonald's rollout, *which had not even begun*, was "profitable." And Krispy Kreme's broader, DFD expansion *was* profitable at the time based on the financial metrics provided, which Plaintiff does not and cannot challenge. (*Id.* at 5, 17-23); *see Cozzarelli*, 549 F.3d at 625-26; *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166-67 (4th Cir. 2016) ("[C]rediting the document over conflicting allegations in the complaint is proper."). So too with a similar slide from a May 2024 investor presentation (AC ¶137; Ex. F, 5/9/24 Deck at 10), which Plaintiff claims was misleading but does not explain why. As for Charlesworth's statement regarding Krispy Kreme's "profitable nationwide expansion," (AC ¶144), read in context, it is crystal clear that the

---

[13] Plaintiff attempts to support its allegations through the excerpt that "[m]uch of the national rollout can happen using *existing capacity*." (AC ¶41; *see also* ¶¶4, 11, 39, 41, 106, 111, 136-9, 158, 160, 181-2.) But Plaintiff omits the remainder of the sentence, in which Charlesworth added: "*but we will also invest in our business to increase production Hubs with Spokes*." (Ex. E, 5/9/24 Tr. at 4.) Moreover, read in context, Defendants' references to "excess" or "existing capacity" referred to the capacity of Krispy Kreme's 150 or so *production hubs*, which would see "increased utilization" and serve "more points of access" through expansion. (*Id.* at 4, 13; *infra* at 6.)

12

McDonald's venture was offered as an example of efforts to "grow with existing customers and add new national partners"—not a claim that the venture was already "profitable" when it had yet to start. (*See* Ex. H, 8/8/24 8-K at 4.) Plaintiff's attempt to mischaracterize Defendants' plainly forward-looking statements should be rejected. *See Marriott*, 31 F.4th at 902; *infra* §I(A)(3).

### 2. Plaintiff Does Not Otherwise Allege That Any of Defendants' Class Period Statements Were False or Misleading When Made

Plaintiff's mischaracterizations aside, the AC has not alleged that any of Defendants' statements were false or misleading *when made*. Instead, Plaintiff attacks Defendants' optimistic statements about the McDonald's partnership with the benefit of hindsight. *See, e.g.*, *In re First Union*, 28 F. Supp. 3d at 888 ("[A]lleging 'fraud by hindsight'—claiming that defendants knew of facts at an earlier time based on subsequent disclosures—has been categorically rejected by numerous courts."); *Boykin*, 175 F.4th at 185 (Plaintiff "may not plead fraud by hindsight."). Moreover, many of the statements are quintessential expressions of optimism, or "puffery," that cannot support a claim of fraud—such as that Krispy Kreme's doughnuts were "always so fresh," that the partnership with McDonald's was "going really great so far," or that the initial consumer response was "positive." (*See* AC ¶¶127-8, 141-2, 161-2, 165-7, 170, 184); *Boykin*, 54 F.4th at 183 (Defendants' "words exemplify . . . the kind of general positivity that reasonable investors could not have relied upon."); *Plymouth Cnty Ret. Ass'n v. Primo Water Corp.,* 966 F. Supp. 2d 525, 544 (M.D.N.C. 2013) (statements that "merely parrot[ed] corporate optimism [] would not be deemed important to a reasonable investor when making a decision about purchasing securities").

#### (a) Statements Prior to McDonald's Rollout Were Not False or Misleading

For example, Plaintiff alleges that it was false to claim, on March 26, 2024, that Krispy Kreme's DFD expansion would create "operating leverage" when "in reality," (i) "operations were a 'complete sh*t show'"; (ii) deliveries were "routinely late or missed entirely'"; and (iii) doughnut

13

quality was "abysmal." (AC ¶¶128-9.) But each of these allegations necessarily **post**-date the start of the nationwide rollout, which did not begin until **October 2024**—indeed, they derive from CWs 5 and 8, neither of whom is alleged to have been *employed* by Krispy Kreme in March 2024. (AC ¶¶55, 66); *In re First Union*, 28 F. Supp. 3d at 893 (despite Plaintiff's "laundry list of alleged customer service and other operational problems . . . few of the problems alleged there had occurred" by the date of the representation); *see also id.* at 892 (statement that acquisition would create "new opportunities to **leverage** our growing . . . businesses" was non-actionable); *Ollila*, 2018 WL 792069, at *4 (Courts will "typically reject attempts to claim fraud via 'Monday morning quarterbacking.'").[14]  Plaintiff also does not plead any facts that Krispy Kreme was not, in fact, "scaling its supply chain" and "adding technology and new equipment" in preparation for expansion. (*See* AC ¶¶128, 132); *In re DXC Tech.*, 2025 WL 950398, at *9 ("Plaintiffs have not identified that any *single* integration effort that was referenced . . . did not occur.").

Next, Plaintiff alleges that it was "misleading to claim that the Kentucky pilot [was] a 'successful test' in which 'consumer excitement and demand exceeded expectations' because the pilot was never designed to effectively measure demand." (AC ¶¶128, 133, 141-3.)  The term "successful" is classic puffery, *see Boykin*, 54 F.4th at 183; and regardless, Plaintiff does not allege any facts to demonstrate that the pilot did not measure demand or that Defendants misreported anything about the results.  That Plaintiff may have "interpreted the data" from the pilot "differently does not make Defendants' statements actionable." *Emps.' Ret. Sys. of Baton Rouge v. Macrogenics, Inc.*, 61 F.4th 369, 388 (4th Cir. 2023) ("Where a company accurately reports the results of a scientific study, it is under no obligation to second-guess [its] methodology.").

---

[14] Here, unlike in *Ollila*, Plaintiff does not adequately allege that any statements were misleading due to *then*-existing material facts, rather than solely with the benefit of hindsight. *Cf. id.*

14

Finally, Plaintiff's attacks on Defendants' other pre-rollout statements (AC ¶¶129, 139, 143, 147-51, 154-6) rely on the same deficient allegations regarding "existing capacity," "leverage," and profitability noted above and thus fail for the same reasons. (*Infra* at 10-14.)[15]

(*Infra* at 10-14.)

(b)      The November 2024 Statements Were Not False or Misleading

Plaintiff claims that it was misleading to assert, mere weeks after the rollout began, that it was off to a "successful" start, with "strong operational execution" and a "positive consumer response." (AC ¶¶163-4, 168-9, 171.) But Plaintiff does not plead that ***any*** of the operational criticisms levelled by its CWs predated November 7, 2024, when Krispy Kreme reported its third quarter results. *In re First Union Corp.*, 128 F. Supp. 3d at 888, 893. Nor do those criticisms— again, that expansion was a "sh*t show" or that doughnuts "looked like garbage"—amount to particularized facts that could establish falsity. *See id.* at 895 (rejecting allegations that "lack the requisite degree of specificity"); *see also Pipefitters Loc. No. 636 Defined Benefit Plan v. Tekelec*, 2013 WL 1192004, at *8 (E.D.N.C. Mar. 22, 2013) (statements that a product was "successful," would have "very good margins," and that business "has been very strong" were immaterial puffery). Moreover, Defendants readily acknowledged that Krispy Kreme had experienced challenges "on the delivery side," the need for "operational adjustments," and that there had been "start-up costs." (*Infra* at 7); *see Tchrs.' Ret. Sys.*, 477 F.3d at 182 (no misstatement where defendants disclosed "precisely what happened"). Likewise, Plaintiff alleges that Krispy Kreme was "blazing through [] money because it was unprepared for the launch," (AC ¶¶172-4), but nowhere attempts to quantify those costs, nor explain how they contradicted Defendants' public

---

[15] Plaintiff also attacks the statements that Krispy Kreme did not expect a "significant increase in capital expenditures" as a percentage of revenue in 2024, and was not "ramping up CapEx over the next couple years to fund some of the expansion." (AC ¶¶153, 158-60.) Notwithstanding that these projections were plainly forward-looking when made, they were proven correct, as to 2024, by later disclosures. (Ex. U, 2/27/25 10-K at 50; *compare* Ex. L, 9/10/24 Tr. at 10 (we "typically spend [*6-8% of revenue*] on CapEx") *with* Ex. R, 2/25/25 8-K at 6 (CapEx was *7.25%* in 2024).)

15

disclosures.  (*Infra* at 7; Ex. O, 11/07/24 Tr. at 10, 12 (disclosing that earnings decreased 37.5% due in part to "***McDonald's start-up costs***"; revising earnings guidance downward "***to reflect the impact of higher logistics costs in the quarter***"; and warning that margins may be "***pressured as a result of some new start-up costs***")); *In re Marriott*, 31 F.4th at 904 (4th Cir. 2022).

        (c)      <u>The February 2025 Statements Were Not False or Misleading</u>

Plaintiff acknowledges that Defendants announced "disappointing results" on February 25, 2025, including "increased costs that resulted in a 28.4% decline" in earnings and that demand had "dipped actually a little lower than we expected."  (AC ¶176; *see also infra* at 8 (acknowledging "consumer softness.").)   Nonetheless, Plaintiff claims that Krispy Kreme made "strong false reassurances" that "continued to artificially inflate [its] stock price." (*Id.*)  But Defendants did not "assur[e] investors" that lower demand was "simply due to a lack of marketing and consumer 'awareness' . . . and ***not*** to any infrastructure or logistics deficiencies."  (AC ¶109.)   Rather, Defendants readily disclosed that Krispy Kreme was "focusing on making doughnuts ***by outsourcing logistics***," to help provide "predictability in costs" and a "more streamlined set of operations."  (Ex. S, 2/25/25 Tr. at 7, 12; *see also id.* at 13 ("***[W]e are incurring startup costs as we invest in the US expansion***."); AC ¶108 (attributing results to McDonald's-related costs).)

    **3.**     **The Remaining Alleged Misstatements Are Non-Actionable as Forward-Looking Statements or Statements of Opinion under *Omnicare***

Many of Defendants' statements are non-actionable under the PSLRA's "safe harbor" for forward-looking statements.  15 U.S.C. § 78u-5(c).  Through the safe harbor, Congress intended to "enhance market efficiency by ***encouraging*** companies to disclose forward-looking information."  H.R. Conf. Rep. No. 104-369, at 43 (1995) ("Understanding a company's own assessment of its future potential would be among the most valuable information shareholders and potential investors could have about a firm.").  A statement whose truth "is discernible only *after*

16

it is made is necessarily forward-looking," *Pipefitters*, 2013 WL 1192004, at \*9, and when made

with meaningful cautionary language and without "***actual knowledge of falsity***," cannot support a

§10(b) violation. *Boykin*, 54 F.4th at 184. As the Fourth Circuit explained, "projections, like

opinions, are fallible," imposing liability on which would "deter companies from discussing their

prospects" and leave markets "deprived of the information those predictions offer." *Id.*

Here, Plaintiff attacks Defendants' various statements that the McDonald's rollout was "on

track." (AC ¶¶5, 11-2, 46-7, 55, 109-10, 113, 146-7, 177-9.) But it is well-established that the

phrase "on track" is forward-looking and not actionable. *See Boykin*, F.4th at 184, citing *Wochos*

*v. Tesla, Inc.*, 985 F.3d 1180, 1191-92 (9th Cir. 2021) (statement that defendant was "on track" to

achieve goal of producing 5,000 vehicles was forward-looking and not actionable).[16] As for

Plaintiff's attacks on Defendants' other, forward-looking statements, in the Fourth Circuit,

business predictions must constitute "specific guarantees" to establish fraud. *Raab v. Gen. Physics*

*Corp.*, 4 F.3d 286, 287 (4th Cir. 1993) (The "prognostications here are not the specific guarantees

necessary to make such predictions material"); *see also In re ChannelAdvisor Corp. Sec. Litig.*,

2016 WL 1381772, at \*5 (E.D.N.C. 2016) (collecting cases). Plaintiff does not identify any

"specific guarantees" in any of Defendants' forward-looking statements about the rollout—nor

could it. (*See* AC ¶¶127, 136-8, 144-6, 152-3, 158, 165, 172, 175-9, 181, 187.)[17] And Krispy

Kreme's public disclosures were replete with meaningful cautionary language and tailored

warnings about McDonald's-related risks, including that the contract did "not guarantee Krispy

---

[16] Moreover, that Krispy Kreme was "on track" to expand into a projected *number* of restaurants—6,000 in 2025 and 12,000 by the end of 2026—does not amount to a guarantee to that *all* facets of the rollout were "proceeding according to plan," as Plaintiff wrongly suggests (*see* AC ¶¶12, 185).

[17] As demonstrated *infra* at §I(B), Plaintiff also cannot allege that Defendants acted with fraudulent intent, much less "actual knowledge" that Krispy Kreme would not meet any projections at the time they were made. *See also In re DXC Tech.*, 2025 WL 950398, at \*7, 11.

17

Kreme any particular level of . . . deployment, sales, or profits." (*Infra* at 5, 7); *Boykin*, 175 F.4th at 184. These challenged statements are therefore non-actionable as a matter of law.

Finally, Plaintiff cannot meet the demanding pleading requirements for imposing opinion-based liability, which "only attaches if the opinion contains embedded false facts or omits material facts that cannot be squared." *Boykin*, 54 F.4th at 183; *Omnicare*, 575 U.S. at 184-85. Here, Plaintiff impugns a number of statements prefaced by "I think," which are clear expressions of opinion or belief.[18] Courts routinely hold similar statements to be inactionable, *see Beaumont v. Paucek*, 2025 WL 2494347, at *19 (D. Md. 2025) (defendants' statement that it "believe[d] the business [was] moving strongly in the right direction" was inactionable), and Plaintiff does not allege that Defendants embedded false facts or omitted material facts. *Boykin*, 54 F.4th at 183.

## B. Plaintiff Fails to Plead Scienter

The AC should also be dismissed on the independent ground that Plaintiff fails to plead "with particularity facts giving rise to a ***strong inference*** that the defendant[s] acted with the required state of mind," "with respect to ***each*** act or omission alleged." *KBC Asset Mgmt.*, 19 F.4th at 607. This requires "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319.[19] Evaluating the strength of an inference is a comparative inquiry, and the AC can survive "only if a reasonable person would deem the inference of scienter cogent and

---

[18] *See Boykin*, 54 F.4th at 183 ("The prefatory 'I believe' or '***I think***,' . . . conveys that a speaker is sharing a personal belief, not warranting facts"); (AC ¶181 ("So there is an opportunity, ***we think***, going forward to invest a little less than we originally expected in the hubs.")); AC ¶¶166-7, 172 (using the prefatory "I think" repeatedly while discussing the McDonald's rollout).)

[19] While "recklessness" can suffice, this requires "behavior . . . so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff, to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Advance Auto*, 167 F.4th at 646; *see also Maguire Financial, LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 547 (4th Cir. 2017) ("[S]evere recklessness is, in essence, a slightly lesser species of intentional misconduct.").

18

at least as compelling as any opposing inference one could draw from the facts alleged." *San Antonio Fire*, 75 F.4th at 241. If "the more compelling inference is that the defendants acted innocently—or even negligently," the AC must be dismissed. *Advance Auto*, 167 F.4th at 646.

### 1. Plaintiff Fails to Plead Any Motive to Commit Fraud

As an initial matter, the AC fails to plead any legally cognizable motive for Defendants to commit fraud. Plaintiff does not plead that either Individual Defendant personally gained from the alleged fraudulent scheme, such as by selling their shares of Krispy Kreme stock at inflated prices. *See Boykin*, 54 F.4th at 186. Rather, all Plaintiff can muster is that Defendants wished to "artificially inflate" Krispy Kreme's stock price generally. (AC ¶¶230, 234.) But, the "unvarnished wish to increase" the Company's share price is "precisely the kind of generalized motive . . . shared by *all* companies that is insufficient to plead scienter under the PSLRA." *Boykin*, 54 F.4th at 186. In turn, the absence of a motive "often weighs heavily in a scienter analysis." *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 752 (4th Cir. 2021). "After all," and as is particularly salient here, "*we generally do not presume that 'defendants would tout a contract that they knew was doomed to fail without some ulterior motive*." *San Antonio Fire*, 75 F.4th at 242. To overcome this weakness, Plaintiff's "circumstantial evidence of fraud must be correspondingly greater." *Id.* Here, Plaintiff's circumstantial evidence falls far short.

### 2. Plaintiff Fails to Plead Conscious Misbehavior or Recklessness

Plaintiff's scienter allegations amount to a classic, "fraud-by-hindsight" theory that the PSLRA was enacted to prevent. *See Ash v. PowerSecure Int'l Inc.*, 2015 WL 5444741, at *14 (E.D.N.C. 2015) (scienter requirement "prevents section 10(b) from devolving into a penalty for business decisions that, in hindsight, look questionable"); *Pipefitters*, 2013 WL 1192004, at *13 (courts have "rejected the 'circular logic' that because a company later disclosed adverse news, executives must have known about the adverse news before it was disclosed yet kept it quiet").

19

(a)     <u>Defendants Did Not Make "Assurances" as to the McDonald's Expansion</u>

First, Plaintiff alleges that Defendants "reassured investors regarding the health and success of the Company and Krispy Kreme's partnership with McDonald's," the "specificity and constant repetition" of which are "probative of scienter." (AC ¶¶189-90.) But none of the statements Plaintiff cites are remotely "specific" or "assurances" of success (*cf.* AC ¶189), nor actionable as misstatements in the first place. (*Infra* §I(A)); *Pipefitters*, 2013 WL 1192004, at *15 (no scienter where statements were not actionable); *Boykin*, 54 F.4th at 186 (the "first strike" against Plaintiff's scienter claims is its inability "to point to a statement of clear falsity"). And Plaintiff makes no attempt to plead how or why any of these statements were intentionally or recklessly deceiving. *See San Antonio Fire*, 75 F.4th at 244 ("Plaintiffs offer no plausible arguments for why . . . Defendants acted with the required mental state," in contrast to the more compelling inference that Defendants "made optimistic projections that didn't pan out.").

(b)     <u>Defendants' Post-Class Period Statements Do Not Establish Scienter</u>

Second, Plaintiff's reliance on alleged, post-class period "admissions," such as that Krispy Kreme could not "deliver sustainable, profitable growth" with the McDonald's partnership (AC ¶¶ 191, 206-8), cannot establish Defendants' state of mind ***at the time*** of the alleged misstatements. *See In re Triangle*, 988 F.3d at 753 (citing *In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 44 (1st Cir. 2017) (refusing to credit defendants' post-class period "evidentiary admissions" because they "do not provide particularized insight into the defendants' knowledge at the time of the alleged misstatements")). Plaintiff's use of these statements "amounts to little more than pleading fraud by hindsight." *Id.*; *see also Maguire*, 876 F.3d at 548 (Congress "determine[ed] that liability for securities fraud should not be predicated solely on an overly optimistic view of a future which may, in fact, encounter harsh economic realities down the road.").

20

       (c)       <u>Plaintiff's CW Allegations Do Not Support a Strong Inference of Scienter</u>

Third, Plaintiff's attempt to plead Defendants' scienter through a grab bag of vague, ex post facto business critiques levelled by CWs is insufficient. In the Fourth Circuit, CW "allegations will only be afforded the weight they are due given their indicia of reliability." *KBC Asset Mgmt.*, 19 F.4th at 609. CW allegations "must be examined to consider the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, the coherence and plausibility of the allegations, and similar indicia." *In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*, 876 F. Supp. 2d 616, 640 (D.Md. 2012), *aff'd sub nom. Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874 (4th Cir. 2014). "Hearsay allegations and bald assertions made by confidential witnesses will not defeat a Rule 12(b)(6) motion." *Id.*

Here, Plaintiff's CW allegations lack sufficient indicia of reliability. Rather, they amount to generalized criticisms from former employees regarding corporate strategy, few (if any) of which "reach into [the] executive boardroom" and "are not inconsistent" with Krispy Kreme's public statements. *Pipefitters*, 2013 WL 1192004, at *15.[20] Only ***one*** of Plaintiff's CWs is alleged to have communicated ***at all*** with an Individual Defendant, much less regarding any of the critiques expressed in the AC. Courts routinely discount allegations from CWs who are not alleged to have direct contact with an individual defendant. *See id.* at *12; *see also KBC Asset Mgmt.*, 19 F.4th at 609; *Tchrs.' Ret. Sys.*, 477 F.3d at 181; *Advance Auto*, 167 F.4th at 649 ("Nor is there any indication that the employee passed their concerns on to the individual defendants or that [they] were otherwise aware of the problems alleged."). The lone exception, CW 4, alleges that in mid-

---

[20] Notably, the CWs do not even agree with *each other* on why the McDonald's partnership failed, alternatively positing that it was due to costs (CWs 1, 6 and 7; AC ¶¶64, 71 75); because the contract imposed no minimum order requirements on McDonald's, who wished to avoid waste and thus limited orders (CW 3; AC ¶61); because Krispy Kreme could not produce *enough* doughnuts to meet demand (CW 5; AC ¶71); or because of delivery and manufacturing issues (CW 4; AC ¶ 92). *See also Fanucchi v. Enviva Inc.*, 2024 WL 3302564, at *14 (D. Md. 2024).

March 2025, Charlesworth told her that Krispy Kreme was "losing money on the McDonald's deal" and that "in some cases we are losing 30 cents a doughnut." (AC ¶97.) But at that point, Defendants had disclosed "consumer softness," and that "demand ha[d] dipped actually a little lower" than expected at McDonald's stores; their expectation that margins would be pressured as a result of new start-up costs through the first half of 2025; and that Krispy Kreme was outsourcing logistics in an attempt to lower costs. (*Infra* at 7-8, 16; AC ¶106.) Thus, far from evincing any intention to mislead, Charlesworth's alleged admission to CW 4 was entirely consistent with Krispy Kreme's contemporaneous public statements. *See Pipefitters*, 2013 WL 1192004, at *15.

Even *if* the Court were to credit their various allegations, the CWs' criticisms are so vague, speculative and conclusory that they fall short of supporting an inference of scienter on the part of any Defendant. *See In re DXC Tech.*, 2025 WL 950398, at *12 ("Generalized subjective assessments from employees who disagree with managers' courses of conduct ***do not demonstrate that those managers knew that their conduct would be unsuccessful or that their statements would be misleading to investors***."). In other words, *even if* Plaintiff's CWs were "correct that Defendants made unwise business decisions," "***that mistake does not support a strong inference of scienter***." *KBC Asset Mgmt.*, 19 F.4th at 610; *see also Tchrs.' Ret. Sys.*, 477 F.3d at 181 ("In hindsight … employees likely regretted the [] acquisition, but this does not mean [defendant] knew *ex ante* that the investment would sour."). This applies across the categories of allegations below:

- ***Due Diligence***. Plaintiff relies on CWs 1-4 to allege that Krispy Kreme's due diligence into the McDonald's expansion was "inadequate." (AC ¶¶51-4, 81, 193.) At most, these CWs allege that Defendants "negligently performed due diligence," which cannot support a § 10(b) claim. *San Antonio Fire*, 75 F.4th at 242. Even accepting CW 3's allegation that expansion was "risky," this does not equate to an inference that Defendants knew that the design of the pilot "foreclosed their sunny projections." *Id.* at 243.

- ***Expansion Costs***. Plaintiff relies on CWs 1, 3, 5-7, and 11 to allege that Defendants ignored "exorbitant" or "prohibitive" expansion costs. (AC ¶¶53-9, 64, 75.) But nowhere

22

do these CWs quantify *how much* the McDonald's expansion was projected to cost,[21] nor how this contradicted any of Defendants' public statements. *See Boykin*, 54 F.4th at 186. And it is nonsensical that Defendants would proceed with an expansion in the face of costs that were, in fact, "prohibitive." (AC ¶59); *see San Antonio Fire*, 75 F.4th at 240.

- ***Terms of the McDonald's Contract.*** According to CWs 3, 4 and 7, Krispy Kreme signed up for "highly unfavorable" contract terms. (AC ¶¶59-62.) But Krispy Kreme disclosed that the agreement did not guarantee deployment, sales or profits (*infra* at 5, 7), and Plaintiff's criticisms of the terms of the contract reduce "to a disagreement over . . . strategy and judgments." *In re DXC Tech. Co. Sec. Litig.*, 2020 WL 3456129, at *9 (E.D. Va. 2020), *aff'd KBC Asset Mgmt.*, 19 F.4th 601.

- ***Operational Issues***. CWs 4-7 allege operational critiques, including that delivery and logistics issues were raised at weekly meetings (not attended by Defendants). (AC ¶¶88-95.) Again, these CWs give no indication as to what specific, contradictory information, if any, was shared with Defendants, much less how any "issues" translated into an intent to deceive by Defendants in their public statements. *San Antonio Fire*, 75 F.4th at 243 (even assuming that Defendants "knew" certain information, Defendants "would also have to know—or, at a bare minimum, be reckless to a risk—that declining to share that information would render their rosy predictions *misleading* for investors").[22]

Finally, Plaintiff's allegation that the "truth" about the McDonald's rollout began to emerge in February 2025, but Defendants "prevented an even greater stock price decline by minimizing the problems with McDonald's expansion," (*see* AC ¶¶105-12), makes no sense, as Defendants would inevitably have to disclose those problems eventually. *See Pipefitters,* 2013 WL 1192004, at *8. Moreover, Krispy Kreme's "[r]epeated public disclosures during the proposed class period" relating to the business operations at issue "tend[] to negate an inference that [the Company] was intentionally or recklessly misleading investors." *Id.* at *13; *KBC Asset Mgmt.,* 19 F.4th at 613-14; *Advance Auto*, 167 F.4th at 648 ("[O]missions and ambiguities count against inferring

---

[21] In lieu of particularized facts, Plaintiff speculates that it was "apparent to everyone within the Company—and Defendants—that the rollout would be far more expensive than publicly represented." (AC ¶ 55; *cf. Advance Auto*, 167 F.4th at 649 (employee's "mere belief that the rest of [] senior management . . . knew about the issue is too speculative to support scienter")).

[22] So too with the hearsay-based critiques of CWs 4-6, 8 and 10 regarding doughnut quality, allegedly "angering McDonald's and the end-customers." (AC ¶98); *see In re Mun. Mortg.*, 876 F. Supp. at 640. CW 8 admits that "complaints lessened over time," (AC ¶104), and ***McDonald's itself*** stated that Krispy Kreme "***delivered a great, high-quality product for us***." (*Infra* at 8.)

23

scienter."). The cogent and far more compelling inference is that after Krispy Kreme began its nationwide rollout in October 2024, demand and profits were lower than expected, which Krispy Kreme promptly disclosed to the market in the months thereafter. (*Infra* at 7-8.)

(d)     Plaintiff's Remaining Patchwork of Scienter Allegations are Insufficient

Plaintiff's allegation that Defendants had access to Krispy Kreme's sales data and quality-related complaints (AC ¶¶194-8)—and thus, were aware of "operational failure" affecting the McDonald's partnership—is premised on the conclusory assumption that such information ran contrary to Defendants' contemporaneous public statements. Plaintiff does not allege a specific, contrary "fact" in that data, and courts frequently reject inferences of scienter based on Defendants' access to information or executive positions. *See In re aaiPharma, Inc. Sec. Litig.*, 521 F. Supp. 2d 507, 512 (E.D.N.C. 2007); *Advance Auto*, 167 F.4th at 649. Next, Plaintiff's attempt to cherry-pick a handful of statements by third-party analysts (AC ¶¶199-200) is irrelevant to scienter. *See Johnson v. Pozen Inc.,* 2009 WL 426235, at *24 (M.D.N.C. 2009), *adopted* 2009 WL 10680297 (M.D.N.C. 2009). Finally, Plaintiff asks the Court to infer scienter because of certain executive departures before or after the alleged fraud. "But executive departures are, at best, weak evidence of scienter." *Advance Auto*, 167 F.4th at 650. And Plaintiff does not "bolster" the departures with any allegations demonstrating Defendants' contemporaneous knowledge of falsehood. *See id.*[23]

**3.     Any Inference of Scienter Is Far Less Compelling Than Opposing Inferences**

When evaluated "holistically," as required, Plaintiff's allegations do not support an inference of scienter that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324-26. According to Plaintiff:

---

[23] To state a securities fraud claim against a corporate defendant, a plaintiff must allege a strong inference of scienter against "at least one authorized agent" thereof. *Tchrs.' Ret. Sys.*, 477 F.3d at 184. Here, the AC does not support any inference of scienter as to either Individual Defendant in order to support an inference of scienter as to Krispy Kreme. *See Janus*, 564 U.S. at 142-43.

24

- Krispy Kreme tested the sale of its doughnuts over two years and 160 locations, but knew that the test was "fundamentally flawed" and did not measure demand. (AC ¶¶77, 143.)

- Then, Defendants declared the test "successful" and agreed to expand into McDonald's stores across the country, despite knowing that the costs of such of expansion were "unsustainable" and that it would be "doomed from the start." (AC ¶¶75, 81.)

- All the while, Defendants had <u>no</u> alleged personal motive to temporarily prop up Krispy Kreme's stock—other than a vague and generalized desire to make the Company appear successful (AC ¶¶52, 230)—*and* knew that any misstatements about the partnership or rollout, before or after it commenced, *could easily be corrected by McDonald's itself.*

This theory is not even plausible, much less compelling. *See Boykin*, 54 F.4th at 186 (Plaintiff's "theory that defendants would undermine their long-term credibility—and risk considerable bad press—just to pump up [their] share price for a few months is unpersuasive. That defendants would tout a contract doomed to fail is 'not even plausible, much less convincing.'"). Rather, the far more compelling inference is that Defendants honestly believed in the success of a venture that ultimately failed to be profitable, while keeping investors promptly informed of their business decisions. This is the opposite of knowing securities fraud. *See In re Triangle*, 988 F.3d at 754-55 (rejecting attempt by investors to "use the benefit of 20-20 hindsight to turn management's business judgment into securities fraud"); *Pipefitters*, 2013 1192004, at *13 ("Merely because later projections are less optimistic than an initial projection does not mean that the initial projection was fraudulent," and "[p]leading fraud by hindsight, or Monday morning quarterbacking of this sort, is insufficient pleading under the PSLRA.").

## II.   PLAINTIFF HAS NOT STATED A CLAIM UNDER SECTION 20(a)

Plaintiff's failure to state a primary violation under Section 10(b) precludes their "control person" claim under Section 20(a) (Count III). *See Advance Auto*, 167 F.4th at 645.

## CONCLUSION

For these reasons, the AC should be dismissed in its entirety with prejudice. *See Pipefitters*, 2013 WL 1192004, at *20 (dismissing complaint and denying leave to amend).

25

Dated: Charlotte, NC  
      March 31, 2026

Respectfully submitted,

*/s/ Robert E. Harrington*  
ROBINSON, BRADSHAW  
& HINSON, P.A.  
Robert E. Harrington  
N.C. Bar No. 26967  
rharrington@robinsonbradshaw.com  
Amanda P. Nitto  
N.C. Bar No. 45158  
anitto@robinsonbradshaw.com  
600 South Tryon Street, Suite 2300  
Charlotte, North Carolina 28202  
Telephone: (704) 377.2536  
Facsimile: (704) 378.4000

SKADDEN, ARPS, SLATE,  
   MEAGHER & FLOM LLP  
Scott D. Musoff  
Alexander C. Drylewski  
One Manhattan West  
New York, New York 10001  
(212) 735-3000  
scott.musoff@skadden.com  
alexander.drylewski@skadden.com

*Attorneys for Defendants*

## <u>ARTIFICIAL INTELLIGENCE CERTIFICATION</u>

Pursuant to the Court's June 18, 2024 Order, 3:24-mc-104, I hereby certify that:

- No artificial intelligence was employed in doing the legal research for the preparation of this document, with the exception of such artificial intelligence embedded in standard on-line legal research sources such as Westlaw, Lexis, FastCase, and Bloomberg; and

- Every statement and every citation to an authority contained in this document has been checked by an attorney at the above-signed firms and/or paralegals working at their direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: Charlotte, North Carolina
       March 31, 2026

                                        */s/ Robert E. Harrington*
                                        Robert E. Harrington