| | |
|---|---|
| IN RE KRISPY KREME SECURITIES LITIGATION | No. 3:25-cv-00332-MOC-SCR<br><br>**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT** |

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ............................................................................... 1

II. STATEMENT OF FACTS ................................................................................... 6

    A. Krispy Kreme's Strategic Pivot To A DFD Model Anchored By McDonald's ........................................................................................... 6

    B. Throughout The Class Period, Defendants Consistently Assure Investors That The McDonald's Partnership Was A Resounding Success ........................... 7

    C. In Truth, The McDonald's Initiative Was A Debacle From The Outset, And Defendants Concealed This Material Adverse Information From Investors ......... 8

    D. As The Truth Slowly Emerges, Defendants Are Forced To Admit That Their Prior Assurances Were False, And The McDonald's Rollout Is Abandoned ..................................................................................... 10

III. ARGUMENT .................................................................................................. 12

    A. The AC Adequately Pleads Material Misstatements And Omissions .................. 12

        1. Defendants' False Statements About The Rollout And Its Costs .............. 13

        2. Defendants' Arguments Fail .................................................................... 14

            a. It Is Defendants, Not Plaintiff, Who Ignore Context ................... 14

            b. The Post-Launch Statements Are False And Misleading .............. 16

            c. Plaintiff Does Not Allege Fraud By Hindsight ............................ 17

            d. The "Demand" Statements Were Material ................................... 18

            e. Defendants' Statements Are Not Shielded By The Safe Harbor ... 19

            f. Defendants' Statements Are Not Inactionable Opinion ................ 21

    B. The AC Raises A Strong And Compelling Inference Of Scienter ........................ 21

IV. CONCLUSION .............................................................................................. 25

i

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**CASES**

*Boykin v. K12, Inc.*,
   54 F.4th 175 (4th Cir. 2022).................................................................................... 20

*Bucks Cnty. Emps. Ret. Sys. v. Norfolk S. Corp.*,
   775 F. Supp. 3d 1275 (N.D. Ga. 2025) ................................................................... 23

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
   496 F. Supp. 3d 952 (E.D. Va. 2020) ..................................................................... 12

*Dunn v. Borta*,
   369 F.3d 421 (4th Cir. 2004) .................................................................................. 19

*Employees' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v.*
   *MacroGenics, Inc.*,
   61 F.4th 369 (4th Cir. 2023).................................................................................... 19

*Epstein v. World Acceptance Corp.*,
   203 F. Supp. 3d 655 (D.S.C. 2016)................................................................... 13, 22

*IBT Emp. Grp. Welfare Fund v. Compass Mins. Int'l, Inc.*,
   706 F. Supp. 3d 1225 (D. Kan. 2023) ..................................................................... 15

*In re Akorn, Inc. Sec. Litig.*,
   240 F. Supp. 3d 802 (N.D. Ill. 2017) ...................................................................... 20

*In re Apple Inc. Sec. Litig.*,
   2020 WL 6482014 (N.D. Cal. Nov. 4, 2020)........................................................... 17

*In re Computer Sciences Corp. Sec. Litig.*,
   890 F. Supp. 2d 650 (E.D. Va. 2012) ................................................................ 14, 16

*In re Constellation Energy Grp., Inc. Sec. Litig.*,
   738 F. Supp. 2d 614 (D. Md. 2010) ........................................................................ 20

*In re Countrywide Fin. Corp. Derivative Litig.*,
   554 F. Supp. 2d 1044 (C.D. Cal. 2008).................................................................... 24

*In re DXC Tech. Co. Sec.*,
   2025 WL 950398 (E.D. Va. Mar. 27, 2025).............................................................. 18

*In re Emergent BioSols. Inc. Sec. Litig.*,
   2023 WL 5671608 (D. Md. Sept. 1, 2023) .............................................................. 24

*In re Envision Healthcare Corp. Sec. Litig.*,
2022 WL 4551876 (M.D. Tenn. Sept. 29, 2022) ....................................................... 16

*In re FibroGen, Inc. Sec. Litig.*,
2022 WL 2793032 (N.D. Cal. July 15, 2022) .......................................................... 25

*In re First Union Corp. Sec. Litig.*,
128 F. Supp. 2d 871 (W.D.N.C. 2001) .................................................................. 18

*In re Genworth Fin. Inc. Sec. Litig.*,
103 F. Supp. 3d 759 (E.D. Va. 2015) .............................................................. *passim*

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
791 F.3d 90 (D.C. Cir. 2015) ............................................................................. 21

*In re Ironnet, Inc. Sec. Litig.*,
2023 WL 5110932 (E.D. Va. Aug. 9, 2023) ............................................................ 24

*In re James River Grp. Holdings, Ltd. Sec. Litig.*,
2023 WL 5538218 (E.D. Va. Aug. 28, 2023) ................................................. 16, 18, 19

*In re Salix Pharms., Ltd.*,
2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ......................................................... 21

*In re SCANA Corp. Sec. Litig.*,
2019 WL 1427443 (D.S.C. Mar. 29, 2019) .................................................. 14, 15, 20

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001) ................................................................................. 25

*In re The Scotts Miracle-Gro Co. Sec. Litig.*,
2026 WL 1094854 (S.D. Ohio Apr. 22, 2026) ................................................... 18, 22

*Johnson v. Pozen Inc.*,
2009 WL 426235 (M.D.N.C. 2009) ...................................................................... 25

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
2016 WL 3981236 (D.S.C. July 25, 2016) ........................................................ *passim*

*Klein v. Altria Grp., Inc.*,
525 F. Supp. 3d 638 (E.D. Va. 2021) ................................................................... 23

*Lefkoe v. Jos. A. Bank Clothiers*,
2007 WL 6890353 (D. Md. Sept. 10, 2007) ........................................................... 12

*Leventhal v. Chegg, Inc.*,
721 F. Supp. 3d 1003 (N.D. Cal. 2024) ................................................................ 17

iii

*Lucid Alternative Fund, LP v. Five9, Inc.*,
 2026 WL 496788 (N.D. Cal. Feb. 23, 2026)................................................................ 17

*Ollila v. Babcock & Wilson Enters., Inc.*,
 2018 WL 792069 (W.D.N.C. Feb. 8, 2018) ......................................................*passim*

*Plumbers, Pipefitters & Apprentices Loc. No. 112 Pension Fund v. Vestis Corp.*,
 808 F. Supp. 3d 1369 (N.D. Ga. 2025) ...........................................................*passim*

*Plymouth Cnty. Ret. Ass'n v. Primo Water Corp.*,
 966 F. Supp. 2d 525 (M.D.N.C. 2013)....................................................................... 18

*Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.*,
 2021 WL 1439680 (E.D. Va. Mar. 24, 2021)...................................................... 22, 23

*San Antonio Fire and Police Pension Fund v. Dentsply Sirona Inc.*,
 732 F. Supp. 3d 300 (S.D.N.Y. 2024) ........................................................................ 25

*Singer v. Reali*,
 883 F.3d 425 (4th Cir. 2018)............................................................................... 12, 19

*Teachers' Ret. Sys. of LA v. Hunter*,
 477 F.3d 162 (4th Cir. 2007)...................................................................................... 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007)................................................................................................ 6, 21

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
 780 F.3d 597 (4th Cir. 2015)...................................................................................... 20

iv

Lead Plaintiff respectfully submits this memorandum of law in opposition to Defendants' Motion to Dismiss the Amended Complaint.[1]

## I. PRELIMINARY STATEMENT

During the Class Period, by far the single most critical issue facing Krispy Kreme was its transformative partnership with fast food giant McDonald's. The deal represented a potential lifeline: Krispy Kreme had struggled with mounting losses and a crippling debt load since its 2021 IPO, and a successful McDonald's partnership would nearly triple Krispy Kreme's domestic points of access and add more than $400 million in annual revenue. Significantly, the success of the initiative depended entirely on the Company's ability to deliver "fresh doughnuts daily" to thousands of McDonald's nationwide, and as a result, investors were intently focused on whether Krispy Kreme had the infrastructure, logistics, and cost structure for the initiative to succeed.

Throughout the Class Period, Defendants provided investors with this exact assurance. From the first day of the Class Period on March 26, 2024, Defendants raved that "consumer excitement and demand exceeded expectations" for the initial McDonald's rollout, and as a result, the Company would expand to roughly 12,000 McDonald's locations. When analysts expressed concern regarding the potential costs of this expansion, Defendants explicitly assured investors that they were "not ramping up CapEx" to fund it and could accomplish the expansion by simply "leveraging" Krispy Kreme's "underutilized system." Underscoring the materiality of these statements, in September 2024, the SEC inquired about Krispy Kreme's "estimated capital expenditure necessary" to meet its obligations under the McDonald's deal. In response,

---

[1] References to "MTD" or "Motion" refer to the Memorandum of Law in Support of Defendants' Motion to Dismiss (ECF No. 69). All citations to "¶_" are to paragraphs in the Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint" or "AC," ECF No. 65). All terms not otherwise defined herein have the same meanings as in the AC. Unless otherwise noted, all emphasis is added, and internal citations and quotations are omitted.

1

Defendants unequivocally asserted that they faced no "capital expenditure commitments or obligations specific to the relationship with McDonald's."

As the Class Period progressed, Defendants continued this drumbeat of wholly positive statements to investors about the partnership. In November 2024, they touted the "successful start to [the] nationwide McDonald's rollout" and the Company's "[s]trong operational execution," which led to elevated consumer demand. When analysts again inquired about the progress of the expansion and the impact of any costs, Defendants staunchly asserted that operations were performing well and there was "no surprise on the cost front." Even as late as February 25, 2025 – just two months before the full truth would be revealed – Defendants assured that the McDonald's expansion "remain[ed] on track" and that "feedback from McDonald's [was] very positive."

However, as was ultimately revealed, the truth about Krispy Kreme's pivotal partnership with McDonald's was the exact opposite of what Defendants claimed it to be. In reality, the McDonald's initiative was an abject and dismal failure from the start, as the Company proved wholly incapable of performing the most fundamental task required of it under the partnership – namely, delivering fresh doughnuts on a daily basis to McDonald's franchises across the country. As a result, unbeknownst to investors, and in direct contradiction to Defendants' public statements, Krispy Kreme was forced to incur tens of millions of dollars in McDonald's-specific costs in an effort to remedy the problems – costs which devastated the Company's profit margins. These problems were so material, and so intractable, that just three months after Defendants raved about the purportedly successful McDonald's rollout – *and at the exact same time that they were assuring investors that the expansion "remain[ed] on track" – Defendants had already terminated the rollout because it was such a debacle*.

No less than eleven high-level former Krispy Kreme and McDonald's employees ("CWs")

– each of whom had direct, first-hand knowledge of the partnership – independently corroborated these facts. These CWs uniformly confirmed that the Company's infrastructure was fundamentally inadequate for the expansion from the outset and that exorbitant, McDonald's-specific costs (tens of millions of dollars at minimum in remediation and infrastructure improvements) were required to address these pervasive issues. Indeed, before the Class Period even began, Defendants had been confronted with a detailed internal cost analysis known as "Project Ray." This analysis documented the enormous upfront investment that the McDonald's expansion would require precisely because Krispy Kreme's deficient infrastructure was incapable of passing McDonald's food safety audits or meeting its volume needs. These issues were so cost-prohibitive that the Company's Director of Field Operations explicitly warned Defendants of the implications of proceeding: "Are you sure you want to proceed if it's going to cost this much money up front?"

True to form, once the McDonald's expansion commenced in October 2024, the CWs confirmed that the rollout was "a complete sh*t show," as it was apparent "from the beginning" that Krispy Kreme's infrastructure could not meet the requirements of the McDonald's partnership. The Company's production facilities were dilapidated, unsanitary, and understaffed, with Krispy Kreme facilities beset by rodents, roaches, and mold. CWs further confirmed that the Company's logistics operations were so deficient that they resulted in late or missed deliveries, as "[n]one of the doughnuts were going out the same day"; deliveries of stale doughnuts that were "24 to 36 hours old" and "looked like garbage"; and a torrent of quality complaints that quickly undercut demand "down to two or three dozen per store," which was wholly "unsustainable."

The truth began to emerge in early 2025, just months after the expansion began. On February 25, 2025, Krispy Kreme's stock fell 35% after it reported that it had "seen consumer softness" in the McDonald's partnership and that it expected "margin compression" due to the need

3

to make "long-term business investments" to fund the national rollout. Significantly, however, Defendants stressed that these issues were only temporary, that costs would quickly fall as the Company leveraged its existing production capacity, and that the rollout "remain[ed] on track to reach about 6,000 restaurants by year end." Analysts lamented the fact that "McDonald's [r]elated [c]osts" increased and McDonald's demand "dropped more than expected," but Defendants' assurances stabilized the stock and prevented an even greater stock price decline.

Remarkably, as the Company would ultimately be forced to admit, at the same time Defendants made these statements, Krispy Kreme had already decided to abandon its McDonald's partnership. On May 8, 2025, Krispy Kreme stunned the market by disclosing that the McDonald's initiative was a complete failure, and as a result, the Company had effectively terminated the partnership. Indeed, while Defendants had claimed in February 2025 that the rollout remained "on track" and was proceeding according to plan, in reality, the Company had actually *stopped* the expansion by that point, as it had not opened a single McDonald's location since February 25, 2025 and "[did] not expect to launch in any additional restaurants in the second quarter of 2025." As a result, Krispy Kreme reported just $15.9 million in Adjusted EBITDA—a 62% year-over-year decline that was directly attributable to "costs associated with our U.S. nationwide expansion," prompting the Company to withdraw guidance and scrap its dividend.

Analysts were "shocked" by these revelations, excoriating management's credibility given that "[m]anagement [had] provided a 'everything going as planned message' on the [February 2025 earnings call] and at several conferences YTD," and underscoring that the "surprising" disclosure "speaks volumes" as to just how bad things were going. On this news, Krispy Kreme's stock collapsed by 37% over two days, plummeting to just $2.73 – more than 84% lower than the Class Period high of $17.35. Just one month later, on June 24, 2025, Krispy Kreme officially terminated

4

the McDonald's partnership specifically because of the enormous costs and lack of demand, with Charlesworth admitting: "efforts to bring our costs in line with unit demand were unsuccessful, making the partnership unsustainable." The Company ultimately absorbed a $356 million goodwill charge and $51 million in McDonald's-specific asset impairments – representing nearly half of the prior year's earnings. Krispy Kreme overhauled virtually its entire leadership team, replacing the CFO, cycling through two Chief Growth Officers, and replacing six of eleven Board members.

Despite this damning factual record, Defendants now seek to dismiss the Complaint at the pleading stage prior to the commencement of discovery. Their arguments are meritless.

On falsity, Defendants argue that all of their detailed factual assurances about the single most important business relationship in the Company's history were mere inactionable puffery, opinion, or forward-looking statements protected by the safe harbor. None of these arguments withstands scrutiny. Throughout the Class Period, Defendants made highly specific, present-tense representations about the extraordinary initiative: that the McDonald's expansion required no "ramping up" of capital expenditures, that costs were "not directly attributable to, or required by" the McDonald's agreement, that operations were executing with precision, that consumer demand was strong, and that feedback from McDonald's was "very positive." These were not vague expressions of corporate optimism – they were concrete factual assertions about then-existing conditions that investors and analysts reasonably relied upon. And they were false. Eleven CWs with direct knowledge of the rollout reported massive operational failures, dilapidated facilities, missed deliveries and stale product that directly contradicted Defendants' assurances. Defendants' own admissions further establish falsity, as the partnership was terminated precisely because of the undisclosed costs and lack of demand. Accepting the AC's well-pled allegations as true, Defendants knowingly misled investors about a core strategic initiative while possessing

5

contemporaneous information showing it was failing. That is fraud.

Defendants' scienter arguments fare no better. It is black-letter law that knowledge of undisclosed information is the bedrock of scienter, and here, a plethora of facts establish that Defendants were directly confronted with the costs and operational deficiencies of the McDonald's expansion throughout the Class Period. Moreover, Defendants themselves boasted of their real-time visibility into the rollout's performance, repeatedly telling investors that "we can track the deliveries" and "track any that are unsold" – making it inconceivable that they were unaware of the failures that those same systems were reporting. While Defendants claim that they had no motive, and that the CW allegations amount to mere operational critiques, these arguments are meritless. Contrary to Defendants' assertions, the multitude of CWs here are not low-level employees grumbling about corporate strategy. To the contrary, they reported on communications made directly with the Individual Defendants about the precise subject on which Defendants were making false representations. And personal financial motive at the pleading stage is unnecessary, particularly where the other indicia of scienter are overwhelmingly strong, as they are here.

This case presents the precise scenario the securities laws were designed to address – executives publicly misrepresenting to investors a critical, Company-altering initiative, while concealing known, material adverse information about that same initiative. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 320 n.4 (2007) ("private securities litigation [i]s an indispensable tool with which defrauded investors can recover their losses—a matter crucial to the integrity of domestic capital markets"). Defendants' Motion should be denied.

## II.	STATEMENT OF FACTS

### A.	Krispy Kreme's Strategic Pivot To A DFD Model Anchored By McDonald's

Krispy Kreme is a doughnut brand whose "Delivered Fresh Daily" ("DFD") model focused on selling "fresh doughnuts daily" at third-party retail partners. ¶¶1, 30-34. The model was simple

6

but demanding: because doughnuts go stale within a day, Krispy Kreme's ability to deliver fresh products to thousands of locations on a daily basis was the linchpin of the entire strategy. ¶3.

In 2022, Krispy Kreme announced a DFD partnership with McDonald's, testing the concept at Kentucky locations. ¶¶35-39. Given the Company's mounting losses and crippling debt load since its 2021 IPO, the McDonald's partnership was critical: a successful nationwide expansion would nearly triple Krispy Kreme's domestic points of access and add more than $400 million in annual revenue. ¶¶1-2. Accordingly, investors were intently focused on whether Krispy Kreme had the infrastructure, logistics and cost control for the expansion to succeed. ¶¶4, 37-44.

B.      **Throughout The Class Period, Defendants Consistently Assure Investors That The McDonald's Partnership Was A Resounding Success**

The Class Period begins on March 26, 2024, when – after promising investors that the McDonald's partnership would only proceed if it could generate profitable growth – Defendants announced a nationwide expansion based on the "successful [Kentucky] test," where "consumer excitement and demand exceeded expectations." ¶¶40, 127-28. Defendants assured that the expansion would require minimal investment because "much of the national rollout can happen using existing capacity," creating what Defendants described as a "very capital-efficient model." ¶¶136, 138. On August 8, 2024, Defendant Charlesworth again downplayed the costs, claiming that the rollout was "leveraging an underutilized system," with "nearly all of the expansion" in the early months serviced by "existing production hubs." ¶149.

When analysts expressed concern about the costs of the rollout, Defendants unequivocally stated on September 10, 2024 that they were "not ramping up CapEx," and that half of the expansion (the first 6,000 locations) could be supported with "existing production facilities." ¶¶152-53. Significantly, when the SEC similarly inquired about the capital expenditures required by the partnership, Defendant Ashukian publicly represented that Krispy Kreme was "not subject

7

to capital expenditure commitments or obligations specific to the relationship with McDonald's" and that it would "support much of [its] expansion using existing capacity." ¶¶157-158.

After the expansion launched in mid-October, Defendants immediately cast it as a triumph. On November 7, 2024, Defendants touted the "successful start" of the McDonald's rollout, crediting "[s]trong operational execution" and a "[p]ositive consumer response." ¶¶161-62, 165. Defendant Charlesworth assured investors that Krispy Kreme was delivering the "right quantities" at the "right time," that demand was "in line with our original assumptions," and that the rollout was purportedly going so well that Krispy Kreme was "accelerat[ing] to service more restaurants as fast as [it] can." ¶¶165-67. Significantly, when analysts pressed about the impact of increased costs on the Company's financials, Defendant Ashukian characterized the elevated expenses as merely reflecting an "intentional decision to accelerate" – "a pull forward versus anything unexpected" – and flatly assured investors there was "no surprise on the cost front." ¶¶172-73.

### C. In Truth, The McDonald's Initiative Was A Debacle From The Outset, And Defendants Concealed This Material Adverse Information From Investors

Contrary to Defendants' repeated assurances, in reality, the McDonald's partnership was a failure from its inception. Indeed, eleven former Krispy Kreme and McDonald's employees – including executives directly responsible for overseeing the expansion – uniformly confirm that Krispy Kreme lacked the infrastructure to support the massive rollout, knew the necessary expenditures precluded near-term profitability, and never meaningfully tested demand. ¶¶50-104.

Multiple CWs confirmed that Defendants disregarded explicit internal warnings about the partnership's costs from the outset. Before the Class Period began, Defendants were presented with "Project Ray" – a detailed internal cost analysis that was so critical of the cost structure of the initiative that Krispy Kreme's Director of Field Operations directly questioned Defendants: "are you sure you want to proceed if it's going to cost this much money up front?" ¶¶56-58. The

8

Company pressed ahead regardless, operating under the internal directive to "get it done, get it done, get it done," with Defendants personally approving the mounting expenses. ¶¶58-64.

The costs were unavoidable. Krispy Kreme's production facilities were in disrepair and wholly unfit to service McDonald's. Multiple CWs described "disgusting" conditions – rodents, roaches, mold, and pervasive sanitation failures – that required labor-intensive "backhouse resets," full renovations, and extensive remediation to satisfy McDonald's rigorous third-party audits, including over $18 million spent on metal detectors alone. ¶¶65-76. Even after remediation, the factories lacked the infrastructure, staffing, and machinery to meet the production volumes – jumping from 12,000 to 60,000 doughnuts per day – prompting senior managers to acknowledge that the Company required "three or four years of preparation." ¶¶69-71, 89. Defendants also knew that the Kentucky pilot had provided no meaningful insight into nationwide demand: McDonald's had capped orders to ensure "zero waste," causing stores to sell out only because they were stocked with trivial quantities – in some cases fewer than 25 doughnuts per store. ¶¶77-81.

The rollout failed immediately. Delivery breakdowns, logistical failures, and chronically poor product quality rendered the expansion unworkable from launch. In Chicago, within two weeks of the rollout, McDonald's franchisees lodged over 400 complaints and slashed their orders to just a few trays per store. ¶¶82-84, 104. In November 2024, CW 4 – Senior Director of the McDonald's Business Unit – raised these failures directly with senior leadership, to no avail, until Defendant Charlesworth was confronted by McDonald's franchisees themselves, who made clear that the inconsistent deliveries, unsanitary practices, and substandard product could not continue. ¶¶94-95. The failed rollout triggered a leadership upheaval, with key rollout executives replaced in waves in late 2024 and early 2025. ¶¶96, 201-05. By mid-March 2025, Charlesworth privately admitted that Krispy Kreme was "losing 30 cents a doughnut" on the partnership. ¶97.

9

Defendants had real-time visibility into these failures. Handheld devices used by delivery drivers fed data into internal systems, and McDonald's franchisees uploaded complaints with photographs through a QR code system in a "Smart Sheet" accessible to all executives above the VP-level. ¶¶87, 198. Defendants themselves publicly boasted that they could track these granular metrics – and that Charlesworth monitored operational performance "every single day." ¶¶85-86.

### D. As The Truth Slowly Emerges, Defendants Are Forced To Admit That Their Prior Assurances Were False, And The McDonald's Rollout Is Abandoned

The truth began to emerge on February 25, 2025, when Krispy Kreme reported weak Q4 2024 results and 2025 guidance that fell short of expectations. ¶105. Defendants noted "consumer softness" at McDonald's, and warned of "margin compression" driven by "start-up costs from [the] U.S. expansion." ¶¶9, 106. The Company further revealed it would outsource "more than half of our DFD deliveries by year-end" to gain "predictability in costs." *Id*. Krispy Kreme's stock price dropped 35% to close at $5.97 on February 26, 2025. ¶¶10, 107. Analysts concluded that the weak results stemmed primarily from "McDonald's start-up costs," and poor demand. ¶¶10, 108.

However, Defendants stabilized the stock by stressing that these were temporary issues and insisting that the rollout remained "on track" to reach 6,000 McDonald's locations by year-end – even as the Company had, unbeknownst to investors, already effectively abandoned the expansion. ¶¶12, 109-112, 177-78. Charlesworth insisted that "the strategy [was] working," that the Company was "leverag[ing] existing capacity," and assured investors about the Company's "long-term profitable growth." ¶¶181-84. Strikingly, even as McDonald's franchisees were flooding Krispy Kreme with mounting daily complaints about missed deliveries and stale product, Charlesworth nevertheless told investors: "the feedback from McDonald's [] has been [] positive." ¶184.

On May 8, 2025, the full truth finally emerged. On that date, and in stark contrast to Defendants' assurances just two months earlier that the rollout remained entirely "on track,"

Defendants now admitted that the exact opposite was true: not a single new McDonald's location had been added since February 25, 2025. ¶¶12, 113. Defendants were forced to concede that the partnership had failed to "achieve a profitable business model" because Krispy Kreme needed to both "increase sales by stimulating higher demand" and cut costs by "simplifying operations" – a stark admission that contradicted their prior assurances of strong demand and lean execution. ¶¶13, 113-15. The Company also announced it would "*fully* outsource U.S. logistics" by mid-2026 – abandoning the very distribution capabilities Defendants had touted as the engine of the McDonald's expansion. ¶115. The financial consequences were devastating: adjusted EBITDA declined 62%; 2025 guidance was withdrawn; the Company eliminated its long-standing dividend; and its stock collapsed another 37%, closing at just $2.73 per share on May 9, 2025. ¶¶13-14, 116.

Analysts were shocked, and in remarkably frank language, eviscerated management's credibility for failing to disclose this material information. Truist succinctly stated: "We are shocked by the speed at which the story fell apart. Management provided a 'everything going as planned message' on the 4Q earnings call in early February and at several conferences YTD." ¶¶15, 118. Morgan Stanley called the halt "surprising" given that Defendants had been touting expansion plans "as recent[ly] as February," and J.P. Morgan noted that terminating the deal after completing only 20% of the rollout "speaks volumes" about its true costs. ¶¶15, 119.

Post-Class Period events confirmed the fraud. Just one month later, on June 24, 2025, Krispy Kreme officially terminated the McDonald's partnership because its costs were "unsustainable" and that "efforts to bring [the] costs in line with unit demand were unsuccessful" – directly contradicting prior assurances that costs were under control and the rollout was proceeding as planned. ¶120. A *Wall Street Journal* investigation corroborated the CW accounts in full, reporting that Krispy Kreme's severe logistical failures, irregular deliveries, and chronically

11

poor product quality were the primary causes of the partnership's collapse. ¶122. Tellingly, Defendants were forced to admit that the investments tied to the McDonald's rollout had conferred no benefit on Krispy Kreme's broader operations – the precise opposite of what they told investors (and the SEC) during the Class Period. ¶¶16, 123-24. The Company disclosed $51 million in unusable McDonald's-specific assets, a $356 million goodwill impairment directly triggered by the failed partnership, and a turnaround plan centered on stripping out McDonald's-related costs entirely. *Id*. Multiple executives were ousted, including the CFO and Chief Growth Officer; a new COO was installed; and more than half the Board was replaced. ¶¶121, 201-05.

## III. ARGUMENT

On this motion, "a court must accept all allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff." *Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*, 496 F. Supp. 3d 952, 961 n.6 (E.D. Va. 2020). A Rule 12(b)(6) motion "'does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *Ollila v. Babcock & Wilson Enters., Inc.*, 2018 WL 792069, at *1 (W.D.N.C. Feb. 8, 2018) (Cogburn Jr., J.). In their Motion, Defendants only challenge two elements of Plaintiff's Section 10(b) claim: falsity and scienter.[2] Because the AC more than adequately pleads both, the Motion should be denied.

### A. The AC Adequately Pleads Material Misstatements And Omissions

To plead falsity, a plaintiff must: (1) "specify the statements that … were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent." *Lefkoe v. Jos. A. Bank Clothiers*, 2007 WL 6890353, at *4 (D. Md.

---

[2] The elements of a Section 10(b) claim are "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Singer v. Reali*, 883 F.3d 425, 438 (4th Cir. 2018).

Sept. 10, 2007). "[A]bsolute, incontrovertible falsity" is unnecessary. *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 771 (E.D. Va. 2015). Rather, the AC need only include "*sufficient facts* to support a *reasonable belief*" the statements were false. *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 666 (D.S.C. 2016) (emphasis in original).

### 1. Defendants' False Statements About The Rollout And Its Costs

Throughout the Class Period, Defendants assured investors that the McDonald's rollout would drive "Profitable U.S. Expansion" by leveraging the "existing capacity" of an "underutilized system," with "nearly all of the expansion serviced by existing production hubs" – and thus no "ramping up [of] CapEx." ¶¶136, 145, 149, 153. Defendants represented that any expenditures would "flow through to the bottom line" and "support the overall DFD and retail channels." ¶¶149, 158, 175. Once the rollout launched, Defendants touted its "successful start," crediting their "[s]trong operational execution" and "positive consumer response," and claimed the early success justified the expansion – with any elevated costs merely a "pull forward" reflecting that acceleration, and "no surprise on the cost front." ¶¶161-66, 172-73. Even as late as February 25, 2025, Defendants insisted the rollout remained "on track." ¶¶177-78, 184.

These statements were materially false and misleading. Defendants knew from the outset that Krispy Kreme lacked the infrastructure to supply fresh doughnuts at scale to McDonald's and that the rollout required massive McDonald's-specific expenditures – including full "backhouse resets" to remediate "disgusting" factories, millions in food-safety equipment, and costly repairs to neglected production lines – that bore no resemblance to the "existing capacity" narrative Defendants were selling to investors. ¶¶65, 67, 70-71. Before the Class Period began, Project Ray's leaders questioned whether the Company should proceed at all given these costs – a warning borne out when Krispy Kreme ultimately wrote off $51 million in McDonald's-specific assets, nearly half of its prior year's U.S. earnings. ¶¶57, 123. Far from the "successful start" Defendants touted,

13

the rollout was "a complete sh*t show": deliveries were regularly late or missed entirely, products arrived stale, and McDonald's franchisees slashed orders within weeks. ¶¶82-84, 88, 91-92, 99-101. Management internally acknowledged it would take years before the Company could reliably service McDonald's – the precise opposite of Defendants' representations. ¶89.

Courts repeatedly find statements praising a company's ability to execute a critical initiative actionable where, as here, Defendants knew of undisclosed operational failures and costs that made success unlikely. In *Ollila*, this Court held that statements claiming that the company was "perform[ing] well on projects" were false where CWs showed defendants knew of "significant, undisclosed problems and delays" that made the projects far more "expansive" than disclosed, and found it independently misleading to portray those problems as "isolated" when they were widespread. 2018 WL 792069, at **1-5. Similarly, in *In re Computer Sciences Corp. Sec. Litig.*, the court found statements about the company's "present expectations regarding the timeframe" to "rollout" new software, and minimizing delays or cost overruns, actionably false where an internal review had concluded the company "could not meet [its] deadline" and "could not deliver the solution set." 890 F. Supp. 2d 650, 659-660 (E.D. Va. 2012); *see also In re SCANA Corp. Sec. Litig.*, 2019 WL 1427443, at *9 (D.S.C. Mar. 29, 2019) (statements touting "great progress" actionable where defendants were "sufficiently aware" of serious deficiencies).

The same is true here. McDonald's-specific costs, the severe operational deficiencies documented by the CWs, and management's internal acknowledgement that the Company needed years more preparation, render Defendants' wholly positive Class Period statements actionable.

### 2. Defendants' Arguments Fail

#### a. It Is Defendants, Not Plaintiff, Who Ignore Context

Defendants accuse Plaintiff of taking the statements out of context, but it is Defendants who "invite the Court to miss the forest for the trees." *Plumbers, Pipefitters & Apprentices Loc.*

14

*No. 112 Pension Fund v. Vestis Corp.*, 808 F. Supp. 3d 1369, 1383 (N.D. Ga. 2025).

Defendants contend that their cost-related statements were truthful because Krispy Kreme disclosed that it "expect[ed] to incur capital expenditures" and acknowledged some categories of investment. MTD at 10-11. But generic acknowledgement of expected capital expenditures does not immunize affirmative misrepresentations about their scope, nature and attribution. Defendants never disclosed the true magnitude of the required infrastructure costs – including the extensive remediation of grossly deficient facilities, over $18 million in metal detectors, and the full suite of McDonald's-mandated food safety upgrades – and actively dismissed the escalating costs as mere "pull-forward" expenses reflecting an "intentional decision to accelerate," rather than evidence of a fundamentally broken business model. ¶¶172-73. Defendants compounded the misrepresentation by assuring that all expenditures supported the broader DFD operations and were not McDonald's-specific—an assertion refuted by the fact that Krispy Kreme continued operating its DFD model with other retail partners after the McDonald's termination, yet wrote off $51 million in assets specifically attributed to McDonald's. ¶¶123-24. If those investments truly supported the broader DFD strategy, there would be nothing to write off.[3] *See KBC Asset Mgmt. NV v. 3D Sys. Corp.,* 2016 WL 3981236, at *5 (D.S.C. July 25, 2016) (calling rising operating expenses "discretionary costs" was misleading); *IBT Emp. Grp. Welfare Fund v. Compass Mins. Int'l, Inc.*, 706 F. Supp. 3d 1225, 1254 (D. Kan. 2023) (falsity where costs were mischaracterized to feign project success).[4]

Defendants' contention that the investor slides displaying McDonald's logo under the

---

[3] Defendants' assertion that the $51 million write-off is not "apples-to-apples" (MTD 11 n.11), only underscores the point – they offer no explanation for why assets they characterized as "support[ing] the overall DFD" became worthless the moment the McDonald's deal ended. ¶175.

[4] Moreover, the market's severe reaction – 35% and 37% stock drops when the truth emerged – further confirms that Defendants had not been transparent. *See SCANA*, 2019 WL 1427443, at *8.

15

heading "Profitable U.S. Expansion" could not convey profitability prior to launch likewise fails. MTD at 12. How a reasonable investor would interpret those slides is a question for the jury, not a basis for dismissal. *See In re Envision Healthcare Corp. Sec. Litig.*, 2022 WL 4551876, at *8 (M.D. Tenn. Sept. 29, 2022). More fundamentally, Defendants made these statements *after* receiving Project Ray's findings that the McDonald's costs would preclude near-term profitability, and *after* the expansion team reported that facilities were in dire condition and the Company was "blazing through … money." ¶¶56-58, 64-71, 76. A reasonable investor "would surely have considered it important that [the Company]'s own on-the-ground analysts did not believe" the McDonald's deal would be profitable. *Computer*, 890 F. Supp. 2d at 669 (misleading to conceal internal review team's conclusions); *Ollila*, 2018 WL 792069, at *4 ("substantial and recurring nature of problems" rendered statements of "growth going forward" misleading).[5]

### b. The Post-Launch Statements Are False And Misleading

Defendants devote barely a page to their November 7 statements touting the "successful start" of the McDonald's expansion, and that brevity is telling. MTD 15-16. Their cursory assertion that no operational problems "predated November 7, 2024," MTD at 15, is flatly contradicted by the record: McDonald's franchisees cut orders almost immediately in the Company's first launch city, Chicago, with volumes slashed within the "second week" of launch – well before the November 7 earnings call. ¶¶83-84. Defendants were aware of this in real time: on that very call, they admitted to tracking McDonald's sales daily, and they had continued access to declining sales data and hundreds of McDonald's complaints already on record. ¶¶85-87, 103-104.[6]

---

[5] Defendants' reliance on *Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 182 (4th Cir. 2007) (MTD 10-11), is misplaced. In *Hunter*, unlike here, the complaint "proffer[ed] just one confidential source" and failed to allege how the source would know the purported facts. *Id.*

[6] *See In re James River Grp. Holdings, Ltd. Sec. Litig.*, 2023 WL 5538218, at *11 (E.D. Va. Aug. 28, 2023) (contemporaneous reports and defendants' admissions of active monitoring allege

16

Having chosen to speak, Defendants assumed "a duty to make it complete and accurate." *Ollila*, 2018 WL 792069, at *4. Instead, they assured investors that there were only "a few start-up costs," "no surprise[s] on the cost front," and that elevated expenses were merely "pull forward" charges. ¶¶167, 172-73. Their fallback argument that failure to "quantify" costs precludes falsity, MTD at 15-16, is legally incorrect and beside the point: "detailed quantification is unnecessary" at the pleading stage. *Leventhal v. Chegg, Inc.*, 721 F. Supp. 3d 1003, 1012 (N.D. Cal. 2024). In any event, the AC identifies specific costs totaling tens of millions of dollars (¶¶73-75, 123), and Defendants themselves admitted that their inability to bring "costs in line with unit demand" rendered the "partnership unsustainable." ¶120; *see Lucid Alternative Fund, LP v. Five9, Inc.*, 2026 WL 496788, at *5 (N.D. Cal. Feb. 23, 2026) (quantification of "struggling" sales unnecessary).

Defendants fare no better on the February 25, 2025 statements. MTD at 16. Defendants focus narrowly on the disclosed demand softness, but the AC challenges entirely different representations made that same day – that McDonald's feedback was "very positive," "the strategy [was] working," and the rollout "remain[ed] on track." ¶¶177-78, 181, 184. Each of those were false when made. By February 25, Krispy Kreme had already received hundreds of McDonald's service and quality complaints (*see e.g.*, ¶¶92, 94, 104), and – as Defendants admitted weeks later – by that time Krispy Kreme already decided to abandon the rollout. ¶113; *see KBC*, 2016 WL 3981236, at *6. A company that has secretly abandoned its flagship expansion cannot simultaneously assure investors that the expansion is "on track."

### c.     Plaintiff Does Not Allege Fraud By Hindsight

Defendants' fraud by hindsight argument is misplaced. MTD 13-14. Courts "must be

---

falsity); *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *6 (N.D. Cal. Nov. 4, 2020) ("Court must draw inferences in favor of plaintiff").

cautious in applying fraud by hindsight to dismiss a case, as its effect at this stage is to cut off the case as a matter of law, without further factual development." *Ollila*, 2018 WL 792069, at *4. Where statements impact a "fundamental aspect of the business," the fact that a "forecast has turned out to be inaccurate provides at least some affirmative evidence of fraud." *In re The Scotts Miracle-Gro Co. Sec. Litig.*, 2026 WL 1094854, at *14 (S.D. Ohio Apr. 22, 2026).

This is not a case of executives making optimistic projections that later proved wrong. Before the Class Period began, the Project Ray team had already warned point-blank of the massive costs required. ¶¶56-58, 131. CWs 3 and 6 confirmed that Defendants understood these costs were inevitable, and that multiple facilities were already on performance improvement plans for food-safety failures that mandated expensive remediation to satisfy McDonald's audits. ¶¶56-58, 66. By June 2024, expansion consultants were flagging enormous costs, stores were "spending money left and right," and executives were acknowledging that the Company needed "another three or four years of preparation." ¶¶64-65, 89. Defendants entirely ignore these facts, as well as the fact that they personally approved escalating expenses while assuring investors that costs were minimal. ¶¶58, 136-58. These contemporaneous conditions – not hindsight – foreclose Defendants' argument. *Ollila*, 2018 WL 792069, at *2 (no hindsight where CW allegations showed defendants "were aware of significant problems"); *James River*, 2023 WL 5538218, at *11 (similar).[7]

### d. The "Demand" Statements Were Material

Defendants wrongly characterize the statements describing the Kentucky pilot test as

---

[7] Defendants' authorities are inapposite. MTD 13-14. In *In re DXC Tech. Co. Sec.*, 2025 WL 950398, at *9 (E.D. Va. Mar. 27, 2025) the statements were limited to integration efforts, whereas here Defendants referred to accessing "existing capacity" for "much of the national rollout" or the "first 6,000" locations. ¶¶138, 152. The complaint in *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 888 (W.D.N.C. 2001) contained no CW accounts and provided "little or no indication of the basis for [its] allegations." In *Plymouth Cnty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 544 (M.D.N.C. 2013), the relevant CWs all left before the class period.

"successful" and that "demand exceeded expectations" as immaterial puffery. MTD 14. Materiality "is a question of fact that should normally be left to a jury," *Dunn v. Borta*, 369 F.3d 421, 427 (4th Cir. 2004), and statements are not puffery "unless they are so obviously unimportant … that reasonable minds could not differ on the question of their importance." *Singer*, 883 F.3d at 440. Statements touting demand for the initiative on which the Company was staking its future are plainly material. *See Vestis*, 808 F. Supp. 3d at 1388 (statements not puffery when made at "too pivotal of a moment" and "about topics too essential to [the company]'s business").

Moreover, these statements are not vague expressions of optimism – they are specific factual assertions that investors reasonably understood to rest on meaningful evidence, "the absence of which renders them misleading.'" *Ollila*, 2018 WL 792069, at *5. Defendants' failure to disclose that the pilot never meaningfully tested demand – because McDonald's artificially capped orders to ensure "zero waste" – was material information that "cannot be squared" with Defendants' characterization of the test as "thorough" and demand-validating.[8] ¶¶78-80, 141; *James River*, 2023 WL 5538218, at *9 (calling insurance reserves "reasonable" not puffery where characterization "cannot be squared" with systemic under-reserving).

e.    **Defendants' Statements Are Not Shielded By The Safe Harbor**

The PSLRA safe harbor does not apply. First, "mixed present/future statement[s] [are] not entitled to the safe harbor," *Genworth*, 103 F. Supp. 3d at 789, and many statements describe present conditions: that the "nationwide rollout … has started well" (¶165); that capital expenditures "support the overall DFD and retail channels" (¶¶175, 187); and that costs reflected

---

[8] *Employees' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*, 61 F.4th 369, 386 (4th Cir. 2023) (MTD 14), is readily distinguishable. There, the statements about an "ongoing" cancer drug trial were consistently "hedged with guarded and restrained positivity," expressly cautioning that interim results might not hold. Here, by contrast, Defendants made unequivocal claims until the truth began to emerge.

an "intentional decision to accelerate." ¶172. Similarly, statements that a project is "on track" convey current conditions. *See SCANA*, 2019 WL 1427443, at *14 ("making progress and looking forward to hitting the targets"); *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 817 (N.D. Ill. 2017) ("on track" conveys "*current* state of the integration") (emphasis in original).[9]

Second, the safe harbor does not protect "material omissions" about known present facts. *In re Constellation Energy Grp., Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 625 (D. Md. 2010). Defendants' statements that the rollout would "leverage" "existing capacity" and drive "Profitable U.S. Expansion" are misleading precisely because they omitted then-known facts – from Project Ray and the expansion team – that utilizing existing facilities required prohibitively expensive remediation. ¶¶136-38, 144, 152, 158, 181; *see Vestis*, 808 F. Supp. 3d at 1386 ("duty to disclose the grave defects that existed within the parts of [the] business that Defendants voluntary touted").

Third, the statements were not accompanied by "meaningful" cautionary language. Such language must be "substantive and tailored" to the specific risks at issue. *Genworth*, 103 F. Supp. 3d at 787. Defendants rely on generic "Risk Factors" from a February 27, 2024 Annual Report – filed **before** the McDonald's expansion was even announced – that were never updated to address the unique risks the expansion posed. MTD 5, Ex. D at 39, Ex. I at 45, Ex. Q at 50.[10] Boilerplate

---

[9] Defendants misread *Boykin v. K12, Inc.*, 54 F.4th 175, 184 (4th Cir. 2022). MTD at 17. The term "on track" is not categorically forward-looking; the term was not even at issue in the case, and the court merely noted, without adopting, an out-of-circuit suggestion to that effect.

[10] Defendants attach the February 2024 Annual Report to their motion, but that document is neither referenced nor relied upon in the AC and therefore should not be considered. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015). In any event, the February 2024 Annual Report merely noted generic warnings about the risks of retail partnerships and distribution generally, which cannot constitute the "substantive and tailored" cautionary language the safe harbor requires. *Genworth*, 103 F. Supp. 3d at 787. Indeed, those same boilerplate risk factors remained unchanged throughout the Class Period – even as Project Ray had flagged prohibitive costs, the expansion team reported "disgusting" facilities, and McDonald's franchisees were slashing orders – which only confirms that Defendants' cautionary language was never tailored to

20

warnings predating a company-altering transaction are not meaningful. *See Harman*, 791 F.3d at 107 ("cautionary statements remained unchanged despite a significant change in circumstances"); *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *12 (S.D.N.Y. Apr. 22, 2016) (failing to address "new risks"). In any event, "the adequacy of cautionary language is a question of fact." *Ollila*, 2018 WL 792069, at *5.

### f. Defendants' Statements Are Not Inactionable Opinion

Defendants' argument that statements prefaced by "I think" are non-actionable "opinions" fails. MTD 18; ¶¶166-67, 172, 181. The challenged "opinion" statements were made post-launch, when Defendants were acutely aware of the severe operational failures and spiraling costs that directly contradicted what they were telling investors. Opinions are actionable where – as here – they "could not have been 'sincerely held' given defendants' contemporaneous knowledge of problems." *Ollila,* 2018 WL 792069, at *6; *Vestis*, 808 F. Supp. 3d at 1387 (statements "couched" as opinions actionable where defendants "knew facts inconsistent with those opinions").

### B. The AC Raises A Strong And Compelling Inference Of Scienter

Scienter is pled through "circumstantial evidence of either reckless or conscious behavior," *Ollila*, 2018 WL 792069, at *2, and is assessed holistically "instead of each piece being scrutinized in isolation." *KBC*, 2016 WL 3981236, at *8. An inference of scienter "need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs,* 551 U.S. at 324. Significantly, motive is not required. *Ollila*, 2018 WL 792069, at **2-3.

Here, scienter is adequately alleged based on several independently sufficient grounds:

Defendants' Repeated Detailed Statements: Defendants repeatedly issued detailed,

---

the actual, known risks of the McDonald's expansion. *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 107 (D.C. Cir. 2015).

confident assurances about the McDonald's partnership's success, demand levels, logistics, and costs – often in direct response to pointed analyst and SEC inquiries. The "content and context" of these statements, made by executives who were "specifically asked, directly and repeatedly about these core operations," provides "powerful evidence of scienter." *KBC*, 2016 WL 3981236, at \*9; *see also Genworth*, 103 F. Supp. 3d at 785 ("[T]hat Defendants made repeated misrepresentations … suggests a substantial degree of scienter").

Defendants Closely Tracked the McDonald's Progress: Defendants directly oversaw the rollout and had real-time visibility into its mounting failures. Charlesworth publicly emphasized his detailed monitoring of the rollout, while Ashukian described meeting "daily" to track performance and "course correct" in real time. ¶194. Numerous CWs confirmed that Defendants reviewed Project Ray's analyses, tracked metrics provided by drivers' handheld devices, and had access to the "Smart Sheet" compiling McDonald's complaints. ¶¶195-98. Defendants' "self-proclaimed 'personal involvement'" and access to granular data itself shows recklessness, at a minimum. *Genworth*, 103 F. Supp. 3d at 785; *Scotts*, 2026 WL 1094854, at \*22 ("granular data that Scotts executives received, which addressed sales and inventory issues and was packaged through internal software and analytics tools" show scienter); *KBC*, 2016 WL 3981236, at \*9 ("Defendants themselves made statements about how involved they were in handling the issues").

Confidential Witnesses: The AC's eleven CWs – including personnel directly responsible for the McDonald's expansion – provide corroborating accounts establishing that Defendants knew of the operational, cost and due diligence failures from the outset. ¶¶51-104; *Epstein*, 203 F. Supp. 3d at 671 ("confidential sources regarding the business culture" support scienter); *Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.*, 2021 WL 1439680, at \*36 (E.D. Va. Mar. 24, 2021) ("red flags" that are "coupled with" "significant problems" support scienter).

22

Defendants' argument that CW allegations cannot support scienter absent direct contact with the defendants, MTD at 21, has been squarely rejected. *Evolent*, 2021 WL 1439680, at *35 (rejecting same argument, finding "Plaintiffs have pleaded facts with particularity that demonstrate that the CWs would have had knowledge of the matters on which they spoke"); *Ollila*, 2018 WL 792069, at **2-3 (crediting CW allegations even though "plaintiff may not be able to show smoking gun documentation that defendants . . . explicitly knew of these issues"). Where, as here, the AC identifies each CW's position, tenure, duties, and reporting relationships, the allegations must be credited. *See Klein v. Altria Grp., Inc.*, 525 F. Supp. 3d 638, 667 (E.D. Va. 2021). Defendants' attempt to reduce the CW interactions with Defendants to a single March 2025 conversation ignores that multiple CWs independently described Project Ray, which was presented to Charlesworth and established that Defendants knew of the partnership's fatal flaws long before the Class Period. ¶¶56-58. Tellingly, Defendants' Motion never mentions Project Ray, underscoring that they have no substantive response.

Defendants' contention that the CWs "do not even agree" on why the McDonald's partnership failed is a red herring. MTD 21. The rollout collapsed for ***multiple, compounding reasons*** – excessive costs, production shortfalls, and delivery breakdowns – and the CWs all point to the same conclusion: Krispy Kreme could not profitably or reliably supply McDonald's. *See Bucks Cnty. Emps. Ret. Sys. v. Norfolk S. Corp.*, 775 F. Supp. 3d 1275, 1293 (N.D. Ga. 2025) ("the sheer scale of Plaintiffs' allegations gives rise to an inference of senior management participation"). Defendants' specific attacks on the CWs are meritless and ignore compelling facts:

- Due Diligence: Defendants' attempt to recast the due diligence allegations as mere "negligent" misjudgment (MTD at 22) ignores that the CWs describe ***specific, known deficiencies*** that directly undermined Defendants' public assurances. *See* ¶¶53-64.

- Costs: The argument that it would be "nonsensical" to proceed if costs were prohibitive (MTD at 23), misunderstands the allegations: Krispy Kreme had publicly tied its

growth narrative to McDonald's and pressed forward under an internal, Defendant-led directive to "get it done," despite knowing the economics were deteriorating. ¶59.

- <u>McDonald's Contract</u>: Defendants' argument that the unfavorable contract terms reflect a mere "disagreement over strategy" (MTD at 23), likewise misses the point. The CWs establish that Defendants knowingly entered into a structurally unprofitable arrangement and then concealed it from investors, while publicly (and falsely) portraying that the partnership was low-risk and a pillar of the Company's growth.

- <u>Operational Issues</u>: Defendants' assertion that their absence from certain meetings ignores that the failures were escalated through formal channels. ¶¶88-95. Senior officers overseeing a flagship partnership do not escape knowledge of operational breakdowns simply because they received summaries rather than attended every meeting. *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1058 (C.D. Cal. 2008) (CW accounts created a "Company-wide inference" of known issues).

<u>The Importance of McDonald's</u>: The McDonald's partnership was central to Krispy Kreme's business – slated to *triple* the Company's points of access and serve as a catalyst for expansion into other major retailers. Defendants themselves repeatedly called it a "significant growth lever." ¶208. Misrepresentations about a company's "primary drivers of its profitability and growth" made at a "most critical period" raise a strong inference of scienter. *Vestis*, 808 F. Supp. 3d at 1389; *KBC*, 2016 WL 3981236, at *9 ("core operations" allegations support scienter).

<u>Defendants' Admissions</u>: The dramatic reversal from assurances that the rollout was low-cost and progressing smoothly, to the admission that it was "unsustainable," strongly supports scienter. *See In re Emergent BioSols. Inc. Sec. Litig.*, 2023 WL 5671608, at *24 (D. Md. Sept. 1, 2023) ("later admission" by CEO supported scienter); *In re Ironnet, Inc. Sec. Litig.*, 2023 WL 5110932, at *12 (E.D. Va. Aug. 9, 2023) (defendants' "own concession" supported scienter). Defendants admitted that the rollout could not achieve "sustainable, profitable growth" and that the Company needed to fully outsource its logistics – admissions directly contradicting the prior assurances of "strong operational execution." Moreover, despite touting that the rollout was "on track" and "working" as late as February 25, 2025, Defendants ***did not add a single McDonald's location after that date***. ¶113. A strategic initiative of this magnitude does not collapse within

24

weeks absent severe, long-standing problems. The $51 million asset impairment and $356 million goodwill write-down make it implausible that the issues only surfaced after the Class Period ended.

Analyst Reaction: Sophisticated analysts' shock at the May 8 disclosures – with Truist calling the collapse "shock[ing]" and criticizing management for failing to disclose the issues earlier, and J.P. Morgan deeming the halt a "surprise" that "speaks volumes" – reinforces scienter by demonstrating the stark discrepancy between Defendants' prior assurances and Krispy Kreme's later disclosures. ¶¶199-200. *In re FibroGen, Inc. Sec. Litig.*, 2022 WL 2793032, at *22 (N.D. Cal. July 15, 2022) (scienter "supported by the reaction of the . . . financial community"); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (similar).[11]

Executive Departures: The sweeping leadership upheaval supports scienter. ¶¶201-05. Key figures responsible for the McDonald's rollout – including Chief Growth Officer Spanjers and Project Ray architect Amy Hine – were removed in late 2024 amid escalating operational failures. The overhaul culminated in 2025 with the resignations of Ashukian, Chief Growth Officer Skena, and replacement of six of eleven Board members – a shake-up the media described as a "massive change." ¶204. There were simply "too many departures to say that they were coincidental with a straight face," as "[s]uch house-cleaning" does "not follow innocent mistakes" *San Antonio Fire and Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 322 (S.D.N.Y. 2024).[12]

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion should be denied in its entirety.[13]

---

[11] *Johnson v. Pozen Inc.*, 2009 WL 426235, at *24 (M.D.N.C. 2009) (MTD 24) is distinguishable, involving analysts' misunderstanding of complex scientific data. Here, analysts were not confused – they criticized the stark contrast between Defendants' disclosures and their prior assurances.

[12] The AC alleges a Section 10(b) primary violation, and Plaintiff therefore overcomes Defendants' only challenge to Section 20(a) liability. *Genworth*, 103 F. Supp. 3d at 790-91.

[13] Should the Motion be granted, Plaintiff requests leave to amend. Fed. R. Civ. P. 15(a)(2).

25

Dated: April 30, 2026

Respectfully submitted,

**TERPENING LAW PLLC**

By: */s/ William R. Terpening*
William R. Terpening
NC Bar No. 36418
221 West 11th Street
Charlotte, NC 28202
Tel.: (980) 265-1700
terpening@terpeninglaw.com

*Local Counsel for Lead Plaintiff*
*and Local Counsel for the Class*

**SAXENA WHITE P.A.**
Maya Saxena (admitted *pro hac vice*)
Lester R. Hooker (admitted *pro hac vice*)
Jonathan Lamet (admitted *pro hac vice*)
Dianne Pitre (admitted *pro hac vice*)
7777 Glades Road, Suite 300
Boca Raton, Florida 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
msaxena@saxenawhite.com
lhooker@saxenawhite.com
jlamet@saxenawhite.com
dpitre@saxenawhite.com

**SAXENA WHITE P.A.**
Steven B. Singer (forthcoming *pro hac vice*)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
ssinger@saxenawhite.com

*Lead Counsel for Lead Plaintiff*

**KLAUSNER KAUFMAN JENSEN**
**& LEVINSON**
Robert D. Klausner
7080 NW 4th Street
Plantation, Florida 33317
Tel.: (954) 916-1202
Fax: (954) 916-1232

26

bob@robertdklausner.com

*Additional Counsel for Lead Plaintiff*

27

**CERTIFICATE OF SERVICE**

I hereby certify that on April 30, 2026, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

Respectfully submitted,

By: */s/ William R. Terpening*
William R. Terpening

## <u>ARTIFICIAL INTELLIGENCE CERTIFICATION</u>

Pursuant to the Court's June 18, 2024 Order, 3:24-mc-104, I hereby certify that:

- No artificial intelligence was employed in doing the legal research for the preparation of this document, with the exception of such artificial intelligence embedded in standard online legal research sources such as Westlaw, Lexis, and Bloomberg; and

- Every statement and every citation to an authority contained in this document has been checked by an attorney at the above-signed firms and/or paralegals working at their direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: Charlotte, North Carolina
April 30, 2026

By: */s/ William R. Terpening*
William R. Terpening

29