**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:25-cv-332-MOC**

| | | |
|---|---|---|
| **DAVID CAMERON,**<br>**TEJA MUDIKI,**<br>**WEST PALM BEACH POLICE PENSION FUND,**<br>**JAN DUJMOVIC**,<br><br>Plaintiffs,<br><br>vs.<br><br>**JEREMIAH ASHUKIAN,**<br>**JOSH CHARLESWORTH,**<br>**KRISPY KREME, INC.**,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **ORDER** |

**THIS MATTER** is before the Court on Defendants' Motion to Dismiss for Failure to State a Claim. (Doc. No. 67). Having considered Defendants' motion and reviewed the pleadings, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' motion.

## I. BACKGROUND

Defendant Krispy Kreme Inc. is a publicly traded company that produces and sells doughnuts through its own stores and partner retailers. Defendant Ashukian served as Krispy Kreme's Executive Vice President and CFO from January 2023 until July 2025. Defendant Charlesworth has served as the President, CEO, and board member of Krispy Kreme since January 2024.

This is a securities class action brought against Defendants on behalf of a class consisting of all persons and entities that purchased or otherwise acquired Krispy Kreme securities between

March 26, 2024, and May 7, 2025, inclusive. The action arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, codified at 15 U.S.C. §§ 78j(b) and 78t(a), as well as Securities and Exchange Commission Rule 10b-5, codified at 17 C.F.R. § 240.10b-5.

Krispy Kreme employs a "hub and spoke" distribution model. (Doc. No. 65 at 12). Centralized production hubs (Krispy Kreme stores and factories) produce doughnuts that are then sold in-store or distributed to other Krispy Kreme stores and local retail partners, including grocery stores, convenience and drug stores, wholesalers, and restaurants. (Id. at 12–13).

In 2016, Krispy Kreme adopted a new business model, emphasizing "Delivered Fresh Daily" ("DFD") distribution to retail partners. (Id.). In October 2022, as part of a push to expand the DFD segment of its business, Krispy Kreme entered a partnership with McDonald's Inc. to provide doughnuts to nine McDonald's locations in the Louisville, Kentucky, area. (Id. at 13). By February 2023, Krispy Kreme expanded the test to 160 McDonald's locations to "evaluate the operational impact of delivering fresh doughnuts on a larger scale and [] explore customer demand for Krispy Kreme doughnuts at McDonald's locations." (Id. (citation modified)). Plaintiffs claim that Defendants represented to investors that the Kentucky test was closely monitored, and the expansion would only proceed if Krispy Kreme could handle the expansion profitably. (Id. at 14).

On March 26, 2024, Krispy Kreme and McDonald's announced that they would expand their partnership nationwide beginning in October 2024. (Id. at 15). In response to this announcement, Krispy Kreme's stock price rose. (Id. at 2). Despite this initial boom, Krispy Kreme and McDonald's paused their joint venture in May 2025 and cancelled it completely by June 2025. (Id. at 83).

Plaintiffs complain that before and during the national rollout of the McDonald's partnership, Defendants were aware of serious operational deficiencies that fundamentally undermined the possibility that the partnership would be profitable for Krispy Kreme, and, despite this knowledge, Defendants continuously and "unequivocally represented to investors that the McDonald's rollout was a complete success." (Id. at 16–18 (citation modified)). Plaintiffs further contend that Defendants misrepresented the costs necessary to achieve the company's goals, (id. at 71), and the company's ability to support the McDonald's partnership using existing production and delivery capacity, (id. at 52–53, 59).

Contrary to Defendants' public statements, Plaintiffs assert that the McDonald's partnership was a boondoggle from the beginning. Plaintiffs rely on the statements of eleven confidential witnesses ("CWs"), all of whom are former Krispy Kreme or McDonald's employees and range from a former Krispy Kreme executive to a local Krispy Kreme store manager. The CWs paint a picture of the partnership that is much less rosy than Defendants indicated in their public statements. Although Defendants stated publicly that its Louisville test was "thorough" and "demonstrated that consumer demand outstripped . . . expectations," the CWs contend that this was far from the truth. (Id. at 55); see also (id. at 49–50, 55 (additional statements that demand during the Kentucky test was robust)). Instead, according to CW 9 and CW 3,[1] "the results of the Kentucky pilot program did not show a 'justification' for a larger expansion" and "McDonald's primary goal during the test was to ensure zero waste—not to assess true demand." (Id. at 30–31).

---

[1] CW 9 was Krispy Kreme's Executive Vice President – Chief Global Supply Chain Officer from July 2021 to January 2025. CW 3 was a Senior Manager for Field Training in the United States and worked at Krispy Kreme from February 2021 through March 2025.

Further, the CWs claim that, while Defendants publicly stated that Krispy Kreme would handle the nationwide McDonald's rollout "using existing capacity," the actual condition of the company's production and logistics infrastructure rendered this a non-starter. (Id. at 53); see also (id. at ¶¶ 138, 149, 152, 181). The CWs allege that "Krispy Kreme's factory conditions [were] 'disgusting': shops needed complete and expensive overhauls, with 'rodents, rats, mice, roaches, and no standards of cleanliness.'" (Id. at 24–25 (quoting CW 5, a Krispy Kreme DFD Implementation Consultant from June 2024 to May 2025)). According to CW 3 and CW 6,[2] Krispy Kreme's facilities did not meet McDonald's stringent health and safety standards, factories regularly failed audits, and facilities required expensive remediation to get them up to McDonald's standards. (Id. at 26).

Cleanliness aside, other CWs stated that Krispy Kreme's production infrastructure was simply not ready to meet the production demands of the McDonald's partnership. One CW stated that "Krispy Kreme had long avoided investing in its machinery, 'putting Band-Aids on things' when machines wore down." (Id. at 27). Another stated that "factories went from 12,000 doughnuts per day to 60,000" and "'[t]here was not enough infrastructure to meet the demand,' Krispy Kreme 'just wasn't ready.'" (Id. at 28). In short, "the shops were not equipped to handle the baking volume" and as a result, the company was unable to deliver "consistent quality," which sometimes "forc[ed] McDonald's to tell its customers 'we don't have Krispy Kreme

[2] CW 6 was a Data Analyst from January 2024 to July 2025 who worked out of Krispy Kreme's Winston-Salem office and reported to Amy Hine. CW 6's job included loss prevention, and therefore she monitored employees through cameras placed inside the shops. This access gave CW 6 firsthand knowledge into what was happening in the production facilities.

today, they haven't shown up.'" (Id. at 36 (quoting CW 4, Former Senior Director of Krispy Kreme's McDonald's Business Unit)).

Moreover, according to the CWs, Krispy Kreme's existing logistics and delivery infrastructure could not handle the new pressures of the McDonald's partnership, contrary to the public representations of Krispy Kreme executives. See (id. at ¶¶ 128, 146, 167). CW 8[3] stated that her production facilities "went from having just two drivers each to fifteen and twelve drivers" after the partnership was launched. (Id. at 29). Newly hired delivery drivers were not up to par, frequently missing McDonald's "tight delivery windows . . . causing rejections and returns." (Id. at 35 (statement of CW 6)). These operational failures eventually led Krispy Kreme to "fully outsource U.S. logistics." (Id. at 44).

Because Krispy Kreme was unable to execute the expansion using existing capacity, the CWs state that the partnership was more expensive than Defendants publicly stated and required significantly more up-front capital investment. See (id. at ¶¶ 153, 158, 167, 172, 173, 175, 187). According to CW 1,[4] the "upfront costs involved in preparing for and conducting the launch were 'dramatic and drastic.'" (Id. at 24). CW 6 and CW 11[5] both stated that the poor condition of Krispy Kreme's production facilities required full "backhouse reset[s]" to overhaul operations and bring them into alignment with McDonald's standards. (Id. at 26). These "resets" included purchasing "swabbing machines that tested for bacteria" and required "disposable swabs at over

[3] CW 8 was a Customer Logistics Manager in a Chicago area Krispy Kreme from May 2024 to October 2025.
[4] CW 1 was Krispy Kreme's Senior Director of Sourcing for International Business from March 2022 until January 2025.
[5] CW 11 was a Krispy Kreme Implementation Consultant who worked on the McDonald's expansion. She worked at the Company from June 2024 through June 2025.

$500 per pack." (Id. (statement of CW 3)). The increase in production volume also required the company to reclassify locations from "restaurant" to "wholesale food manufacturer." (Id. at 29). According CWs 3, 5, 6, and 7,[6] this reclassification required the company to purchase metal detectors for the affected stores, "a capital expenditure that exceeded $18 million." (Id.).

The increase in delivery volume was also not without capital costs. CWs 3, 6, and 8 allege that Krispy Kreme lacked the trucks required to service McDonald's locations and "the [new] delivery trucks were very expensive, coming in at over $100,000 each." (Id. at 29 (statement of CW 8)). But Krispy Kreme executives publicly and repeatedly stated that the company was "not subject to capital expenditure commitments or obligations specific to the relationship with McDonald's." (Id. at 63). Despite these representations, after the partnership was terminated, "Krispy Kreme recorded long-lived asset non-cash impairment charges of $22.1 million and lease impairment and termination costs of $28.9 million," which were specifically attributed to the "termination of the Business Relationship Agreement with McDonald's USA." (Id. at 48).

CW statements indicate these costs were known to Defendants in advance of the decision to proceed with the national rollout. CW 1, the former Senior Director of Sourcing for International Business at the company, stated that "[executives] knew the increased expenses—including extra equipment needed to satisfy the McDonald's volume—rendered the McDonald's plan unsustainable." (Id. at 29–30). According to CW 6, "[a] comprehensive analysis of what the McDonald's launches would cost was presented to the Company's Board of Directors" by Amy

[6] CW 7 was a Krispy Kreme General Manager in the Grand Rapids, Michigan, area from June 2018 through August 2025.

Hine, Krispy Kreme's former Director of Field Operations, "prior to the March 2024 announcement [of the McDonald's partnership]." (Id. at 22). According to the same CW, "Amy [Hine] asked the question many, many times: 'are you sure you want to proceed if it's going to cost this much money up front?'" (Id.). CW 6 stated that "cost estimates were regularly conveyed to the Company's senior officers, including the Vice President of Operations, the COO, and the CEO, as all such expenditures required executive-level approval." (Id.).

Plaintiffs contend that these problems fundamentally undercut Krispy Kreme's ability to deliver on its promises, both to McDonald's and investors. Far from the "profitable nationwide expansion" touted by executives between October 2024 and February 2025, the CWs state that the rollout was immediately plagued by quality issues and unsustainably low demand. (Id. at 56–57); see also (id. at ¶¶ 161, 162, 165, 166, 167, 170, 177, 178, 184). According to company insiders, the contractual agreement with McDonald's was inherently flawed. Multiple CWs stated that "McDonald's had no minimum ordering requirements [and] 'they could order whatever they wanted,' but Krispy Kreme still had to deliver even if the orders were miniscule." (Id. at 23). According to CW 7, "'within the first three weeks,' sales went 'down to two or three dozen per store,' with some McDonald's locations producing only $15 to $25 per day, which did not even cover the driver's hourly rate." (Id. at 24). Another CW reported that after the nationwide rollout, her facilities' production "quadrupled from producing 1,000 dozen doughnuts to 4,000 dozen upon the launch," but once McDonald's locations were able to control their own ordering, "production was cut to just 2,000 dozen." (Id. at 33). CW 10, a McDonald's Kitchen Manager in the Chicago area, reported that "by the second week of the rollout, her store had already scaled back orders to only a dozen of each flavor, amounting to just thirty-six

doughnuts." (Id.). This was not limited to her location—it "was true for many of the sister stores owned by her franchisee" and "[b]y January, all twenty of the franchisee's locations were instructed to limit their Krispy Kreme order to just six of each flavor, or just eighteen total doughnuts." (Id.). These cutbacks "occurred with every launch" and "the reduction was apparent by autumn 2024." (Id. at 32 (first quoting CW 11; then quoting CW 6)).

Plaintiffs assert that these issues were known at the highest levels of Krispy Kreme's leadership. CW 4 recalled a meeting, attended by both Defendant Charlesworth and CW 4, where McDonald's franchisees "raised the exact problems [that] CW 4 had been voicing: inconsistent deliveries, unsanitary procedures, and subpar doughnut quality." (Id. at 37). Contrary to their positive public statements, according to CW 8, "Defendants were well-aware of the quality and operational issues because they had access to the real-time complaints submitted by McDonald's regarding delivery and product quality failures." (Id. at 40). In addition to operational deficiencies, the CWs allege that Defendants were aware of poor sales, as Defendant Charlesworth publicly stated, "We can track the deliveries. We can track any that are unsold." (Id. at 69). And in March 2025, Charlesworth told CW 4 directly that "Krispy Kreme was losing money on the McDonald's deal due to significant cost pressures," in some cases "30 cents a doughnut." (Id. at 38).

Nevertheless, as late as February 2025, Defendants publicly maintained that the rollout "remain[ed] on track to reach 6,000 [McDonald's] restaurants by year-end" and that "the feedback from McDonald's [was] very positive." (Id. at 43); see also (id. at ¶¶ 177, 178, 184). Within two months the partnership was paused. (Id. at 43–44). By June 2025, it was terminated entirely. (Id. at 46).

On January 30, 2026, Plaintiffs filed their Amended Complaint claiming violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)) and U.S. Securities and Exchange Commission Rule 10b-5 (17 C.F.R. § 240.10b-5), which prohibit the use of manipulative and deceptive devices related to the sale of securities and allow Plaintiffs to recover losses incurred as a result of false or misleading statements by companies and their executives. Plaintiffs contend that between March 2024 and May 2025, Defendants engaged in conduct designed to deceive the investing public by artificially inflating the price of Krispy Kreme shares. During this course of conduct, Plaintiffs aver that Defendants employed devices, schemes, and artifices to defraud investors, and made untrue statements of material fact and/or omitted to state material facts necessary to render the statements not misleading.

Plaintiffs identified thirty-five "material misstatements and omissions concerning Krispy Kreme's financial and operational condition." (Doc. No. 65 at 48). These alleged misstatements and omissions fall into four general categories: (1) the scope and success of Krispy Kreme's national partnership with McDonald's, (id. at ¶¶ 128, 137, 144, 145, 146, 147, 161, 162, 165, 166, 167, 170, 177, 178, 181, 184); (2) demand for Krispy Kreme's doughnuts at McDonald's locations during the Kentucky tests and after the October 2024 national rollout, (id. at ¶¶ 128, 141, 142, 162, 165, 166, 170, 178); (3) Krispy Kreme's ability to support the partnership using existing logistics and production capacity, (id. at ¶¶ 127, 128, 136, 137, 138, 146, 149, 152, 167, 181, 184); and (4) the cost of the McDonald's partnership, (id. at ¶¶ 153, 158, 167, 172, 173, 175, 181, 187).[7]

---

[7] Some of the alleged misstatements or omissions fall into multiple categories and are therefore listed multiple times.

## II. STANDARD OF REVIEW

A motion to dismiss "challenges the legal sufficiency of a complaint." Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." Id. Only "a short and plain statement of the claim showing that the pleader is entitled to relief" is required. FED. R. CIV. P. 8(a)(2). Such statement does not require "[s]pecific facts," but need only give defendants "fair notice of what the claim is and the grounds upon which it rests." Erickson v. Pardus, 551 U.S. 89, 93 (2007) (citation modified).

For purposes of the motion, the factual allegations in the complaint are accepted as true and viewed in the light most favorable to the non-moving party, Coleman v. Md. Ct. of Appeals, 6266 F.3d 187, 189 (4th Cir. 2010), though the court need not accept "unwarranted inferences, unreasonable conclusions, or arguments," Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). Finally, "[a] Rule 12(b)(6) motion 'does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" Pisgah Laby's, Inc. v. Mikart, Inc., 2015 WL 996609, at *2 (W.D.N.C. Mar. 5, 2015) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)).

In addition to the Rule 12(b) standard, the Public Securities Litigation Reform Act ("PSLRA") imposes a heightened pleading standard. To state a claim under 15 U.S.C. § 78j and 17 C.F.R. § 240.10b-5, a plaintiff must allege an actionable misrepresentation or omission of material fact. Yates v. Mun. Mortg. & Equity, LLC, 744 F.3d 874, 884 (4th Cir. 2014). A

plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). A plaintiff must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); see Public Emps.' Ret. Ass'n v. Deloitte & Touche LLP, 551 F.3d 305, 311–12 (4th Cir. 2009); In re Computer Scis. Corp. Sec. Litig., 890 F. Supp. 2d 650, 661–62 (E.D. Va. 2012). Such an inference "'must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" Boykin v. K12, Inc., 54 F.4th 175, 186 (4th Cir. 2022) (quoting Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007)). Finally, "'any statement or omission of fact must be material,' meaning objectively significant to a reasonable investor." Epstein v. World Acceptance Corp., No. 6:14-CV-01606-MGL, 2015 WL 2365701, at *5 (D.S.C. May 18, 2015) (quoting Longman v. Food Lion, Inc., 197 F.3d 675, 682–83 (4th Cir. 1999)). "Determining whether the complaint satisfies this standard necessarily entails a case-by-case assessment of the complaint as a whole," Teachers' Ret. Sys. of La. v. Hunter, 477 F.3d 162, 174 (4th Cir. 2007), and "the trier of fact decides whether a public statement is misleading." Kiken v. Lumber Liquidators Holdings, Inc., 155 F. Supp. 3d 593, 601 (E.D. Va. 2015).

A statement that turns out to be false is not necessarily indicative of fraud. DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990) (holding that if a company "bathes itself in a favorable light" and then later must "disclose[] that things are less rosy," that alone does not signify "that the difference must be attributable to fraud"). Such "fraud by hindsight claims" are

not actionable. See Lormand v. US Unwired, Inc., 565 F.3d 228, 254 (5th Cir. 2009) (finding fraud by hindsight when allegations "infer earlier knowledge based only on the situation that later came to pass"). Indeed, courts will "typically reject attempts to claim fraud via 'Monday morning quarterbacking.'" Ollila v. Babcock & Wilson Enters., Inc., No. 3:17-CV-109, 2018 WL 792069, at *4 (W.D.N.C. 2018).

When a complaint relies on facts provided by confidential sources, it must "describe the sources with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." Yates v. Mun. Mortg. & Equity, LLC, 744 F.3d 874, 885 (4th Cir. 2014). Further, allegations from a CW "will only be afforded the weight they are due given their indicia of reliability." KBC Asset Mgmt. NV v. DXC Tech. Co., 19 F.4th 601, 609 (4th Cir. 2021).

## III. DISCUSSION

Defendants argue that: (1) their statements before, during, and after the McDonald's deal were not materially false, or were protected as non-actionable "puffery," opinion, or forward-looking statements; and (2) Plaintiffs have failed to plead a strong inference of scienter to support their claims.

Plaintiffs allege thirty-five "material misstatements and omissions concerning Krispy Kreme's financial and operational condition" made between March 26, 2024, and February 27, 2025. (Doc. No. 65 at 49). These allegations are buttressed by eleven CWs whose statements describe severe issues with Krispy Kreme's infrastructure and Defendants' knowledge of the McDonald's partnership's massive capital requirements, which combined to undercut the

partnership's likelihood of success beginning shortly after the national rollout in mid-October 2024.

The Court will first address Defendants' challenge to Plaintiffs' reliance on CWs, and then analyze which statements are sufficiently pled to survive Defendants' motion to dismiss.

**a. Plaintiffs' Reliance on CWs**

Defendants claim that the Court should ignore the CWs' allegations, dismissing their statements as little more than "generalized criticisms from former employees regarding corporate strategy" that are too "vague, speculative and conclusory" to render Defendants' statements actionable. (Doc. No. 69 at 21–22). Not so. Plaintiffs set forth sufficient facts to show that their CWs are reliable. The Amended Complaint states the CWs' titles, experiences with Krispy Kreme, and basis for their knowledge of the facts alleged. Far from a smattering of low-level employees, Plaintiffs' CWs were well positioned to provide credible information about the condition of Krispy Kreme's production and delivery infrastructure, the costs associated with the McDonald's rollout, and the success (or lack thereof) of the national McDonald's partnership. See, e.g., (Doc. No. 65 at 20–21). Because the CWs are appropriately identified and because they have sufficient indicia of reliability, the Court will "generally consider and take as true" their statements at the pleading stage. Gimpel v. Hain Celestial Grp., Inc., 156 F.4th 121, 129 (2d Cir. 2025).

**b. Statements Insufficiently Pled**

Of the statements that Plaintiffs identify as misleading, twenty-one are insufficiently pled. These statements are not actionable because they are (1) puffery or corporate optimism; (2)

forward looking and thus protected by the PSLRA's safe harbor; (3) not materially false or misleading; or (4) a combination of the three.

i. *Puffery*

To be actionable, "any statement or omission of fact must be material." Longman, 197 F.3d at 682. Statements are not actionable if they are no more than corporate puffery or optimism. If a firm "bathes itself in a favorable light" but later "discloses that things are less rosy," it does not necessarily follow that the earlier positive statements were fraudulent. DiLeo, 901 F.2d at 627. Such "[i]mmaterial boasting and exaggerations" are generally not actionable because "a reasonable investor, exercising due care" would not rely on such statements when making investing decisions. Boykin, 54 F.4th at 183 (first quoting Xia Bi v. McAuliffe, 927 F.3d 177, 183 (4th Cir. 2019); then quoting In re Marriott Int'l, Inc., 31 F.4th 898, 902 (4th Cir. 2022)).

Many of Defendants' alleged misstatements before February 2025 fall into this category. For example, when announcing the McDonald's partnership, a joint press release by the two companies read: "Three of Krispy Kreme's most popular doughnuts will be delivered fresh to McDonald's restaurants every day." (Doc. No. 65 at 49). Plaintiffs claim that, since not every doughnut delivered to a McDonald's restaurant was "fresh" and because not all doughnuts were delivered "every day," the statement is actionably false or misleading. (Id. at 50). Far from it. This is a clear and obvious example of corporate puffery. No reasonable investor would understand such a statement to be an actionable guarantee to investors that every doughnut Krispy Kreme produced would be at peak freshness and delivered without any delay.

The statements Plaintiffs identify at Doc. No. 65 ¶¶ 128, 141, 142, 161, 162, 165, 166, and 170 suffer the same flaw. And the statements identified at ¶¶ 128, 141, and 142 were all made before the national rollout of the McDonald's partnership. (Doc. No. 65). Any positive statements about the partnership's progress could not be related to the actual status of the partnership, since the partnership had not yet begun anywhere but on paper. The same is true for statements asserting positive consumer sentiment regarding the McDonald's partnership made in the early months of the partnership. Krispy Kreme did not roll out any additional McDonald's locations before October 2024. (Doc. No. 69 at 5–7). These statements are thus correctly understood as "generic enthusiasm" for a major new deal. Boykin, 54 F.4th at 183. In other words, inactionable corporate puffery.

Defendants' optimistic statements about consumer sentiment in November 2024 are similarly insufficient. Although the national McDonald's rollout had been underway for slightly less than a month and Defendants had access to some information about consumer reaction and the partnership's performance, Krispy Kreme had only expanded to 400 Chicago area McDonald's locations. (Doc. No. 69 at 7). A reasonable investor equipped with this information (which was available to Plaintiffs) could not rely on statements such as "[t]he nationwide rollout to McDonald's has started well" or that Krispy Kreme had seen a "successful start to [the] nationwide McDonald's rollout" as indicative of anything other than extremely preliminary information and generic corporate positivity for a new business venture. (Doc. No. 65 at 67, 65); see also (Doc. No. 65 at ¶¶ 161, 166, 170, 184 (statements that similarly state the success of the McDonald's rollout)).

These November 2024 statements stand in contrast with the statements from February 2025, which are actionable. In February 2025, Krispy Kreme had expanded to thousands of McDonald's restaurants across the Midwest and had nearly five months of data on consumer demand and the company's performance. By February, it was reasonable for an investor to rely on Defendants' claims that the McDonald's partnership was going well and that consumer reaction was positive, but not so in November 2024. Defendants' positive statements about the McDonald's rollout made before February 2025 could only be understood by a reasonable investor as immaterially puffery promoting a new business initiative and not statements of business fact. For this reason, such statements are properly dismissed.

ii. *Forward Looking Statements*

Other statements are forward looking and are therefore protected by the PSLRA's "safe harbor" provisions. A purely forward-looking statement that (1) is accompanied by "meaningful cautionary" language; (2) is "immaterial"; or (3) the Plaintiff cannot prove "was made with actual knowledge . . . that the statement was false" is subject to "safe harbor" under 15 U.S.C. § 78u-5(c)(1) and is not actionable.

Many of Defendants' statements made before February 2025 are forward-looking and satisfy at least one of these criteria. For instance, a March 2024 press release stating that "by making Krispy Kreme accessible to fans nationwide through this partnership, <u>we expect</u> to more than double our points of access by the end of 2026" is not actionable. (Doc. No. 65 at 49 (emphasis added)). Such a statement is purely forward looking as it does not reference current conditions, and Plaintiffs do not demonstrate that it was made with actual knowledge of falsity. While Plaintiffs' CWs state that the partnership was doomed to failure post-facto, Plaintiffs

present insufficient evidence that Defendants had "actual knowledge" that Krispy Kreme could not achieve its ambitious goals prior to the national rollout. 15 U.S.C. § 78u-5(c)(1); see Xia Bi, 927 F.3d at 183 ("[A]s Yogi Berra observed, [i]t's tough to make predictions, especially about the future." (quotations omitted)). In addition to those identified above, numerous other statements suffer the same flaws. See (Doc. No. 65 at ¶¶ 137, 144, 145, 146; 184). For the foregoing reasons, these statements must be dismissed as forward-looking statements protected by the PSLRA safe harbor provision.

iii. *Not Materially False*

Finally, some of Defendants' alleged misstatements are either objectively true, or are so vague that they are not demonstrable as either true or false. See Marriott, 31 F.4th at 901 ("[A] plaintiff must identify a factual statement or omission—that is, one that is demonstrable as being true or false." (quotations omitted) (emphasis added)); 15 U.S.C. § 78u-4(b)(1)(A). For instance, Plaintiffs claim that the following statement in a March 2024 press release was actionable: "Krispy Kreme has been scaling its supply chain, building a support team, adding technology and new equipment, and enhancing field training to support its Delivered Fresh Daily Expansion, which includes this phased rollout." (Doc. No. 65 at 50); see also (Doc. No. 65 at ¶ 146). Far from materially false, the facts are that Krispy Kreme did build a team dedicated to DFD expansion and the McDonald's partnership. See (id. at 20–24 nn. 6–13). Indeed, many of Plaintiffs' CWs worked on or with this team. (Id.). Further, as opposed to a failure to invest in new equipment and modernize its production and delivery infrastructure, Krispy Kreme invested heavily in the same, a fact which Plaintiffs rely on to argue that Defendants failed to disclose the cost of the McDonald's partnership. See, e.g., (id. at 19–21).

Plaintiffs also take issue with some of Defendants' statements regarding the cost of the McDonald's rollout. For instance, after being asked whether there would be some "big upfront costs" related to the McDonald's partnership, Defendant Ashukian stated that there was "no surprise on the cost front" before listing a litany of expenses including "increased training and development," "overstaffing drivers," and "upgrading doughnut production lines." (Doc. No. 68-15 at 12). Later in the same exchange after being asked about "some of the start-up costs associated with [the McDonald's partnership]" and the "early learnings from the McDonald's rollout," Defendant Charlesworth stated that "the learnings are that it's working as expected" and that "there [are] a few startup costs." (Id. at 13–14). When read in context, these statements are simply not false. Even if, as Plaintiffs allege, the McDonald's partnership's costs were much greater than Defendants publicly acknowledged, the statements that Plaintiffs identify here acknowledge that there were at least "a few" costs, which is enough to make the instant statements not materially false. Further, these statements regarding cost are too vague to be material. See In re Computer Scis. Corp. Sec. Litig., 890 F. Supp. 2d at 668 (finding that "statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker" cannot constitute actionable misstatements). Defendants were not giving a comprehensive assessment of the partnership's costs, only stating that there were "a few." (Doc. No. 68-15 at 13–14). Even if Defendants went on to list some of the costs, stating that there are "a few" costs is inherently and obviously vague, and indicates that a reasonable investor could not rely on such a statement as a comprehensive accounting. As such, the statements are too vague to be actionable.

For the foregoing reasons, the Court will dismiss Plaintiffs' Amended Complaint as it pertains to statements found in Doc. No. 65 at ¶¶ 127, 128, 137, 141, 142, 144, 145, 146, 161, 162, 165, 166, 167, 170, 173, and 184.

**c. <u>Statements Sufficiently Pled</u>**

The remaining fourteen statements are sufficiently pled to survive Defendants' motion to dismiss. The actionable misstatements fall into three general categories: (1) Defendants' assertions to investors that Krispy Kreme would achieve the McDonald's rollout using existing logistical infrastructure and production capacity; (2) Defendants' assertions that the McDonald's partnership would not require significant up-front costs and capital expenditures; and (3) Defendants' statements to investors in February 2025 touting the operational success of the national McDonald's rollout and claiming that the company was still on track to expand to 6,000 McDonald's restaurants by the end of the year.

i. *Actionable misstatements or omissions*

As discussed at length above, to state a claim under Section 10(b), a plaintiff must allege an actionable misrepresentation or omission of material fact. <u>Yates</u>, 744 F.3d at 884. To satisfy this requirement, the statement must be "demonstrable as being true or false," <u>Marriott</u>, 31 F.4th at 901, and "objectively significant to a reasonable investor," <u>Epstein</u>, 2015 WL 2365701 at *5; <u>see also</u> <u>Phillips v. LCI Intern., Inc.</u>, 190 F.3d 609, 613 (4th Cir. 1999) ("If a reasonable investor, exercising due care, would gather a false impression from a statement, which would influence an investment decision, then the statement satisfies the initial element of a § 10(b) claim."). Further, and as discussed in greater detail above, statements are not actionable if they are "corporate puffery," forward-looking and thus protected by the PSLRA's "safe harbor" provision, or not

materially false. See Boykin, 54 F.4th at 183 (discussing what makes a statement immaterial puffery); see 15 U.S.C. § 78u-5(c)(1) (laying out the PSLRA safe harbor).

1. Existing Capacity and Infrastructure

Plaintiffs allege that the following statements regarding Krispy Kreme's ability to execute the McDonald's partnership using existing capacity were false or misleading due to significant deficiencies in Krispy Kreme's production and distribution capabilities that Defendants were or should have been aware of:[8]

- "We'll support much of this nationwide rollout using existing capacity, while adding distribution with other major customers as we grow." (Doc. No. 65 at 53).
- "Much of the national rollout can happen using existing capacity." (Id.).
- "[W]e're focusing our attention on the US on what is a very capital-efficient model and leveraging the excess capacity of the production Hubs through these off-premise DFD doors. . . . We've got the excess capacity in the US." (Id. at 54).
- "[E]xpansion of delivered fresh daily in the U.S. is leveraging an underutilized system. . . . In the early months, nearly all of the expansion is serviced by existing production hubs. (Id. at 59).
- "Specifically on production, we're able to go from [] the first 6,000 with just our existing production facilities, a lot of them former franchisees, a few years old, heavily underutilized. So, we're able to leverage that to service the demand. . . . And so, we have a very clear path to support that expansion." (Id. at 61).
- "[F]rom an operational point of view . . . we're finding more and more ways to leverage our existing capacity, whether it's because we've increased productivity at our existing hubs or we're learning how to get the doughnuts out to the points of access better and better." (Id. at 74).

Though these statements are about the future rollout of the McDonald's partnership, they are best characterized as "mixed present/future statements" and therefore "not entitled to the safe harbor" provided by the PSLRA. In re Genworth Fin. Inc. Sec. Litig., 103 F. Supp. 3d 759, 771

[8] There are minor differences in the alleged misstatements as presented in Plaintiffs' Amended Complaint (Doc. No. 65) and Defendants' Appendix (Doc. No. 69-1), but such differences are not material. All quotations in this Order are presented as they appear in the Amended Complaint unless otherwise noted.

(E.D. Va. 2015), see also Makor Issues & Rts., Ltd. v. Tellabs Inc., 513 F.3d 702, 705 (7th Cir. 2008) (stating that a "mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present"). Indeed, these statements fundamentally concern the present state and capacity of the infrastructure. C.f. Spitzberg v. Houston Am. Energy Corp., 758 F.3d 676, 692 (5th Cir. 2014) (finding that an oil company's statements indicating "confidence in the commercial productibility of the reservoir," were actionable, though forward looking), Hatamian v. Advanced Micro Devices, Inc., 87 F. Supp. 3d 1149, 1157 (N.D. Cal. 2015) (finding that statements concerning the company's present and future chip manufacturing yields were actionable).

Moreover, these statements are not mere corporate puffery. Statements are properly dismissed as puffery if "they are so obviously unimportant . . . that reasonable minds could not differ on the question of their importance." Singer v. Reali, 883 F.3d 425, 440 (4th Cir. 2018). Far from being "obviously unimportant," these statements cut directly to heart of the McDonald's partnership's value proposition: Krispy Kreme could get more product in front of customers using only existing production and distribution infrastructure, thereby increasing profits without significantly increasing costs. By making these statements, Defendants misled investors about a material aspect of the partnership. Thus, the statements are not mere puffery.

Additionally, Plaintiffs' CWs provided evidence establishing that the statements were, in fact, false. One CW stated that Krispy Kreme's production and logistics infrastructure was in a state of disrepair and that "the shops were not equipped to handle the baking volume which led directly to inconsistent delivery." (Doc. No. 65 at 36). Another stated that "[t]here was not enough infrastructure to meet the demand," while yet another stated that Krispy Kreme's

facilities were "disgusting: shops needed complete and expensive overhauls." (Id. at 28, 24–25). In addition to inadequate production, the CWs indicated that Krispy Kreme's existing logistics infrastructure at the time of the McDonald's rollout was not sufficient to handle the increased volume required by the McDonald's partnership. The CW's state that Krispy Kreme had to massively expand its supply of delivery drivers and purchase numerous additional trucks. (Id. at 29); see also (id. at 35–37 (describing additional problems with Krispy Kreme's logistics infrastructure)). Finally, in May 2025, Krispy Kreme announced that it would "fully outsource U.S. logistics" moving forward—a far cry from leveraging an existing system. (Id. at 44). These facts, when interpreted in the light most favorable to Plaintiffs, are adequate to survive the motion to dismiss.

2. Cost and Capital Expenditures

Plaintiffs claim that Defendants downplayed the significant upfront costs required by the McDonald's partnership by making the following allegedly false statements:

- "We typically spend 6% to 7%, 7% to 8% on CapEx, so we're not ramping up CapEx over the next couple years to fund some of the expansion in the US." (Id. at 61).
- "[We are] not subject to capital expenditure commitments or obligations specific to the relationship with McDonald's. We plan to support much of this expansion using existing capacity, and do not expect a significant increase in capital expenditures as a percentage of revenue in 2024. . . . [T]hese capital expenditures support the overall DFD and retail channels and are not directly attributable to, or required by, this agreement." (Id. at 63).
- "The full year guide on EBITDA was updated to reflect the impact of higher logistics costs in the quarter, our intentional decision to accelerate start-up costs, so it's a pull forward versus anything unexpected." (Id. at 70).
- "[T]hese capital expenditures support the overall DFD and retail channels and are not directly attributable to, or required by, the agreement with McDonald's." (Id. at 72).
- "[T]hese capital expenditures support the overall DFD and retail channels and are not directly attributable to, or required by, the agreement with McDonald's. We are not subject to capital expenditure commitments or obligations specific to the relationship with McDonald's." (Doc. No. 69-1 at A-16).

While sometimes forward looking, these statements are best described as mixed present/future statements, and the elements that are not forward looking do not fall within the PSLRA's safe harbor.

While Defendants did acknowledge some expected capital expenses, this does not negate their failure to disclose the full scope of these costs and their direct connection to the McDonald's partnership. According to CW 6 and CW 3, Director of Field Operations Amy Hine developed a "comprehensive analysis of what the McDonald's launches would cost" and presented it to the Board. (Doc. No. 65 at 21–24). According to the CWs, "Hine detailed the magnitude of the required investments, including the specific rationale underlying each component, and provided an analysis across all relevant cost categories, expressing concern about the cost parameters associated with the project." (Id. at 22). Courts have held that when a defendant fails to share the results of an internal analysis that reaches conclusions at odds with those presented to the investing public, such statements are actionable. See In re Computer Scis. Corp. Sec. Litig., 890 F. Supp. 2d at 669 (holding that it is misleading to conceal the contradictory conclusions of an internal review team). Further, Defendants' claim that the increased capital expenditures were not directly tied to the McDonald's expansion are belied by the company later disclosing that "at least $51 million in asset impairments [were] tied directly to the 'termination of the Business Relationship Agreement with McDonald's USA.'" (Doc. No. 65 at 78).

Consequently, these statements are actionable.

3. Consumer Demand and Success of the Partnership, February 2025

Plaintiffs allege that the following statements, made in February 2025, touting the success of the McDonald's rollout were misleading and false when made because Defendants were already aware of untenable costs associated with the expansion and the severe production and logistical deficiencies by that time:

- "[We] remain on track to reach about 6,000 [McDonald's] restaurants by year-end." (Id. at 72).
- "We expect to be in about 6,000 [McDonald's restaurants] by the end of the year and 12,000 by the end of 2026. So that rollout is on track. . . . [T]he feedback from McDonald's is very positive. They tell us it's working well and we're working hard with them to maximize the opportunity, make sure that the launch goes well. . . . [w]ith local marketing, the team at McDonald's is able to raise awareness, make sure that people know it's on the menu, driving very strong demand." (Id. at 73).
- "[T]he feedback from McDonald's has been positive. We're now looking to roll out to . . . 6,000 [McDonald's restaurants] by the end of this year, and indeed 12,000 by the end of next year. So it's an important program for our growth. The doughnuts are freshly made, they are delivered daily from our hub-and-spoke network so they're very similar to what you get in a Krispy Kreme store." (Doc. No. 69-1 at A-16).

By February 2025, the McDonald's rollout had been underway for nearly five months. Defendants claim that these statements are forward looking and thus protected by the safe harbor. While statements that a company is "on track" to meet its goals may be forward looking and thus protected by the safe harbor, such statements are not protected if the speaker knows the statement is false when making it or if the statement does not include adequate cautionary language. See Wochos v. Tesla, Inc., 985 F.3d 1180, 1191–92 (9th Cir. 2021) (statement that defendant was "on track" to achieve goal of producing 5,000 vehicles was forward-looking and not actionable); but see 15 U.S.C. § 78u-5(c)(1) (stating that the safe harbor only applies to forward looking statements that include adequate cautionary language).

The context of the statements and material facts available to Defendants prevent the safe harbor from applying. First, while not conclusive, it is significant that the McDonald's

partnership was permanently "paused" on May 8, 2025, just over two months after Defendants claimed that everything was proceeding as planned. (Doc. No. 65 at 83). The CWs paint a picture of a fundamentally flawed rollout, one that was hampered by inadequate infrastructure and resulted in inconsistent deliveries of a low-quality product which led to an immediate and drastic reduction in demand from McDonald's. (Id. at 34–40). Far from being positioned to expand to 6,000 restaurants by the end of the year, by February 2025, the CWs state that "within the company[,] . . . the partnership was already over." (Id. at 38). Though Defendants claim that implying falsity by the later collapse of the partnership is "fraud by hindsight," Plaintiffs and the CWs provide an adequate factual basis to raise the inference that Defendants were more-likely-than-not aware by February 2025 that Krispy Kreme would be unable to achieve its goals regarding the McDonald's expansion.

Second, the Defendants did not provide meaningful cautionary language. For cautionary language to be meaningful, "the cautionary statements must be substantive and tailored to the specific future projections, estimates[,] or opinions . . . which the plaintiffs challenge." Institutional Invs. Grp. v. Avaya, Inc., 564 F.3d 242, 257 (3d Cir. 2009). Defendants point to a March 2024 warning that the McDonald's deal did "not guarantee Krispy Kreme any particular level of [business unit] deployment, sales, or profits" and "Risk Factors" disclosed in the company's annual reports as sufficient cautionary language. (Doc. No. 69 at 5). These warnings are "vague or blanket (boilerplate) disclaimer[s] which merely warn[] the reader that [an] investment has risks." Institutional Invs. Grp., 564 F.3d at 257. Such general disclaimers are not tailored to Defendants' statements that the rollout was proceeding as planned. Consequently,

they cannot be considered meaningfully cautionary and are "inadequate to prevent misinformation." Id.

Finally, the statements that Krispy Kreme was on track to reach 6,000 restaurants by the end of the year and that consumer demand was strong were related to the current state of the rollout in February 2025. See In re Akorn, Inc. Sec. Litig., 240 F. Supp. 3d 802, 817 (N.D. Ill. 2017) (finding that "on track" conveys the "current state of the integration"). Because these statements were "mixed future/present" statements, they are not protected by the PSLRA's safe harbor provision.

Defendants' statements are also not so vague as to constitute puffery. By February 2025, an investor would "reasonably underst[and]" Defendants' statements as "rest[ing] on a factual basis that justifies them as accurate." See Va. Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1093 (1991). Puffery encompasses statements that are too general for a reasonable investor to rely on. In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 245 (2d Cir. 2016). Statements are not puffery when they constitute "misrepresentations of existing facts" that were made even though the speaker "knew that the contrary was true." Novak v. Kasaks, 216 F.3d 300, 315 (2d Cir. 2000) (holding that Defendants' predictions were actionable when they "stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true"); see also Limantour v. Cray Inc., 432 F. Supp. 2d 1129, 1146 (W.D. Wash. 2006) (finding that statements providing a general timeline for when a product would reach market were actionable).

By February 2025, the McDonald's rollout had been underway for nearly five months and Plaintiffs' CWs allege that Defendants were aware of extensive complaints about product

quality and data showing poor sales. See (Doc. No. 65 at 39, 69, 81). After nearly five months of the partnership, a reasonable investor would understand Defendants' claims that Krispy Kreme was still on track to reach 6,000 McDonald's by the end of the year as informed by internal data and specific enough that an investor could rely on them. Viewing the facts in the light most favorable to Plaintiffs and granting them all reasonable inferences fairly deducible therefrom, by February 2025 Defendants knew that the lofty plans they had for the partnership would not come to fruition, yet they continued to represent to investors that the partnership was on track and expected to meet its goals. As such, the Court finds that the foregoing statements are not mere corporate puffery and denies Defendants' motion to dismiss as it relates to the foregoing statements.

ii. *Scienter*

Defendants argue that Plaintiffs failed to plead a strong inference of scienter because Plaintiffs did not allege that Defendants acted with a motive, actual knowledge, or recklessness. Defendants also argue that the allegations from CWs do not support scienter, and there are more compelling inferences of non-fraudulent intent.

Scienter is adequately pled where "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, Inc., 551 U.S. at 324; Zak v. Chelsea Therapeutics Int'l, Ltd., 780 F.3d 597, 606 (4th Cir. 2015). Allegations need not be "irrefutable, i.e., of the 'smoking gun' genre," nor even be "the most plausible of competing inferences." Tellabs, 551 U.S. at 324. Scienter is pled by setting forth facts "that constitute circumstantial evidence of either reckless or conscious behavior" and "the adequacy of the scienter allegations is to be measured by the facts

collectively alleged in the complaint." Kiken, 155 F. Supp. 3d at 601. Thus, allegations are evaluated "holistically" and afforded "the inferential weight warranted by context and common sense." Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc., 576 F.3d 172, 183 (4th Cir. 2009); see also Ottmann v. Hanger Orthopedic Grp., Inc., 353 F.3d 338, 345–46 (4th Cir. 2003) ("[C]ourts should not restrict their scienter inquiry by focusing on specific categories of facts, such as those relating to motive and opportunity, but instead should examine all of the allegations in each case to determine whether they collectively establish a strong inference of scienter."). As such, "the absence of a motive allegation is not fatal." Tellabs, 551 U.S. at 325; accord Ottmann, 353 F.3d at 346.

1. *Motive*

Defendants argue that Plaintiffs fail to state a motive and that this failure should count strongly against finding scienter. Defendants are correct that Plaintiffs do not allege that Defendants were motivated by insider trading or personal gain. Plaintiffs, instead, allege that before the McDonald's deal was announced, Krispy Kreme's business was contracting and "Defendants were scrambling for a way to show that they could somehow reverse the negative trajectory." (Doc. No. 65 at 20). Instead of doing the hard work to make the McDonald's deal a success, Plaintiffs allege that Defendants rushed into the deal without "perform[ing] adequate due diligence," hoping to "save the company" and their jobs. (Id. at 20–21). After rushing into a flawed deal, Plaintiffs claim that Defendants plowed ahead and continued to represent to investors that everything was progressing according to plan despite significant evidence to the contrary. Notably, when the McDonald's deal was cancelled, several of the individuals behind it, including Defendant Ashukian, were fired. (Id. at 46); see San Antonio Fire & Police Pension

Fund v. Dentsply Sirona, Inc., 732 F. Supp. 3d 300, 322 (S.D.N.Y. 2024) (holding that "house-cleaning" is circumstantial evidence of scienter). These facts, when interpreted in the light most favorable to Plaintiffs, support the inference that Defendants agreed to a fundamentally flawed contract, knew early on that it was destined for failure, and continued to make public statements touting the partnership as a success to save face and their jobs. This inference is at least as compelling as the inference of non-fraudulent intent.

2. *Recklessness or Conscious Behavior*

Defendants argue that Plaintiffs are asking the court to infer fraud by hindsight, and that Plaintiffs pled no facts concerning what Defendants knew when they made the alleged misstatements. In doing so, Defendants contend that Plaintiffs have failed to plead scienter. See Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1254 (11th Cir. 2008); Yates, 744 F.3d at 885.

However, Plaintiffs' Amended Complaint includes allegations, supported by numerous CWs, that Defendants were aware of the serious operational shortcomings that plagued Krispy Kreme's manufacturing and logistics network at the start of the McDonald's partnership. For example, Plaintiffs allege that Amy Hine presented an internal report that flagged the enormous upfront costs of the McDonald's partnership to the Krispy Kreme Board of Directors in 2023. (Doc. No. 65 at 22). Further, Plaintiffs allege that the large capital investments necessary to remediate Krispy Kreme's manufacturing facilities and bring its distribution network to scale were known to Defendants because all rollout expenses were subject to Defendants' approval. (Id.). Plaintiffs additionally allege that severe problems with the company's manufacturing facilities and infrastructure were known internally and that concerns about the company's ability

to execute the deal using existing infrastructure were shared with senior executives who reported directly to Defendants Charlesworth and Ashukian. (Id. at 22–24, 27–28).

This is to say nothing of Defendants' knowledge of the true nature of the McDonald's rollout by February 2025. Plaintiffs' CWs claimed that Defendants had "real time access to sales data and full access to information concerning how well the national partnership was going." (Id. at 33). Defendants stated on Nov. 7, 2024, that "we can track the deliveries. We can track any [doughnuts] that are unsold. And, indeed, we can see that they clearly sold throughout the day." (Id.). One CW alleges that Defendant Charlesworth was so familiar with the real-time sales data system that in meetings with investors "he would 'pull his phone out' and show precisely 'what came in on what day and what went in and out.'" (Id. at 34).

Interpreted in the light most favorable to Plaintiffs, these facts suggest that Defendants were aware of, or at least recklessly disregarded, information about Krispy Kreme's operational deficiencies, the vast capital expenditures required to execute the McDonald's partnership, and the success (or lack thereof) of the rollout by February 2025. Thus, Plaintiffs met their burden by pleading a strong inference of scienter.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss for Failure to State a Claim (Doc. No. 67).

## ORDER

**IT IS, THEREFORE, ORDERED** that Defendants' Motion to Dismiss for Failure to State a Claim (Doc. No. 67) is **GRANTED IN PART AND DENIED IN PART**.

Signed: August 26, 2026

Max O. Cogburn Jr.
United States District Judge

-31-